1   JAY R. WEILL (State Bar No. 75434)
    E-Mail:        *jweill@sideman.com*
2   STEVEN M. KATZ (State Bar No. 164617)
    E-Mail:        *skatz@sideman.com*
3   EMILY J. KINGSTON (State Bar No. 184752)
    E-Mail:        *ekingston@sideman.com*
4   SIDEMAN & BANCROFT LLP
    One Embarcadero Center, Eighth Floor
5   San Francisco, California 94111-3629
    Telephone:     (415) 392-1960
6   Facsimile:     (415) 392-0827

7   **Attorneys for Petitioners**
    CANDYCE MARTIN 1999 IRREVOCABLE TRUST and
8   CONSTANCE GOODYEAR 1997 IRREVOCABLE TRUST,
    PARTNERS OTHER THAN THE TAX MATTERS PARTNERS

9

10              **IN THE UNITED STATES DISTRICT COURT**

11             **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

12                       **OAKLAND DIVISION**

13   CANDYCE MARTIN 1999 IRREVOCABLE          **LEAD CASE NO. CV 08 5150 (PJH)**
     TRUST, A PARTNER OTHER THAN THE          (Consolidated with CV 08 5151)
14   TAX MATTERS PARTNER,
                                              **PETITIONERS' POST-TRIAL**
15              Petitioner,                   **PROPOSED FINDINGS OF FACT**
                                              **AND CONCLUSIONS OF LAW**
16        v.

17   THE UNITED STATES OF AMERICA,            Bench Trial:  August 22 - 30, 2011
                                              Place:        Courtroom G, 15th Fl.
18              Respondent.                   Judge:        Hon. Phyllis J. Hamilton

19   _____

20         Petitioners CANDYCE MARTIN 1999 IRREVOCABLE TRUST and CONSTANCE

21   GOODYEAR 1997 IRREVOCABLE TRUST, PARTNERS OTHER THAN THE TAX

22   MATTERS PARTNERS ("Petitioners") hereby respectfully submit these Post-Trial Proposed

23   Findings Of Fact And Conclusions Of Law, pursuant to the Court's request at the conclusion of

24   the Trial in this matter, which occurred from August 22, 2011 through August 30, 2011, and

25   request that the Court adopt them as the Court's order in this case.

26

27

28

SIDEMAN & BANCROFT LLP
LAW OFFICES
ONE EMBARCADERO CENTER, 8TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3629

# PROPOSED FINDINGS OF FACT

### A.    Introduction

1.    This is a consolidated action[1] contesting the adjustment of certain partnership items proposed by the Internal Revenue Service ("IRS") in Notices of Final Partnership Administrative Adjustment ("FPAAs") dated June 19, 2008, issued to First Ship 2000-A, LLC ("2000-A") for the taxable year 2000, and to First Ship, LLC ("First Ship") for the taxable year 2001. The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1346(e) and 26 U.S.C. § 6226(b)(1) (hereinafter referred to by Code §). Stipulation of Facts ("Stip.") ¶ 1.

2.    In the FPAA issued to 2000-A, the IRS proposed that various items on its 2000 partnership return be disallowed, adjusted, or redetermined contending, *inter alia in relevant part,* that the claimed losses fail under several sections of the Internal Revenue Code and Treasury Regulations, that 2000-A was formed and availed of solely for the purposes of tax avoidance, and that the transactions reflected on its 2000 partnership return lacked economic substance and were without a legitimate business purpose. In addition, the IRS proposed that certain accuracy related penalties be assessed with respect to all underpayments of tax attributable to the proposed adjustments. Stip. ¶ 20; Stip. Ex. 9 (Joint Exhibit ("Jt. Ex.") 304).[2]

3.    In the FPAA issued to First Ship, the IRS proposed that a deduction for various fees be disallowed because it related to transactions that lacked economic substance and were without legitimate business purpose. In addition, the IRS proposed that certain accuracy related penalties be assessed with respect to all underpayments of tax attributable to the proposed adjustments. Stip. ¶ 22; Stip. Ex. 10 (Jt. Ex. 305).

---

[1] This action was consolidated on May 22, 2009, with the case of *Constance Goodyear 1997 Irrevocable Trust et al. v. United States of America,* Case No. CV-08-5151 (PJH), for all purposes.

[2] The parties submitted a document entitled Stipulated Facts and Exhibits with the Court during the course of the trial, which had previously been filed with the Court on November 4, 2009, in conjunction with the Petitioners' Motion for Partial Summary Judgment on the Statute of Limitations issue. The exhibits referenced therein were identified as Exhibits 1 though 10. These exhibits correspond to the parties' Joint Exhibits 296, 297, 298, 299, 300, 301, 302, 303, 304 and 305, respectively.

SIDEMAN & BANCROFT LLP
LAW OFFICES
ONE EMBARCADERO CENTER, 8TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111

4. The Petitioners claim that the IRS erred in proposing any adjustments to the 2000 tax return of 2000-A and the 2001 tax return of First Ship because: (a) the proposed adjustments are barred by the statute of limitations; (b) the transactions complied with the Internal Revenue Code; and (c) the transactions had economic substance and business purpose.

5. The Petitioners further claim that the IRS erred in proposing to assess any accuracy related penalties, because: (a) the substantial understatement penalty does not apply as there was substantial authority for the tax positions taken; (b) the negligence penalty does not apply because there was no negligence or disregard of rules or regulations; (c) the valuation misstatement penalty does not apply because there was no valuation misstatement; and (d) any underpayment was made with reasonable cause and good faith and the taxpayers reasonably relied on the advice of professionals.

**B.   History of the Chronicle Publishing Company and the deYoung Family**

6. Michael deYoung ("M.H. deYoung") and his brother, Charles deYoung, founded the San Francisco Chronicle in 1865. Trial Transcript ("Tr."), p. 48:21-23; Stip. ¶ 23.

7. Charles deYoung was shot and killed in his office in the Chronicle in 1880 by a disgruntled politician who shot him over an editorial Charles deYoung had written.  Tr. p. 48:23-25; p. 307:13-15.

8. At the time of his death, Charles deYoung wasn't married and had no children, and sole ownership of the San Francisco Chronicle passed to M.H. deYoung. Tr. pp. 48:25-49:1; p. 307:15-17.

9. In 1906, M.H. deYoung incorporated the Chronicle Publishing Company ("CPC") as a Nevada corporation . Stip. ¶ 23.

10. M.H. deYoung had five children, one boy, Charles, who died of Typhus with no children, and four girls, Helen Cameron, who had no children, and Constance Tobin, Phyllis Tucker, and Kathleen Thieriot, each of whom had children. Tr. p. 49:1-6; p. 307:15-17.

11. M.H. deYoung placed the ownership of CPC into trust for the benefit of his five children.  Tr. p. 307:20-21.

12. M.H. deYoung ran CPC until his death in 1925. Tr. p. 49:16.

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 8TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111

SIDEMAN & BANCROFT LLP
LAW OFFICES
ONE EMBARCADERO CENTER, 8TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111

13.     Upon the death of M.H. deYoung, Helen Cameron's husband, George Cameron became the C.E.O. or President of CPC, and ran CPC until his death in 1955. Tr. p. 49:17-24. During his tenure, CPC acquired one of the very first television stations, KRON, and then other properties, including book publishing. Tr. p. 49:20-23.

14.     Upon George Cameron's death in 1955, Katheen Thieriot's son, Charles, took over control of CPC, and ran the company until he died in 1977.  Upon his death, his son, Richard, became the C.E.O.  Tr. p. 49:24-50:4.

15.     Michael deYoung's trust for the benefit of his five children did not end until 1988, when his last child, Phyllis Tucker, died. Tr. p. 307:21-24.

16.     Constance Tobin had three children, Patricia, Michael and Consuelo. Tr. p. 49:6-9. Consuelo Tobin Martin (hereinafter occasionally referred to as "CTM") is the mother of Candyce Martin, Francis A. Martin, III, Constance Martin Goodyear, Priscilla Martin Tamkin, and Helen Spalding (Consuelo Tobin Martin and her five children are hereinafter collectively referred to as the "Martin family."  Consuelo Tobin Martin's five children are hereinafter collectively referred to as the "Martin siblings"). Tr. p. 48:10-14.

17.     During Richard Thieriot's tenure as C.E.O., Francis Martin was the head of Chronicle Broadcasting Company.  Richard Thieriot's cousin, Peter Thieriot, was the head of CPC's Real Estate company.  They retained these roles until 1993, when Phyllis Tucker's sole surviving child, Nan McEvoy, became Chairman of the CPC Board, and brought in John Sias as C.E.O., and  together they did some "housecleaning" by firing Richard Thieriot, Francis Martin, Peter Thieriot, and others who had previously held positions at CPC. Tr. pp. 50:14-51:3.

18.     The other deYoung family members who were shareholders of CPC, retaliated and, in 1995, Nan McEvoy was fired.  She later sued the company for age discrimination and lost. Tr. p. 51:4-5.

19.     In 1995, CPC, which had before then elected to be treated as a Delaware S Corporation, owned largely four businesses: (a) the newspaper business, including the San Francisco Chronicle, the Worcester paper, and the Pantagraph paper in Illinois; (b) a television

SIDEMAN & BANCROFT LLP
LAW OFFICES
ONE EMBARCADERO CENTER, 8TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111

1  business, including television station KRON and a couple of other stations; (c) a cable business;

2  and (d) Chronicle Books. Tr. p. 49:21-22; pp. 309:24-310:3.

3       20.    As of the year 1999, the Martin siblings collectively owned through various trusts

4  or outright, 630,000 shares (or 16.67%) of the stock of CPC.  Stip. ¶ 24; Joint Exhibit ("Ex.") 25.

5  Each of the Martin siblings owned an equal amount of 126,000 CPC shares, either through various

6  trusts or outright. Tr. pp. 54:25-55:10; pp. 313:24-314:1; Ex. 25.

7       21.    Of the 630,000 shares of CPC Stock held by the Martin siblings, 380,500 shares

8  were held in fourteen (14) trusts related to the Martin family (the "14 Martin Family Trusts").

9  Stip. ¶ 25; Ex. 25.

10       22.    The 14 Martin Family Trusts included five non-grantor trusts that Consuelo Tobin

11  Martin created in 1988 for the benefit of each of her five children as the income beneficiaries, with

12  her grandchildren as the remaindermen (the "1988 Trusts"). Tr. p. 52:17-21; Stip. ¶ 5.a.; Ex. 25.

13  Consuelo Tobin Martin placed 23,100 shares of CPC stock into each of the five 1988 Trusts. Tr. p.

14  53:20-23; p. 259:17-19; p. 311:9-13; Ex. 25.  The 1988 Trusts included:

15          a.    The CTM Children's Trust FBO Candyce Martin (1988 Trust);

        b.    The CTM Children's Trust FBO Francis Martin, III (1988 Trust);

16          c.    The CTM Children's Trust FBO Constance Goodyear (1988 Trust);

        d.    The CTM Children's Trust FBO Priscilla Tamkin  (1988 Trust); and

17          e.    The CTM Children's Trust FBO Helen Spalding (1988 Trust).

18  Stip. ¶ 5.a.; Ex. 25.

19

20       23.    The 14 Martin Family Trusts also included five grantor trusts that Consuelo Tobin

Martin created for the benefit of her five children in 1999 (the "1999 Trusts"). Tr. p. 54:18-24; p.

21  310:22-23; p. 311:14-16; Stip. ¶ 26.  Consuelo Tobin Martin placed 26,000 shares of CPC stock

22  into each of the five 1999 Trusts. Tr. pp. 54:25-55:2; p. 259:20-22; p. 311:15-23; Stip. ¶ 26; Ex.

23  25.  The 1999 Trusts included:

24          a.    CTM 1999 Trust FBO Margaret Candyce Martin;

25          b.    CTM 1999 Trust FBO Francis Augustus Martin, III;

        c.    CTM 1999 Trust FBO Constance Martin Goodyear;

26          d.    CTM 1999 Trust FBO Priscilla Martin Tamkin; and

27          e.    CTM 1999 Trust FBO Helen Martin Spalding;

28  Stip. ¶ 26; Ex. 25.

24.     The 14 Martin Family Trusts also included four trusts created by three of Consuelo Tobin Martin's children for the benefit of their own children, into which they placed a varying numbers of shares of CPC stock they had previously owned outright.  These trusts included the following into which the reflected amounts of shares were contributed:

    a.    The Francis A. Martin III 1997 Irrevocable Trust, 50,000 CPC shares;
    b.    The Francis A. Martin III 1998 Irrevocable Trust, 25,000 CPC shares;
    c.    The Constance M. Goodyear 1997 Irrevocable Trust, 40,000 shares; and
    d.    The Candyce Martin 1999 Irrevocable Trust, 20,000 shares.

Stip. ¶ 27; Ex. 25; Tr. p. 310:23-25.

25.     In addition to the CPC stock, certain of the 14 Martin Family Trusts also owned, directly or indirectly, stock in Liberty Media Group ("Liberty Media"), AT&T, and TCI Satellite. Stip. ¶ 34.

26.     Peter M. Folger, a management labor lawyer who co-founded the San Francisco law firm, Folger, Levin & Kahn, LLP, was appointed to act as trustee of the 14 Martin Family Trusts.  Tr. pp. 53:24-54:1; p. 258:10-20; pp. 258:24-259:12; p. 318:9-10; p. 687:15-17; Ex. 25.

27.     Mr. Folger had graduated from Stanford University and obtained his law degree from the University of San Francisco law school.  Tr. p. 258:4-8.

28.     Mr. Folger had been a long time close family friend of the Martin family and Martin siblings. Tr. p. 54:2-7; p. 258:22-23; p. 318:11-15.  His parents had been friends of Consuelo Tobin Martin and her husband. *Id.*  Consuelo Tobin Martin wanted someone of her children's generation that she felt comfortable with. Tr. p. 54:15-17.  Mr. Folger had "some really wonderful personal characteristics that make him a great trustee for everybody.  No one feels that he's closer to and would represent one sibling's interest over another.  He listens to everybody. He takes everybody's views into account.  And that's really a rare quality." Tr. p. 318:15-21.  He was a calming influence, a very nice man, who relied on a consensus among the beneficiaries. Tr. p. 91:16-25.

29.     Mr. Folger was also the Trustee of the trusts of Richard Thieriot, including the Richard T. Thieriot 1997 Trust and the Thieriot Family 1999 Irrevocable Trusts.  Richard Thieriot was a cousin of the Martin siblings and also a shareholder of CPC.  Ex. 25; Tr. 279:18-22.

SIDEMAN & BANCROFT LLP
LAW OFFICES
ONE EMBARCADERO CENTER, 8TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111

1      30.     From 1988 through 1998, Mr. Folger's position as Trustee required only that he

2   periodically attend CPC's annual meetings and give stock voting proxies to the Trusts'

3   beneficiaries. Tr. pp. 259:23-260:7.

4      31.     Mr. Folger generally did not receive a fee for his services as trustee, except for a

5   period when he received compensation at an hourly rate for his time spent dealing with

6   reformation issues surrounding the five 1988 Trusts. Tr. p. 65:1-3; p. 259:14-16; pp. 260:17-261:4.

7      32.     On June 2, 1999, Consuelo Tobin Martin formed LMGA Holdings, Inc. ("LMGA

8   Holdings") as a Delaware S Corporation. Prior to November 1, 2000, Francis Martin was the

9   director of LMGA Holdings, and Peter Folger was a corporate officer.  Tr. pp. 287:23-288:19; Ex.

10  1, pp. 110, 111.  On November 1, 2000, Francis Martin resigned as President of LMGA Holdings

11  and on November 2, 2000, Peter Folger became President of LMGA Holdings. Tr. pp. 287:23-

12  288:19; Ex. 1, pp. 110, 111.

13     33.     On June 15, 1999, each of the five 1999 Trusts purchased a 20% share of LMGA

14  Holdings.  Stip. ¶¶ 8, 29.

15     34.     On June 15, 1999, and June 16, 1999, 4,130,728 shares of Liberty Media stock and

16  $13.8 million in cash were transferred to LMGA Holdings. Stip. ¶ 30.

17     35.     First Ship was formed as a California limited liability company on March 6, 2000,

18  and remains in existence today. Stip. ¶¶ 3, 15; Stip Ex. 1 (Jt. Ex. 296).

19     36.     First Ship's members (or partners, for tax purposes) were the 14 Martin Family

20  Trusts.  Stip. ¶ 4; Stip. Ex. 2 (Jt. Ex. 297).

21     37.     On October 10, 2000, 2000-A was formed as a California limited liability

22  company. Stip. § 6, Stip. Ex. 3 (Jt. Ex. 298).  2000-A had three partners with the following

23  percentage holdings:  First Ship (77.03%); Fourth Ship, LLC ("Fourth Ship") (22.22%); and

24  LMGA Holdings (0.75%). Stip. ¶ 6; Stip. Ex. 4 (Jt. Ex. 299).

25     38.     LMGA Holdings was the managing member of 2000-A.  Stip. Ex. 4 (Jt. Ex. 299).

26  As President of LMGA Holdings, Mr. Folger had the authority to act as the managing member of

27  2000-A.

28

SIDEMAN & BANCROFT LLP
LAW OFFICES
ONE EMBARCADERO CENTER, 8TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111

39.     Fourth Ship was formed as a California limited liability company on October 12, 2000.  Fourth Ship had nine partners: (1) the five 1988 Trusts; (2) the Francis Martin 1997 Trust; (3) the Francis Martin 1998 Trust; (4) the Constance Goodyear 1997 Trust; and (5) the Candyce Martin 1999 Trust. Stip. ¶ 7.

**C.     Sale of CPC**

40.     After a great deal of turmoil among the CPC owners caused the deYoung family's relations to deteriorate to such an extent that no one could get along, on June 16, 1999, CPC's board of directors announced its decision to accept bids for the sale of all of CPC's assets. Tr. p. 52:2-7; p. 308:19-21; Stip. ¶ 31.

41.     At this time, Helen Spalding was a member of the CPC board of directors.  She had been on the board since 1994, and remained a board member until the final liquidation of CPC. Tr. p. 51:16-24; p. 694:14-23.

42.     CPC completed the sale of substantially all of its business assets in 1999 and 2000. Stip. ¶ 31.  The total final sales price for all of the CPC assets was $2,119,955,144, comprised of cash equal to $479 per share of CPC stock, and shares of Young Broadcasting, Inc. stock. *Id.* CPC made large distributions of cash and securities to its shareholders. *Id.*

43.     After the sale of CPC's assets and distribution of the proceeds to its shareholders, the 14 Martin Family Trusts held the following assets:

| Asset | Number of Shares | Value |
|---|---|---|
| Cash | NA | $121,452,146 |
| Cash in Escrow | NA | $    3,019,841 |
| Liberty Media | 5,435,370 | $  97,496,949 |
| Young Broadcasting | 391,444 | $  11,376,341 |
| AT&T | 267,533 | $    5,885,726 |
| TCI Satellite | 33,785 | $       221,714 |
| Total | | $239,452,518 |

Stip. ¶ 34.

**D.     Recontribution Agreement**

44.     In the midst of the efforts to sell CPC's assets, its board of directors realized that there were certain types of liabilities that might arise after the proceeds from the sale of CPC's

SIDEMAN & BANCROFT LLP
LAW OFFICES
ONE EMBARCADERO CENTER, 8TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111

1   assets had been distributed to its shareholders, and that the responsibility to cover such liabilities

2   could fall first and foremost to the board of directors as individuals to personally cover the

3   liabilities and that such liabilities might be unlimited.  Tr. pp. 57:8-58:22; 696:4-10.  These

4   potential future liabilities included but were not limited to contractual matters, buyer's remorse,

5   union or worker's contract issues, environmental issues, and CPC's status as a Subchapter S

6   corporation, and it was feared that these potential liabilities could exist long into the future.  Tr.

7   pp. 57:8-58:22; p. 309:10-19; pp. 314:12-315:9; pp. 597:20-598:9.

8          45.    As a director, Ms. Spalding understood that her potential exposure for CPC

9   liabilities was unlimited and it was therefore very important that there be some mechanism

10  whereby all shareholders would share these possible responsibilities equitably.  Tr. p. 696:4-10.

11         46.    In order to more equitably share the responsibility for these potential future

12  liabilities amongst the CPC shareholders, the board of directors discussed with the shareholders

13  and ultimately caused to be prepared "The Chronicle Publishing Company Recontribution

14  Agreement" (the "Recontribution Agreement"), which governed shareholder responsibility for

15  potential future CPC debts or liabilities. Ex. 25; Tr. pp. 54:24-55:2; p. 56:6-10, 12-17; p. 62:11-19.

16         47.    The Recontribution Agreement provided that CPC shareholders would contribute

17  on a pro rata basis funds to cover any excess liabilities incurred by CPC, and would indemnify

18  CPC and other shareholders at least to the extent of the distributions they had received, and

19  possibly beyond the extent of their distributions. Ex. 25; Tr. p. 136:4-5; p. 351:11-22.

20         48.    On August 10, 2000, as a prerequisite to receiving a distribution of the CPC sales

21  proceeds and securities, each CPC shareholder, including the 14 Martin Family Trusts, was

22  required to sign the Recontribution Agreement. Ex. 25; Tr. pp. 54:24-55:2; p. 56:6-10, 12-17; p.

23  350:1-4.

24         **E.    Concerns Arising from Sale of CPC**

25         49.    In light of the distribution of the CPC sales proceeds and securities, the Martin

26  family and the 14 Martin Family Trusts were faced with several urgent financial and non-financial

27  concerns. Tr. pp. 308:23-309:19; pp. 314:6-318:8.

28

SIDEMAN & BANCROFT LLP
LAW OFFICES
ONE EMBARCADERO CENTER, 8TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111

50.     The first concern they faced was managing the ongoing potential exposure to excess CPC liabilities faced by its shareholders pursuant to the Recontribution Agreement.  The Recontribution Agreement increased the need of the Martin family and the 14 Martin Family Trusts for asset conservation and a mechanism for pooling family and trust assets to ensure, to the extent possible, each member paid no more than his or her fair share of any potential excess future CPC liabilities. Ex. 25; Tr. pp. 54:24-55:2; p. 56:6-10, 12-17; p. 60:9-15; p. 62:11-19; p. 135:13-24; pp. 141:18-142:8; 261:15-21; 262:6-17.

51.     The potential future CPC liabilities would extend many years into the future, until various state and federal statutes of limitation had expired.  Tr. pp. 87:18-88:11.

52.     In addition to several other important issues arising under the Recontribution Agreement, one of the major issues that could have caused a recontribution of assets by the CPC shareholders was a possible revocation of CPC's "Subchapter S" status.  Tr. p. 79:15-19.

53.     CPC had elected "Subchapter S" status  and was a "Subchapter S" corporation at the time of the sale.  Tr. p. 80:11-13.

54.     Subchapter S of the Internal Revenue Code, 26 U.S.C. §§ 1361 to 1379, allows a single tax on the shareholders of a corporation upon the distribution of income, as opposed to the double taxation present with a "C" corporation, first at the corporate level and then again at the shareholder level. Tr: p. 79:15-19; p. 137:15-19; pp. 137:25-138:6.

55.     There are certain eligibility requirements in order to elect and maintain "Subchapter S" status, and problems as to eligibility might not surface for years. Tr. pp. 79:19-80:7; pp. 138:12-139:10; p. 271:8-17; pp. 314:19-315:25.  For example, CPC's Subchapter S status could have been revoked: (a) if a non-US citizen acquired shares; (b) if the maximum number of shareholders were exceeded through the death of one of the living shareholders who had a large number of children; or (c) if the wrong kinds of trusts were shareholders. Tr. pp. 314:12-315:6; p. 353:1-8.

56.     If CPC's Subchapter S status had been revoked for any of these reasons, the IRS could have gone back and taxed CPC as a C corporation and then taxed the shareholders again as recipients of dividends and the sales proceeds. Tr. p. 80:14-20; p. 137:15-19; pp. 135:25-138:6; p.

PETITIONERS' POST-TRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

315:6-14.  This could have caused the Martin family and the 14 Martin Family Trusts to become jointly and severally liable for what could be a colossal tax owing at the corporate level at a time when CPC no longer had the assets.  Tr. pp. 138-12-139:10.  Given CPC's $2 Billion value at the time of sale, the extent of this additional tax liability just on the sale alone could have been more than $800 Million. Tr. p. 352:5-13.

57.     In fact, one of these possibilities nearly happened.  One of the Martin family cousins, Bob Thieriot, discovered he had brain cancer about three months before he died.  He had established a number of unqualified trusts.  At the last moment, when his brother, Peter Thieriot, who had worked for CPC, discovered the nature of these trusts, Bob Thieriot agreed to make changes to the trusts so that they would qualify under the Subchapter S rules at his death. Tr. p. 315:14-25.

58.     The Martin family and the 14 Martin Family Trusts had no way of knowing or controlling what other CPC shareholders might have done.  Tr. p. 314:15-18.

59.     In light of a possible revocation of CPC's Subchapter S status, which was a very real concern and could have caused chaos, the Martin family and the 14 Martin Family Trusts determined to preserve a portion of their distributions and hold them in a pooled fashion until after the statute of limitations on the Subchapter S issue had expired. Ex. 25; Tr. pp. 54:24-55:2; p. 56:6-10, 12-17; p. 62:11-19; p. 135:13-24; p. 139:12-21; p. 271:13-17; p. 352:20-22.

60.     The second concern the Martin family and the 14 Martin Family Trusts faced was dealing with and reforming the ambiguous distribution provisions of the five 1988 trusts, which held a large percentage of the Martin family's assets.  There was an urgent need to clarify the terms of distribution to beneficiaries upon the death of one of the Martin siblings.  The remaindermen of the trusts were comprised of the 10 grandchildren of Consuelo Tobin Martin and the five 1988 Trusts provided that they receive equally on a pro rata instead of per stirpes basis. This was not a problem while the Trusts held simply CPC shares.  But, when those shares were converted to cash upon the sale of CPC, distribution under the Trusts in their then current form became extremely difficult.  Tr. p. 75:12-16; p. 76:2-9; pp. 136:12-137:10; pp. 270:24-271:7; p. 312:3-8; pp. 316:9-318:5.

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 8TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111

PETITIONERS' POST-TRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

61.     In 1998 or 1999, the five 1988 Trusts had previously been revised in order to eliminate a provision that prohibited inheritance by an adopted child.  Richard Sideman, a Harvard Law School Graduate, a holder of a Masters in Tax from NYU, and a co-founder of the San Francisco law firm Sideman & Bancroft, LLP, who had worked with the Martin family in 1991, when he was engaged to assist Consuelo Tobin Martin with respect to a gift tax issue, was further engaged again in 1998 or 1999, in order to assist the family in this first revision. Tr. p. 53:4-16; pp. 80:25-81:71; p. 123:3-5; pp. 123:24-124:1; p. 127:7-16; p. 128:13-18.

62.     Reformation was a complicated and time consuming process requiring extensive analysis as to potential beneficiary scenarios, and obtaining a probate court order and an IRS private letter ruling, all of which finally concluded in 2005.  Tr. pp. 142:24-143:1; pp. 161:21-163:24; Exs. 322, 323, 324, 325.

63.     The uncertain status of these trusts in the interim affected the Martin family's and the 14 Martin Family Trusts' investment decisions.  In particular, given the complicated legal tontine created by the Trusts' provisions, and to eliminate the possibility of a conflict of interest between the trustee and unexpected beneficiaries, all of the 1988 Trusts had to be managed as a unit.  In addition, Trust assets needed to be completely pooled in order to assure there would be total equality for known and potentially unknown beneficiaries until the 1988 trusts could be clarified. Tr. p. 53:4-10; 75:12-16; p. 76:2-9; pp. 136:12-137:10; p. 142:9-11; pp. 270:24-271:7; p. 275:13-21; p. 335:8-11.

64.     The third concern the Martin family and the 14 Martin Family Trusts faced was the volatility of the Martin family's and the 14 Martin Family Trusts' investments. The Martin family and the 14 Martin Family Trusts had received a large amount of cash and stock from the sale of CPC's assets.  These assets were held by the trusts and there were interests of both income beneficiaries and remaindermen to be addressed.  Keeping the funds in cash would not protect the interests of the remaindermen in light of inflation or altered markets.  In addition, management of the stock also was a prime consideration. Tr. pp. 140:20-141:8.

65.     In light of these potential challenges, and moreover because it was a prudent thing to do, the Martin family's and Trusts' holdings in cash were converted to equities. Tr. p. 90:10-14; pp. 140:24-141:8; pp. 275:22- 276:15; p. 464:4-8; p. 607:19-22.

**F.    <u>Arthur Anderson</u>**

66.     While the family was beginning to grasp the enormity if its various concerns, in late 1998 or 1999, in anticipation of the CPC sale, Arthur Anderson, LLP ("AA"), at that time the public accounting firm for both CPC and the Martin Family and the various trusts, approached Francis Martin with a proposal to address the liabilities concerns that also potentially had some tax benefits. Tr. pp. 127:24-128:4; pp. 129:24-130:11; p. 130:7-11; p. 130:19-22; p. 320:5-11; p. 598:11-16.

67.     Because of their prior work for Consuelo Tobin Martin and their work on the first reformation of the five 1988 Trusts, Richard Sideman and his firm, Sideman & Bancroft, LLP, were well known to the Martin family. Tr. p. 53:4-16; pp. 67:24-68:4; pp. 80:25-81:71; p. 127:7-16; p. 128:13-18; p. 598:19-22.  As such, at the request of his siblings, Mr. Martin engaged Richard Sideman, briefed him about the family's many concerns, and requested that he meet with AA in order to learn about and independently review its proposal. Tr. p. 59:6-24; p. 63:11-15; pp. 127:24-128:4; p. 129:24-130:11; pp. 130:19-131:1; p. 262:18-22; p. 319:4-9; p. 589:11-16; pp. 597:9-600:14.

68.     Mr. Sideman's job was to look at AA's proposal and give independent advice to the Martin family and Mr. Folger as trustee of the 14 Martin Family Trusts.  Tr. pp. 130:24-131:1; p. 270:20-23.  He was also to address the family's many concerns arising from the CPC sale and to find a way to help them manage and potentially mitigate their potential exposure under the Recontribution Agreement.  Tr. p. 319:11-16; 598:11-16.

69.     Mr. Sideman had not known Mr. Folger prior to this time, but came to learn that he was a contemporary of the Martin siblings, and a childhood friend of Mr. Martin.  Tr. p. 131:3-14.

70.     Mr. Sideman and his partner, Kristina Harrigan, met with people from AA, who made a chalkboard or large easel presentation; no written proposal was presented.  Tr. p. 132:6-13.

PETITIONERS' POST-TRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 8TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111

SIDEMAN & BANCROFT LLP
LAW OFFICES
ONE EMBARCADERO CENTER, 8TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111

71.     After their meeting with AA and further review of its proposal, Mr. Sideman and Ms. Harrigan recommended against it.  Tr. p. 132:2-3; p. 273:9-12.  They had come to the conclusion that there had been misleading statements by AA that were material and important. Tr. p. 247:2-8.  Mr. Sideman and Mr. Folger found the proposal inappropriate and unworkable and did not like it.  Tr. p. 320:15-23.  Moreover, AA's proposal was not economically viable and would not achieve the goals of the Martin family and the 14 Martin Family Trusts.  Tr. p. 324:21-22; p. 462:17-19.  The AA proposal was never close to completion. Tr. pp. 215:24-216:1.

72.     Ultimately, the family lost confidence in AA and terminated its services.  In addition, Mr. Folger as trustee for the 14 Martin Family Trusts, terminated AA's services for the Trusts.  Tr. p. 133:15-16; p. 285:12-23; p. 321:4-14; Ex. 105.

### G.     Development of the Joint Investment Transaction

73.     One component of the AA proposal had been a hedging transaction.  A hedge was of some interest to the Martin family and the 14 Martin Family Trusts, as they already had a large portfolio of stock in the market and had been further advised by JP Morgan, their long time investment bankers, to invest the large amount of the cash distributions they had received or expected to receive from the CPC sale into the equity market. Tr. p. 90:2-11; p. 326:4-8; p. 462:17-23; p. 464:4-8; pp. 605:25-606:1; p. 607:19-22.  They were interested in maximizing the benefits from potential increases in the market while at the same time insuring themselves against a possible decrease in the market Tr. 144:4-19; pp. 489:15-490:16; pp. 606:9-607:14. Recognizing that the particular hedge transaction in the AA proposal did not have economic viability and would not achieve the family's economic objectives, Mr. Sideman sought an expert in economic modeling to design or approve an economically viable options transaction that would both maximize the potential upsides and mitigate the potential downsides in the market.  Tr. pp. 143:8-144:19; p. 189:8-10; p. 236:10-11; pp. 248:17-249:24; p. 462:17-19.

74.     Mr. Sideman was directed by Mukesh Bajaj, an economics and financial expert with whom he'd previously worked, to Mark Rubinstein, an Economics Professor at the Haas School of Business at the University of California, Berkeley, who has an economics degree from Harvard University, an MBA from Stanford University, a PhD in Finance from UCLA, and who is

1    an expert on derivatives and portfolio structures. Tr. pp. 82:25-83:9; pp. 143:15-144:1; p. 150:24;

2    p. 703:7-23. Mr. Rubinstein, who was considered by investment banks to be the "godfather of

3    derivatives," along with two other professors, developed the "binomial option pricing model,"

4    which is widely used to value options. Tr. pp. 385:23-386:5; pp. 704:15-705:22.

5        75.    On April 11, 2000, Mr. Sideman engaged Professor Rubinstein to provide

6    independent advice as to, and to design or approve an economically viable and appropriate,

7    options transaction that would enable the Martin family and the 14 Martin Family Trusts to

8    maximize the potential upsides in the market while mitigating their potential downside risk and to

9    otherwise address their business and financial objectives.  Tr. pp. 143:8-144:19; p. 189:8-10; p.

10   236:10-11; pp. 248:17-249:24; p. 326:9-17; p. 462:17-19; Ex. 39.

11       76.    On June 14, 2000, Mr. Sideman also formally engaged the global accounting and

12   consulting firm PricewaterhouseCoopers ("PWC") to design a joint investment structure, a

13   component of which might be a hedging transaction, to meet the objectives of the Martin family

14   and the 14 Martin Family Trusts of risk management, asset conservation, flexible and prudent

15   investment, maximization of returns, and equitable allocation amongst the trusts of the attendant

16   risks and rewards.  Tr. 142:16-19; p. 145:10-16: pp. 188:22-189:2; p. 322:21-15; Ex. 125.

17       77.    Having previously terminated AA as its accountant and tax return preparer, the

18   Martin family and the 14 Martin Family Trusts separately engaged PWC to handle the family's

19   and Trusts' accounting and tax return preparation needs.  Tr. pp. 170:10-171:8; Exs. 300, 301.

20       78.    Over a number of months, PWC gathered information about the CPC sale, the

21   Martin family and the 14 Martin Family Trusts, and their objectives.  Tr. p. 179:11-23; Ex. 129.

22       79.    Mr. Sideman and his Sideman & Bancroft colleagues, Ms. Harrigan and C. Jean

23   Ryan, worked closely on the project with PWC and its partners and employees, principally Roger

24   Feusier, a Certified Public Accountant with a Masters in Tax Law, and Duane Pellervo, a lawyer

25   with a Masters in Tax Law from Georgetown University, speaking almost everyday and providing

26   PWC anything it requested in order to do its work.  Tr. p. 180:2-6.

27       80.    PWC prepared and put on several iterative presentations of a proposed joint

28   investment structure it had designed to members of the Martin family, Mr. Folger as the Trustee of

SIDEMAN & BANCROFT LLP
LAW OFFICES
ONE EMBARCADERO CENTER, 8TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111

1   the 14 Martin Family Trusts,  Mr. Sideman, and Ms. Ryan.  These presentations described the

2   various concerns and objectives that the joint investment structure was intended to address and

3   achieve and the components of a proposed joint investment structure. Tr. p. 147:2-10; p. 153:1-24;

4   p. 176:6-15; p. 323:1-22; p. 349:2-18; pp. 372:6-373:4; pp. 454:8-455:16; pp. 533:17-536:18; Exs.

5   30, 120, 309.

81.     At these meetings, Mr. Folger asked a lot of questions.  He saw it as his role to

understand and vet the proposed joint investment structure.  In the course of this process, while he

listened and might defer to the Martin family, it was ultimately his decision, based on the advice

of Mr. Sideman, Ms. Ryan, and PWC, as to whether to approve and finally recommend the joint

investment structure to the Martin family and to allow its implementation by the 14 Martin Family

Trusts.  Tr. pp. 233:12-20; 323:23-324:5; p. 324:14-15; p. 335:17-19.  In addition to attending the

PWC meetings, Mr. Folger also frequently met and talked with Mr. Sideman separately about the

proposed joint investment structure and met with the Trusts' beneficiaries. Tr. pp. 154:9-158:4;

266:8-18; p. 267:18-23; p. 268:7-12; pp. 273:16-274:20; p. 325:21-25; 454:1-22.

82.     At the same time that PWC was working to design a joint investment structure,

Professor Rubinstein had been evaluating and rejecting various options transactions proposed by

Lehman Brothers and JP Morgan.  Over the course of several months, he communicated with

Sideman & Bancroft his various concerns with respect to the rejected proposed options

transactions.  Tr. p. 173:1-10; p. 733:18-25; Exs. 40, 47, 49, 50.  After extensive analysis and

consultation with Professor Rubinstein, JP Morgan finally designed an options transaction that

Professor Rubinstein deemed to be economically viable that could enable the Martin family and

the 14 Martin Family Trusts to achieve their business and financial objectives. Tr. p. 173:1-10;p.

733:18-25; p. 769:18-23; Exs. 51, 52.

83.     Once Professor Rubinstein finally approved the last JP Morgan proposed options

transaction, confirming it had economic reality, Mr. Sideman also agreed to approve the options

transaction as a component of the joint investment transaction.  Tr. p. 173:3-13.  Mr. Sideman

would not have recommended or approved an options transaction that was not approved by

Professor Rubinstein.  Tr. p. 225:11-15.

84.     PWC did a final presentation to the Martin family, Mr. Folger, Mr. Sideman and Ms. Ryan on late October or early November, 2000.  Tr. pp. 372:6-373:4; pp. 454:8-455:5; pp. 543:16-544:3.  Following this presentation, upon the advice of Mr. Sideman that PWC's proposed joint investment transaction would meet the Martin family's and Trusts' objectives of risk management, asset conservation, flexible and prudent investment, maximization of returns, and equitable allocation amongst the trusts of the attendant risks and rewards, and with the knowledge that JP Morgan had designed an economically viable hedging transaction that had been approved by Professor Rubinstein, the Martin family and Mr. Folger on behalf of the 14 Martin Family Trusts determined to go forward with a joint investment structure and the hedging transaction. Tr. p. 151:18-22; pp. 172:21-173:10; p. 268:7-23; p. 473:4-6; p. 477:9-16; p. 324:23-25; p. 325:1-10; pp. 543:23-544:3; Ex. 309.

85.     Mr. Folger, on behalf of 2000-A and the 14 Martin Family Trusts, and the Martin family relied on Sideman & Bancroft and PWC to provide them with advice as to whether to enter into the joint investment transaction and its propriety.  As Mr. Folger testified, "I relied on the advisors ... and I would say primarily Richard Sideman to make sure that whatever was being considered was proper and legal and sound in every respect." Tr. p. 264:3-10.  He further testified, " I was relying on Richard Sideman to say that this was an authentic, valid transaction, and I satisfied myself that he was answering that question, and so I did [sign the documents]."  Tr. p. 267:21-23.

## H.     Implementation of the Joint Investment Transaction

86.     The joint investment structure was implemented as described below.

87.     On November 9, 2000, LMGA Holdings distributed to the five 1999 Trusts all of its Liberty Media shares along with a portion of the cash it held.  Ex. 1, p. MTCB 00116-00121.

88.     On that same date, based on the advice of JP Morgan, $121,452,146 in cash held by the 14 Martin Family Trusts and $1 million of cash retained by LMGA Holdings was invested in Standard & Poor's Depositary Receipts ("SPDRs"), an investment unit that tracks the S&P 500. Stip. ¶ 36.  Investing in SPDRs permitted the Trusts to quickly and conveniently convert the CPC proceeds into an investment that was intended to perform in a manner similar to, and that

SIDEMAN & BANCROFT LLP
LAW OFFICES
ONE EMBARCADERO CENTER, 8TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111

1   promised a return measured by, S&P 500 equities to which the SPDRs were later converted, but

2   was more convenient and less costly than direct investments by the Trusts. Tr. p. 464:4-16; Exs.

3   30, 120, 309.

4           89.     Each of the 14 Martin Family Trusts then executed a series of transactions designed

5   to hedge the investment risk on the Trusts' assets.  In general terms, the strategy provided for the

6   execution of a series of call and put options ("Long" and "Short" Options) based on a notional

7   investment portfolio that mirrored the Trusts' actual aggregate investment portfolio. Stip. ¶¶ 37,

8   40; Exs. 3, 319.  With this hedging strategy, the Trusts stood to recover a portion of their

9   investment losses in the event the investments' value fell to certain specified levels in the near

10  term, and also to potentially profit if the investments' value rose. Tr. pp. 435:15-437:14; p. 547:5-

11  15; p. 736:19-25.

12          90.     Specifically, on November 8, 2000, the trusts entered into a set of options

13  transactions with JP Morgan.  The options were European-style options written against a notional

14  portfolio (the "option notional portfolio") that was virtually identical to the assets owned by the

15  Trusts after the purchase of the SPDRs.  Instead of SPDRs, the option notional portfolio included

16  units of the S&P 500 index (86,230 shares).  The number of shares of Liberty Media, Young

17  Broadcasting, AT&T, and TCI Satellite included in the portfolio were exactly the same as the

18  Trusts owned (i.e., 267,533 shares of AT&T, 5,435,370 shares of Liberty Media Group, 33,785

19  shares of TCI Satellite, and 391,44 shares of Young Broadcasting).  Based on the initial stock

20  prices and the initial level of the S&P 500 index used to value the portfolio, its initial value (the

21  "notional value") was $226.3 million. Ex. 3; Stip. ¶¶ 37, 40.

22          91.     The options consisted of six European-style option contracts (the "Long Options")

23  from JP Morgan for premiums paid totaling $315,781,658.59. Ex. 332, p. US011130. In addition,

24  the Trusts sold (or wrote) five European style option contracts (the "Short Options") to JP Morgan

25  for premiums received totaling $314,885,515.95. Ex. 332, p. US011150.   To reflect the

26  differences between the premiums for the Long and Short Options, the Trusts made an up-front

27  payment to JP Morgan of $896,142. Stip. ¶ 37.

28

SIDEMAN & BANCROFT LLP
LAW OFFICES
ONE EMBARCADERO CENTER, 8TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111

PETITIONERS' POST-TRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

92.     The options were ordinary European-style options in all but one respect: the payoffs on the options did not depend on the value of the option notional portfolio at expiration. Rather, the payoffs depended on the average value of the options over three days leading up to and including expiration—that is, the option payoffs depended on the average value of the portfolio as of the market close on December 27, 28, and 29, 2000.  Professor Rubinstein testified that this feature of the options effectively prevented any attempt by JP Morgan to control the option payoffs. Tr. pp. 773:19-774:8; Ex. 332, p. US011129.

93.     The trusts entered into a total of eleven options contracts comprised of six purchased options, made up of five calls and one put, and five sold or written options, made up of four calls and one put:

| Purchased Options | | | Sold/Written Options | | |
|---|---|---|---|---|---|
| Option Type | Exercise Price* | Scale Parameter** | Option Type | Exercise Price | Scale Parameter** |
| Call | 80.50% | 2.7 | Call | 83.5% | 3.7 |
| Call | 86.75% | 1.0 | Call | 88.25% | 1.0 |
| Call | 91.50% | 1.0 | Call | 93.00% | 1.0 |
| Call | 96.25% | 1.0 | | | |
| Put | 119.00% | 2.684 | Call | 119.00% | 2.684 |
| Call | 119.65% | 2.684 | Put | 119.65 | 2.684 |

\* These percentages are derived by dividing the call strike price by the Initial Notional Amount.
\*\* The scale parameter scales the notional portfolio on which the option is written.

Ex. 332, pp. US011129-31; US011149-51.

94.     The put-call pairs with exercise prices of 119.00% and 119.65% (and an identical multiplicative factor of 2.684) collectively constituted a "box-spread," which has a fixed dollar payoff at expiration. The combined effect of these four options was that the 14 Martin Family Trusts would pay JP Morgan an incremental $3.95 million embedded within the options at expiration, regardless of the value of the underlying portfolio in exchange for a smaller up-front premium. Tr. p. 995:1-16; pp. 1075:23-1077:22.

95.     The Martin family entered into a long call-spread with a lower exercise price of 80.5% and an upper exercise price of 83.5%. Ex. 332, pp. US011129-31, US 011149-51.

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 8TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111

PETITIONERS' POST-TRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

96.     The six long (purchased) options bought were as follows:

| Type | Premium | Strike Price | Multiplier |
|------|---------|--------------|------------|
| Call Strike 1 | $123,805,727.02 | $182,170,411.18 | 2.7 |
| Call Strike 2 | $ 33,729,813.40 | $196,314,076.64 | 1.0 |
| Call Strike 3 | $ 24,935,847.96 | $207,063,262.40 | 1.0 |
| Call Strike 4 | $ 17,520,041.28 | $217,812,448.15 | 1.0 |
| Call Strike 5 | $  2,998,457.08 | $270,766,331.65 | 2.684 |
| Put Strike 1 | $112,791,772.85 | $269,295,390.44 | 2.684 |
| Total | $315,781,658.59 | | |

Ex. 332, pp. US011130-31.

97.     For the call options, if the final notional amount of the portfolio on December 29, 2000, was greater than the call strike price, JP Morgan was required to pay the Martin Trusts the difference between such amount and the call strike price, multiplied by the 2.684 multiplier.  If the final notional amount was below the call strike price, no payments or settlements were due from either party.  The final notional amount of the portfolio could trigger payments on more than one of the call options. Ex. 332, p. US011131.

98.     For the put option, if the final notional amount of the portfolio on December 29, 2000, was below the put strike price, JP Morgan was required to pay the Martin Trusts the difference between such amount and the put strike price, multiplied by the above multiplier.  If the final notional amount was greater than the put strike price, no payments or settlements were due from either party. Ex. 332, p. US011131.

99.     The Martin family entered into three short call-spreads with the following non-overlapping exercise prices:

| Lower Exercise Price (sold call) | Upper Exercised Price (purchased call) |
|----------------------------------|----------------------------------------|
| 83.50% | 86.75% |
| 88.25% | 91.50% |
| 93.00% | 96.25% |

Ex. 332, pp. US011129-31; pp. US011144-51.

SIDEMAN & BANCROFT LLP
LAW OFFICES
ONE EMBARCADERO CENTER, 8TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111

100.     The terms of the five sold options were as follows:

| Type | Premium | Strike Price | Multiplier |
|------|---------|--------------|------------|
| Call Strike 1 | $145,235,838.80 | $188,959,370.60 | 3.7 |
| Call Strike 2 | $  29,160,843.71 | $199,708,556.35 | 1.0 |
| Call Strike 3 | $  20,760,637.91 | $210,457,742.11 | 1.0 |
| Call Strike 4 | $    3,297,171.29 | $269,295,340.44 | 2.684 |
| Put Strike 1 | $116,408,024.24 | $270,766,331.65 | 2.684 |
| Total | $314,885,516.96 | | |

Ex. 332, pp. US011150-51.

101.     For the call options, if the final notional amount of the portfolio on December 29, 2000, was greater than the call strike price, the Martin Trusts were required to pay JP Morgan the difference between such amount and the call strike price, multiplied by the above multiplier. Ex. 332, p. US011151. If the notional amount was below the call strike price, no payments or settlements were due from either party.  The final notional amount of the portfolio could trigger payments on more than one of the call options. Id.

102.     For the put option, if the final notional amount on December 29, 2000, was below the put strike price, the Martin Trusts were required to pay JP Morgan the difference between such amount and the put strike price multiplied by the above multiplier.  Ex. 332, p. US011151.  If the final notional amount was greater than the put strike price, no payments or settlements were due from either party. Id.

103.     The options were separate and distinct financial instruments that were priced separately, could be traded separately and had different strike and sales prices. Exs. 4; 332.

104.     In order to obtain pooling and joint management benefits, on November 17, 2000, the 14 Martin Family Trusts contributed their assets, including, *inter alia*, the SDPRs, to four domestic limited liability companies, including First Ship, Second Ship, Third Ship and Fourth Ship (the "Parent LLCs"), each of which was treated as a partnership for federal income tax purposes. Ex. 3, pp. MTCB 00839-00874.

105.     The Trusts contributed to First Ship: (a) the SPDRs, with a fair market value of $90,725,160; (b) 391,444 shares of Young Broadcasting valued at $10,813,617; (c) 4,130,730 shares of Liberty Media Group valued at $64,542,655; (d) a KRON Holdback of $3,019,838; (e)

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 8TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111

1  33,785 shares of TCI Satellite valued at $162,575; and (f) the Long Options.  Ex. 3, pp. MTCB

2  00839-00850, MTCB 00870-00875; Stip. Ex. 2 (Jt. Ex. 297) at pp. PWC 02784-02789.

3        106.    Also on November 17, 2000, the five 1988 Trusts and the four trusts of Mrs.

4  Martin's children contributed 210,880 SPDRs with a fair market value of $29.4 million to Fourth

5  Ship. Ex. 3, p. MTCB 00859-00867.

6        107.    While it was the long term plan of the Parent LLCs to segregate their assets into

7  different investment pools in separate lower tier LLCs to facilitate the family members' divergent

8  investment strategies, with investment activities of each sub-portfolio conducted in an efficient

9  and commercially competitive manner, multiple lower tier LLCs were not initially formed,

10  primarily because a large portion of the 14 Martin Family Trusts' assets were to be disposed of in

11  the near term and it was then unclear how the proceeds of such sales would be reinvested. Tr. pp.

12  374:13-375:14; pp. 383:25-384:11; pp. 478:24-479:10.

13        108.    At that time, the sole lower tier LLC, 2000-A, functioned as the repository for all

14  Trust assets that were initially designated for prompt sale.  Holding the short term assets in the

15  separate legal entity of 2000-A was intended to provide additional flexibility and efficiency in

16  effecting the disposition of those assets.  Further, since the Options were directed primarily toward

17  the risks associated with the short term assets, it made good business sense *apart from any tax*

18  *efficiencies* to also house the hedging positions in 2000-A.  Tr. pp. 383:13-384:11; pp. 478:24-

19  479:23; pp. 548:23-549:7.

20        109.    On November 27, 2000, First Ship contributed to 2000-A all of its SPDRs, some of

21  its stock, and the Long Options; 2000-A also took on First Ship's obligations under the Short

22  Options.  Fourth Ship and LMGA also contributed their SPDRs to 2000-A.  Ex. 3, pp. MTCB

23  00879-00887.

24        110.    As of November 27, 2000, 2000-A held all of the 868,111 shares of SPDRs. Ex. 3,

25  pp. MTCB 00866 – 00888.

26        111.    Immediately after the transfer of the SPDRs to 2000-A, JP Morgan directed the

27  reinvestment of the SPDRs in stock of S&P companies, with a view toward generating a return

28  that tracked and hopefully exceeded the performance of the S&P 500.  Stip. ¶ 38; Ex. 309.

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 8TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111

112.   On November 29, 2000, the SPDRs were sold for $116.0 million resulting in a loss of approximately $5.4 million.  On December 1, 2000, the Martin Family trusts purchased various S&P 500 securities for $112.2 million. These securities were sold on December 27, 2000 for $106.9 million, resulting in a loss of $5.3 million. The combined loss on the trusts' S&P 500 investments during November and December—the investments in SPDRs and S&P 500 securities—was $10,756,230.  Stip. ¶ 38.

113.   In the meantime, the performance of the options was being closely monitored by JP Morgan, Mr. Sideman, Professor Rubinstein, and the Martin family. Tr. pp. 608:22-609:11.

114.   On or about December 20, 2000, JP Morgan advised Mr. Sideman that the options had achieved a positive return (net of transaction costs) of approximately $3.9 million.  Mr. Sideman confirmed this information with Professor Rubinstein, and, after informing Mr. Martin that they were "in the money," Mr. Sideman advised that the options should be closed out. Tr. p. 235:2-12; pp. 608:22-609:6; Stip. ¶ 39.  JP Morgan sought authorization to close out the options from Mr. Folger, 2000-A's managing member, who authorized the termination of the options by signing a Termination Agreement dated December 22, 2000. Ex. 4, pp. MTCB 01182 – 01184.  At termination, JP Morgan paid the trusts approximately $4.8 million, resulting in a net profit (after subtracting the upfront premium and the box-spread) of $3.9 million.  Stip. ¶ 14.

115.   The assets of 2000-A were also sold, and the cash proceeds were distributed to its members in complete liquidation. Tr. p. 479:18-25. The proceeds of the liquidation and closing of the hedge positions distributed by 2000-A to its members, including First Ship, consisted of cash in the amount of $127,168,869.  2000-A was cancelled on December 28, 2000. Stip. ¶ 14, ¶ 39; Stip. Ex. 7 (Jt. Ex. 302).

116.   Due to the treatment of the hedging positions under partnership tax rules, First Ship's tax basis in its 2000-A membership interest exceeded the cash it received in exchange for its interest in the liquidation of 2000-A.  As such, First Ship recognized a loss of $318,917,377 on the liquidation, which it passed through to its members. Stip. ¶ 47.

117.   The implementation of the LLC structure, contemplated in November, 2000, was completed in 2001.  The Parent LLCs formed multiple lower tier LLCs (11 in all) to hold specific

LAW OFFICES

SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 8TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111

SIDEMAN & BANCROFT LLP
LAW OFFICES
ONE EMBARCADERO CENTER, 8TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111

1  pools of assets, with those pools further divided into "Discretionary Investments" and "Common

2  Investments."  In general, assets held by the Parent LLCs at the close of 2000 were not distributed

3  to the ultimate owners but, rather, were invested within the structure.  Each owner of a Parent LLC

4  indirectly owned interests in those two categories of investments.  Discretionary Investments were

5  intended to provide a degree of investment flexibility to individual Martin family members,

6  whereas Common Investments were intended to consist of conservative and uniform investments

7  that were jointly agreed to by the family members, in order to facilitate the objective of

8  maintaining a relatively stable pool of assets to cover the various exposures described above. Tr. p.

9  161:6-20; pp. 374:10-375:14; p. 479:2-10; p. 482:3-16; p. 536:1-18; p. 575:21-24; Exs. 198, 266,

10  310.

11       118.    The structure stayed in place until 2006, when the reasons for its implementation

12  were no longer of consequence. Tr. pp. 87:13-88:15; 476:20-278:9

13       119.    The transaction at issue was unique and there was no evidence that it was marketed

14  by the Sideman firm, PWC, JP Morgan or Brown & Wood to any other clients.  Tr. pp. 236:18-

15  237:15.

16       **I.**      **Tax Opinions**

17       120.    The viability of the recognized tax loss was the subject of favorable tax opinions

18  written by Brown & Wood, a nationally recognized law firm, in exchange for a non-contingent

19  fee.  Brown & Wood had been engaged by Mr. Sideman prior to the implementation of the joint

20  investment transaction to provide a tax opinion with respect to its potential tax implications. Over

21  the course of several months, Sideman & Bancroft and PWC worked closely with Brown &

22  Wood, providing it with all facts and information relevant to the Martin family and the Trusts, the

23  then-developing joint investment transaction, and the issues to be addressed in the tax opinion,

24  assuring the accuracy of the representations to be made therein.  Tr. p. 368:15-20; p. 369:15-18; p.

25  371:18-22; p. 372:3-5; pp. 377:25-378:2; p. 475:10-17; pp. 537:22-538:11.  During the trial,

26  Candyce Martin verified that the factual statements contained in the Brown & Wood opinion were

27  accurate.  Tr. pp. 327:2-329:15.

28

SIDEMAN & BANCROFT LLP
LAW OFFICES
ONE EMBARCADERO CENTER, 8TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111

121.    The opinions, dated November 15, 2000, were issued to Mr. Folger as the trustee of each of the 14 Martin Family Trusts.  Exs. 6, 8, 10, 12, 14, 16, 18, 20; Tr. pp. 458:24-459:1; Stip. ¶ 41.

122.    Brown & Wood also provided a six-page letter dated January 31, 2001 to each of the Trusts, concerning the tax consequences of the distributions from First Ship 2000-A in December 2000. Exs. 5, 7, 9, 11, 13, 15, 17, 19, 21, 23; Stip. ¶ 42.

123.    The Brown & Wood opinion letters were carefully reviewed by Sideman & Bancroft and PWC.  Tr. pp. 474:22-475:2; Ex. 184.

124.    As none of them was a tax lawyer, Mr. Folger, on behalf of the 14 Martin Family Trusts, and the Martin family members, relied on Sideman & Bancroft and PWC to read and understand the Brown & Wood opinions, and to advise them accordingly.  Tr. pp. 263:19-264:15; pp. 265:25-266:7; p. 267:3-23; 329:19-23; p. 330:3-20.

125.    The Brown & Wood opinions were provided at a total cost to all the Trusts of $700,000.  The amount of this fee was based on an approximately $50,000 per opinion cost, and was not tied to the amount of the tax losses at issue.  Tr. pp. 458:24-459:1

126.    There is no evidence that Brown & Wood was a promoter of the specific transaction at issue.

127.    The Martin family's other legal and tax advisors on the transactions, Sideman & Bancroft, PWC, and Mr. Rubinstein, were paid solely on an hourly fee basis.  These fees had no relation to the tax losses at issue and were due whether or not the transactions were consummated. Tr. pp. 145:17-146:2; p. 346:21-24; p. 347:17-24.

**J.    Tax Returns**

128.    2000-A reported income, gain, loss and deductions related to the transactions at issue on its 2000 partnership tax return, Form 1065, which was filed on or about March 22, 2001. Stip. ¶ 9; Stip. Ex. 5 (Jt. Ex. 300).  The Schedule K, "Partner's Shares of Income, Credits, Deductions, etc.," of 2000-A's Form 1065 reported ordinary dividends of $159,264, net short-term capital losses of $5,376,293, deductions related to portfolio income of $100,082, investment

PETITIONERS' POST-TRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

1  income of $159,264, investment expenses of $100,082, and total cash distributions of

2  $127,168,869. Id.

3       129.    The 2000 partnership tax return of 2000-A was prepared and signed by PWC. Tr.

4  pp. 362:12-363:2; Stip. Ex. 5 (Jt. Ex. 300).

5       130.    Each member's distributive share of the reported items of income, gain, loss and

6  deductions from 2000-A was reported on Schedules K-1 issued to its members, including First

7  Ship, Fourth Ship and LMGA Holdings. Stip. ¶ 10; Stip. Ex. 5 (Jt. Ex. 300).

8       131.    The Schedules K-1, "Partner's Share of Income, Credits, Deductions, etc.," of

9  2000-A's Form 1065 reported First Ship's, Fourth Ship's, and LMGA Holding's distributive share

10  of 2000-A's $5,376,293 net short -term capital loss as follows:

11  
| Partner | Short-Term Loss |
|---|---|
| First Ship | ($4,067,455) |
| Fourth Ship | ($1,265,910) |
| LMGA Holdings | ($     42,928) |
| Total | ($5,376, 293) |

15      The Schedules K-1 of 2000-A's Form 1065 reported First Ship's, Fourth Ship's and

16  LMGA Holding's distributive share of 2000-A's $127,168,863 distributions as follows:

17  
| Partner | Distributions |
|---|---|
| First Ship | $ 97,960,224 |
| Fourth Ship | $ 28,250,657 |
| LMGA Holdings | $     957,988 |
| Total | $127,168,863 |

21  Stip. ¶ 44; Stip. Ex. 5 (Jt. Ex. 300).

22       132.    First Ship reported its distributive share of each item of income, gain, loss, and

23  deductions from 2000-A on its 2000 partnership tax return, Form 1065.  On the attached Schedule

24  D, First Ship reported a short term capital loss from the liquidation of its interest in 2000-A of

25  $318,018,377, which was attributable to the effect of the hedging positions on First Ship's tax

26  basis in its 2000-A membership interest. Stip. ¶ 11; Stip. Ex. 6 (Jt. Ex. 301).  First Ship reported a

27  net short-term capital loss of $321,865,000. Stip. ¶ 46.

28

SIDEMAN & BANCROFT LLP
LAW OFFICES
ONE EMBARCADERO CENTER, 8TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111

133.    The 2000 partnership return of First Ship was prepared and signed by PWC. Tr. pp. 362:12-363:2; Stip. Ex. 6 (Jt. Ex. 301).

134.    First Ship reported $415,978,601 as its basis in its partnership interest in 2000-A, which included the premiums on the long options totaling $315,781,636, unreduced by the premiums received on the short options totaling $314,885,516.  First Ship's $415,978,601 basis in its partnership interest in 2000-A also included its $3,319,128 pro rata share of the partners' purported total fees of $4,308,787 paid for the transaction.  First Ship distributed its reported $321,865,645 net short-term capital losses to the 14 Martin Family Trusts, including petitioners. Stip. ¶ 47; Stip. Ex. 6 (Jt. Ex. 301).

135.    Each member's distributive share of the items of income, gain, loss, and deductions from First Ship was reported on Schedules K-1 issued to its members, including the Martin Trusts. Stip. ¶ 12; Stip Ex. 6 (Jt. Ex. 301).

136.    Each of the 14 Martin Family Trusts reported its distributive share of the items of income, gain, loss and deductions from First Ship, including its share of the short term capital loss reported by First Ship from the liquidation of its interest in 2000-A, on its 2000 income tax returns. Stip. ¶ 13.

137.    As a result of the sale of CPC, the Martin family reported the sale of the CPC assets on their personal and related trust returns for the taxable year 2000, including gains in excess of $318 million. Stip. ¶ 35.

138.    Candyce Martin individually received cash and Young Broadcasting, Inc. stock distributions from the CPC sale for the 56,900 shares of CPC stock she held outright.  Tr. p. 313:12-18; Ex. 25.  She reported the capital gains from this distribution on her U.S. Individual income tax return for taxable year 2000 and paid the resulting taxes on 100% of the generated gains.  Tr. p. 331:16-19; p. 332:1-5.

139.    In addition, the Candyce Martin 1999 Trust, which participated in the Joint Investment Transactions, received cash and Young Broadcasting, Inc. stock distributions from the CPC sale for the 20,000 shares of CPC stock it held. Tr. p. 310:23-25; Ex. 25. This trust reported on its tax return the capital gains from the CPC allocations and also reported but utilized as an

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 8TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111

1   offset only a minute portion of its share of the capital loss reported by First Ship on its return from

2   the liquidation of its interest in 2000-A.  Tr. p. 331:3-9.

3      140.   As a result of these reporting positions, Candyce Martin individually, and the

4   Candyce Martin 1999 Trust, paid tax on approximately 65% of the overall distributions made by

5   CPC to her either individually, or to the 1988 and 1999 trusts for her benefit, or to the Candyce

6   Martin 1999 Trust.  Tr. p. 331:5-8; pp. 331:16-332:5.

7      141.   Prior to the CPC sale, Francis Martin held 1,900 shares of CPC stock outright.  Ex.

8   25.  These were the only shares over which he had individual control.  Tr. p. 684:2-5.

9      142.   Constance Martin Goodyear individually received cash and Young Broadcasting,

10  Inc. stock distributions from the CPC sale for the 36,900 shares of CPC stock she held outright.

11  Tr. p. 688:20-23; Ex. 25.  She reported the capital gains from this distribution on her U.S.

12  Individual income tax return for taxable year 2000 and paid the resulting taxes on 100% of the

13  generated gains. Tr. pp. 688:20-689:5.

14     143.   In addition, the Constance Goodyear 1997 Trust, which participated in the Joint

15  Investment Transactions, received cash and Young Broadcasting, Inc. stock distributions from the

16  CPC sale for the 40,000 shares of CPC stock it held.  Ex. 25.  This trust reported on its tax return

17  the capital gains from the CPC allocations and also reported but utilized as an offset only a minute

18  portion of its share of the capital loss reported by First Ship on its return from the liquidation of its

19  interest in 2000-A.  Tr. p. 689:18-19; p. 690:14-23.

20     144.   As a result of these reporting positions, Constance Goodyear individually, and the

21  Constance Goodyear 1997 Trust, paid tax on 61% of the overall distributions made by CPC to her

22  either individually, or to the 1988 and 1999 trusts for her benefit, or to the Constance Goodyear

23  1997 Trust.

24     145.   Priscilla Tamkin individually received cash and Young Broadcasting, Inc. stock

25  distributions from the CPC sale for the 20,900 shares of CPC stock she held outright.  Tr. p.

26  313:12-18; Ex. 25.  She reported the capital gains from the CPC allocation on her U.S. Individual

27  income tax return for taxable year 2000 and paid the resulting taxes on 100% of the generated

28  gains.  Tr. p. 61:16-22.

146.     In addition, the two Priscilla M. Tamkin 1999 Trusts, which did not participate in the Joint Investment Transactions, received cash and Young Broadcasting, Inc. stock distributions from the CPC sale for the 20,000 and 36,000 shares of CPC stock they respectively held.  Ex. 25.  These trusts reported on their tax returns the capital gains from the CPC allocations and paid the resulting taxes due thereon.  Tr. p. 116:22.

147.     As a result of these reporting positions, Priscilla Tamkin individually, and the two Priscilla M. Tamkin 1999 Trusts paid tax on 61% of the overall allocations made by CPC to her either individually, or to the 1988 and 1999 trusts for her benefit, or to the two Priscilla M. Tamkin 1999 Trusts.  She reported nearly $30,000,000 in capital gains from the CPC distribution and paid $7.7 million in taxes.  Tr. p. 61:22-24.

148.     Helen Spalding individually received cash and Young Broadcasting, Inc. stock distributions from the CPC sale for the 26,900 shares of CPC stock she held outright. Ex. 25.  She reported the capital gains from the CPC allocations on her U.S. Individual income tax return for taxable year 2000 and paid the resulting taxes on 100% of the generated gains.  Tr. p. 697:2-12.

149.     In addition, the Helen Spalding 1997 Trust, which did not participate in the Joint Investment Transactions, received cash and Young Broadcasting, Inc. stock distributions from the CPC sale for the 50,000 shares of CPC stock it held.  Ex. 25.  This trust reported on its tax return the capital gains from the CPC allocations and paid the resulting taxes due thereon.  Tr. p. 697:2-12.

150.     On its Form 1065 for the period ending December 31, 2000, Fourth Ship reported a net short-term capital loss of $1,910,955. Stip. ¶ 49.

151.     On its Form 1065 for the period ending December 31, 2000, LMGA Holdings reported a net short-term capital loss of $64,801. Stip. ¶ 50.

152.     On its Form 1065 for the period ending December 31, 2001, First Ship reported a deduction of $1,353,736 for legal and professional fees relating to the transaction, which deduction was passed through to the Martin Family Trusts.  The 2001 partnership return of First Ship was prepared and signed by PWC.  Each of the Trusts reported its distributive share of these deductions from First Ship on its timely filed 2001 tax returns. Stip. ¶ 48.

SIDEMAN & BANCROFT LLP
LAW OFFICES
ONE EMBARCADERO CENTER, 8TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111

153.    Tax savings were not the primary motivation of 2000-A, Mr. Folger, any of the partners, the 14 Martin Family Trusts or the Martin family, for entering into the transaction.  Tr. pp. 69:21-70:13: p. 270:15-23; pp. 271:18-272:7; p. 332:16-23; p. 610:6-11; p. 690:6-12.

154.    The Martin family paid substantial tax on gains from the CPC distributions as to both shares held individually and in trust.  Tr. p. 61:16-22; p. 331:3-9; p. 332:1-5; pp. 688:24-689:5; p. 689:17-19; p. 690:21-23; p. 697:2-12.

**K.      IRS Audit**

155.    In 2004, the IRS commenced an audit of 2000-A's taxable year 2000 partnership tax return and of First Ship's taxable years 2000 and 2001 returns. Stip. ¶ 17.

156.    Both 2000-A and First Ship are subject to the unified audit rules under the Tax Equity and Fiscal Responsibility Act ("TEFRA") as codified in §§ 6221-6233. Stip. ¶ 18.

157.    On April 8, 2004, and successively thereafter, the IRS, the 14 Martin Family Trusts that were members of First Ship, and individual Martin family members ("Taxpayers") executed Forms 872-I, Consent to Extend the Time to Assess Tax As Well As Tax Attributable To Items of a Partnership, with respect to taxable year 2000 ("Consents"). Stip. ¶ 18.

158.    The Consent forms contained the following language, which was agreed to by the IRS and the Taxpayers:

> The amount of any deficiency assessment is to be limited to that resulting from any adjustment directly or indirectly (through one or more intermediate entities) attributable to partnership flow-through items of First Ship LLC, and/or to any adjustments attributable to costs incurred with respect to any transaction engaged in by First Ship LLC, any penalties and additions to tax attributable to any such adjustments, any affected items, and any consequential changes to other items based on any such adjustments.

Stip. ¶ 18.

159.    The first Consent forms extended the statute of limitations to April 15, 2005. Several successive consents were signed by the same parties extending the statute of limitations to June 30, 2008.  Each consent contained the same language reflected in the above paragraph. Stip. ¶ 19.

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 8TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111

160.   On June 19, 2008, the IRS issued an FPAA to 2000-A, determining that certain items on 2000-A's 2000 tax return should be adjusted and that an accuracy-related penalty under 26 U.S.C. § 6662(a) was applicable. Stip. ¶ 19.

161.   No FPAA was issued to First Ship for taxable year 2000. Stip. ¶ 19.

162.   On June 19, 2008, the IRS issued an FPAA to First Ship, determining that deductions for certain legal and professional fees claimed on First Ship's 2001 tax return are disallowed and that an accuracy-related penalty applied.  Stip. ¶ 19.

163.   In the FPAA issued to 2000-A, the government proposed, *inter alia,* that a 40% accuracy related penalty be assessed with respect to all underpayments of tax attributable to the proposed adjustments. Stip. ¶ 20; Stip. Ex. 9 (Jt. Ex. 304).

164.   The government has acknowledged that the Court is bound by the Ninth Circuit's decision in *Keller v. Comm'r*, 553 F.3d 1056 (9th Cir. 2009), which limits the accuracy related penalty to 20%.  U.S. Trial Brief, p. 22:18-19.

L.     **Expert Testimony Regarding Options**

165.   Professor Rubinstein was provided all facts and information relevant to his analysis.  His recommendations and decisions with respect to the options transactions were determined entirely without regard to any tax consequences.  He testified that the existence of tax benefits would not have changed his analysis. Tr. pp. 838:21-839:5; p. 860:1-24.  He further testified that it did not matter to his analysis whether the Trusts already held the S&P stock so long as it was their intention to do so.  Tr. p. 761:22-25.

166.   In 2000, Professor Rubinstein concurred with JP Morgan that the strategy ultimately adopted was a commercially reasonable mechanism to reduce market risks. Ex. 52.

167.   Professor Rubinstein testified that a profit on the overall hedge strategy would have been earned if the value of the notional portfolio rose by only 3.79%. Tr. p. 1026:12-20.

168.   Respondent's expert, Professor Steven Grenadier, testified that a 15% rise in the portfolio was necessary to earn a profit on the hedging strategy. Tr. 943:8-13.  However, according to Professor Rubinstein, Professor Grenadier's analysis was misleading in that, for this critical conclusion, he excluded the Liberty Media and other non-S&P equities held prior to

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 8TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111

PETITIONERS' POST-TRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

SIDEMAN & BANCROFT LLP
LAW OFFICES
ONE EMBARCADERO CENTER, 8TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111

1   November, 2000. Tr. p. 1030:17-20; p. 1098:17-1100:7.  If these assets were included in the

2   analysis, as they should have been, Professor Rubinstein calculated that only a 3.79% rise in the

3   value of the entire portfolio was required to achieve a profit overall, even taking into consideration

4   the cost of the options, and that this had a 41% chance of happening, which he characterized as a

5   significant chance. Tr. pp. 1030:17-1031:18.

6        169.   Professor Rubinstein advised Sideman & Bancroft that the pricing of the options

7   was reasonable. Tr. p. 769:18-23; Ex. 52.

8        170.   Professor Grenadier testified that the options were overpriced. Tr. p. 952:13-22.

9   However, as Professor Rubinstein testified, Professor Grenadier's analysis was solely based on the

10  Black Scholes method of pricing and failed to consider (1) jump risk, (2) JP Morgan's fees, (3) the

11  customized nature of the options, and (4) a profit for JP Morgan, each of which would cause the

12  prices of options to be higher. Tr. pp. 1000:15-1001:3; pp. 1065:6-268:24.

13               **PROPOSED CONCLUSIONS OF LAW**

14      A.   **The Proposed Adjustments are Barred by the Statute of Limitations**

15       171.   Generally, any tax must be assessed within 3 years after a tax return is filed unless

16  the taxpayer consents to extend the assessment period. *See* 26 U.S.C. §§ 6229(a) & (b) and

17  6501(c)(4)(a).

18       172.   In a series of identical Consents, the IRS and the 14 Martin Trusts that were

19  partners in First Ship agreed to extend the 3-year assessment period for taxable year 2000 from

20  April 15, 2004, to June 30, 2008, limiting any proposed assessment "to that resulting from any

21  adjustment directly or indirectly (through one or more intermediate entities) attributable to

22  partnership flow-through items of First Ship."

23       173.   No Consents were executed with respect to items attributable to partnership flow-

24  through items of 2000-A for 2000.

25       174.   On June 19, 2008, the IRS issued an FPAA to 2000-A for taxable year 2000; no

26  FPAA was issued to First Ship for 2000.

27       175.   Since the Consents were limited to proposed adjustments attributable to partnership

28  flow-through items of First Ship, and there were no consents relating to adjustments attributable to

1   partnership flow-through items of 2000-A, the FPAA issued to 2000-A on June 19, 2008, was

2   beyond the statute of limitations and the assessments against the 14 Martin Family Trusts are time

3   barred.

4           **B.      Taxpayers Can Structure Transactions in The Most Tax-Advantageous**
                 **Manner**

5

6           176.    Taxpayers may structure transactions in a manner that takes advantage of benefits

7   under the Internal Revenue Code to generate the most tax-advantageous results. *Am. Home Prods.*

8   *Corp. v. United States*, 601 F.2d 540, 548 (Ct. Cl. 1979) ("It is fundamental that once a taxpayer

9   properly enters a bona fide transaction the mere fact that the transaction legally reduces taxes is

10  irrelevant.  A taxpayer has the option to select a transaction which will legally minimize taxes.");

11  *Avon Prods., Inc. v. United States,* 97 F.3d 1435, 1443 (Fed. Cir. 1996) (that a transaction may

12  have been structured for tax purposes does not render it impermissible).

13          177.    The Supreme Court has long recognized this tenet:

14              As to the astuteness of taxpayers in ordering their affairs so as to minimize taxes,
                we have said that "the very meaning of a line in the law is that you intentionally
15              may go as close to it as you can if you do not pass it."  This is so because nobody
                owes any "public duty to pay more than the law demands: taxes are enforced
16              extractions, not voluntary contributions."

17  *Atl. Coast Line R. Co. v. Phillips*, 332 U.S. 168, 172-73 (1947).

18          178.    Provided a transaction is bona fide, it matters not that the taxpayer takes advantage

19  of the Code to engage in a transaction designed, in part, to produce tax benefits.  Where a

20  transaction "is compelled or encouraged by business or regulatory realities, is imbued with tax-

21  independent considerations, and is not shaped *solely* by tax-avoidance features ... the Government

22  should honor the allocation of rights and duties effectuated by the parties." *Frank Lyon Co. v.*

23  *United States*, 435 U.S. 561, 583-84 (1978) (emphasis added); *see also Comm'r v. Brown*, 380

24  U.S. 563 (1965) ("the tax laws exist as an economic reality in the businessman's world....

25  Businessmen plan their affairs around both, and a tax dollar is just as real as one derived from any

26  other source").

27

28

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 8TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111

C.      **The Transactions Complied with the Internal Revenue Code**

179.    Section 721(a) of the Internal Revenue Code, Title 26 U.S.C., provides that no gain or loss is recognized when a partner contributes property to a partnership in exchange for a partnership interest.

180.    Section 722 governs the partner's basis in the partnership interest acquired and provides that "the basis of an interest in a partnership acquired by a contribution of property, including money, to the partnership shall be the amount of such money and the adjusted basis of such property to the contributing partner at the time of the contribution...."

181.    Under Section 723, when a partner contributes property to a partnership, the partnership succeeds to the basis of the property in the contributing partner's hands.

182.    Under Section 752(a), a partner's basis is increased by any increase in the partner's share of partnership liabilities or any increase in the partner's individual liabilities resulting from the assumption of such partner of partnership liabilities.

183.    Under Section 752(b), when a partnership assumes a liability of a partner, the partner's basis in his partnership interest is decreased by the amount of the liability.

184.    In accordance with the Internal Revenue Code, First Ship's basis in 2000-A was increased by the costs of its Long Option position contributed to 2000-A. 26 U.S.C. §§ 722, 723.

185.    Though First Ship's basis in 2000-A included the costs of the Long Option positions, no adjustment to the basis for the Short Option positions was required under 26 U.S.C. § 752, because the Short Option positions were contingent obligations and therefore not "liabilities."

i.      **Short Options are Not Liabilities Under 26 U.S.C. § 752**

186.    While "liabilities" are not defined in § 752, Courts have consistently held, and the IRS has until recently advocated the position, that contingent or speculative commitments are not considered "liabilities" under § 752, and, as such, they have no effect on the partner's basis.

187.    The seminal case on this issue is *Helmer v. Comm'r*, 34 T.C.M. 727 (1975), where the Tax Court held that a partnership's receipt of money pursuant to an option and the partnership's obligation to deliver property upon exercise of that option did not create a

SIDEMAN & BANCROFT LLP
LAW OFFICES
ONE EMBARCADERO CENTER, 8TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111

1    partnership liability under § 752.  Adopting the position advocated by the IRS, the court

2    determined that the holder's claim to the property under the option was not a liability for purposes

3    of § 752, since the obligation of the partnership to credit the payments was contingent upon the

4    option being exercised. *Helmer*, 34 T.C.M. at 1.

5          188.    The IRS continued to advocate and prevail on this position in the Tax Court and

6    before the United States Court of Appeals for the First and Fifth Circuits. *See Brountas v.*

7    *Comm'r*, 692 F.2d 152 (1st Cir. 1982); *Gibson Prods. Co. v. United States*, 637 F.2d 1041 (5th Cir.

8    1981) (contingent obligations not "liabilities" under § 752); *Long v. Comm'r*, 71 T.C. 1 (1978)

9    (contingent or contested obligations not "liabilities" for purpose of reducing basis in partnership

10   interest);  and *La Rue v. Comm'r*, 90 T.C. 465, 479 (1988) (obligations not fixed in amount not

11   "liabilities" included in partner's basis).  At the time of the transactions here, there were no

12   contrary judicial authorities.

13         189.    The IRS also consistently applied the reasoning of these cases in its revenue

14   rulings. *See e.g.,*  Rev. Rul. 79-294, 1979-2 C.B. 305 (obligations reflected in executory contracts

15   prior to performance are not included in basis); *see also* Rev. Rul. 73-301, 1973-2 C.B. 215

16   (interim payments in connection with long-term contract are not liabilities under § 752); Rev. Rul.

17   59-29, 1957-1 C.B. 519 (IRS does not recognize obligations reflected in executory contracts prior

18   to performance).

19         190.    The rule of law articulated in *Helmer,* and followed by subsequent decisions of the

20   First and Fifth Circuits, the United States Tax Court, and published rulings of the IRS, applies to

21   the transactions here.

22         191.    The Short Option purchased by the 14 Martin Family Trusts and contributed to

23   2000-A was exercisable on or before December 29, 2000, and would only be exercised if the

24   aggregate value of the short term assets held in the portfolio declined to between 81.2 and 90.5

25   percent.  There was no way to tell prior to that date whether the aggregate value of the short term

26   assets would have declined to between 81.2 and 90.5 percent on that date such that the Short

27   Option would be exercised.  Thus, the obligations imposed by the Short Option were contingent

28   until December 29, 2000.

PETITIONERS' POST-TRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

SIDEMAN & BANCROFT LLP
LAW OFFICES
ONE EMBARCADERO CENTER, 8TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111

192.    Pursuant to *Helmer* and its progeny, this contingent obligation was not a "liability" under § 752.  Accordingly, the partners were not subject to a reduction in basis for the Short Option under § 752, and their calculation of basis complied with the literal requirements of the Internal Revenue Code.

193.    The long and short options were separate and distinct financial instruments; they were priced separately, could be traded separately, and had different strike and sales prices. Further, their acquisition and disposition were § 988 transactions that may not be integrated, and gains, losses and basis are computed separately. 26 U.S.C. § 988(a)(1)(A); Treas. Reg. § 1.988-1(e).

194.    Even if a taxpayer holds both a long and short position in property at the same time, each position is still treated as separate property. *See e.g., Smith v. Comm'r*, 78 T.C. 350 (1982) (refusing to combine long and short positions in silver under the step transaction doctrine); *Sala v. United States*, 552 F. Supp. 2d 1167, 1194 (D. Colo. 2008) (citing *Smith* for the proposition that "[a]s a general rule, long and short options are considered separate instruments, even when purchased in offsetting pairs"), *rev'd on other grounds*, 613 F.3d 1249 (10th Cir. 2010); *Stoller v. Comm'r*, 994 F.2d 855 (D.C. Cir. 1993) (respecting separate contracts as independent transactions).

195.    This Court agrees with the application of Section 752 argued by petitioners.  *See Stobie Creek Invs., LLC v. United States*, 82 Fed. Cl. 636 (2008), *aff'd*, 608 F.3d 1366 (Fed. Cir. 2010); *Klamath Strategic Investment Fund, LLC v. United States*, 440 F. Supp. 2d 608 (E.D. Tex. 2007), *aff'd in part, vacated in part, and remanded on other grounds*, 568 F.3d 537 (5th Cir. 2009) ("It is clear from the record that the government has often and consistently relied on the principle that a 'liability' under Section 752 does not include an obligation that is contingent.  The government has applied this principle when it works to its benefit (to increase taxes owed).  This Court will consistently apply these same principles even if they sometimes work to the benefit of taxpayers (to decrease taxes owed). This Court's analysis of liability under Section 752 will not vary in meaning simply based on whose ox is being gored."); *Jade Trading LLC v. United States*, 80 Fed. Cl. 11 (2007); *but see*, *Kornman & Assoc. v. United States*, 527 F.3d 443 (2008)

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 8TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 8TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111

1  (addressing whether an obligation to close a short sale, as opposed to an option, was a "liability");

2  *Marriott Int'l Resorts, L.P. v. United States*, 586 F.3d 962 (Fed. Cir. 2009); *Maguire Partners v.*

3  *United States*, 2009 WL 4907033 (C.D. Cal. 2009), *aff'd sub nom not for publication, Thomas*

4  *Investment Partners, Ltd., et al. v. U.S.*, 108 AFTR2d 2011-5369 (9th Cir. 2011).

5  ii.   **Amended Treasury Regulation § 1.752 Cannot Apply Retroactively**

6  196.   Nearly three years after the transactions involved in this case were concluded, on

7  June 24, 2003, the Treasury Department proposed regulations to define "liability" under § 752 in

8  the partnership context. *See* Prop. Treas. Reg. §§ 1.752-0 to -7, 68 Fed. Reg. 37,434 (June 24,

9  2003).  Final regulations dated May 26, 2005, expanded the definition of "liability" to include

10  "any fixed or contingent obligation to make payment." *See* Treas. Reg. § 1.752-1a(4)(ii), §1.752-

11  6(a).  Under these new regulations, basis in a partnership interest is reduced by the value of

12  contingent liabilities assumed by the partnership, but the partner is not permitted to increase his

13  basis for his share of the new partnership liability.

14  197.   In attempting to apply these new regulations retroactively to an assumption of

15  liabilities accruing after October 18, 1999 and before June 24, 2003 (*see* Treas. Reg. § 1.752-6),

16  Treasury admitted that the new regulations were contrary to the then-existing case law and policy

17  that excluded contingent obligations from the computation of partnership basis:

18  The definition of a liability contained in these proposed regulations does not follow
19  *Helmer v. Commissioner,* TC Memo 1975-160.  (The Tax Court, in *Helmer*, held
   that  a partnership's issuance of an option to acquire property did not create a
20  partnership liability for purposes of Section 752).

21  Assumption of Partner Liabilities, 68 Fed. Reg. 37434, 37436 (June 24, 2003).  The new

22  regulations, retroactively applied, are not valid.

23  198.   The retroactive application of the new regulations was addressed and rejected in

24  *Klamath Strategic Inv. Fund, LLC. ex rel St. Croix Ventures, LLC v. U.S.*, 440 F.Supp.2d 608

25  (E.D. Tex 2006); *Stobie Creek Investments, LLC v. U.S.*, 82 Fed. Cl. 636, 664-71 (Fed. Cl. 2008);

26  *Sala*, 552 F.Supp.2d at 1197-98; *Murfam Farms, LLC v. United States*, 88 Fed.Cl. 516 (2009).

27  199.   The holding in *Mayo Found. for Medical Educ. and Research v. United States*, 131

28  S.Ct. 704 (2011), does not dictate that the Regulation be applied here.  In fact, since *Mayo* was

1    decided, several courts have rejected the IRS's attempt to apply regulations also issued to assist

2    the IRS's litigating position pursuant to which the longer six year limitations period would have

3    been used to make adjustments in "Son of Boss" cases in which the IRS had failed to make

4    adjustments within the normal three year period. *See Carpenter Family Invs., LLC v. Comm'r.*,

5    136 T.C. 17 (2011); *Home Concrete & Supply, LLC v. United States*, 634 F.3d 249 (4th Cir. 2011);

6    *Burks v. United States,* 633 F.3d 347 (5th Cir. 2011); *but see, Grapevine Imports, Ltd. v. United*

7    *States*, 363 F.3d 1368 (Fed. Cir. 2011); *Salman Ranch, Ltd. v. Comm'r*, 2011 WL 2120044, 107

8    AFTR2d 2011-2359 (10th Cir. 2011).

9        200.   In *Klamath*, the court characterized the regulations as an improper attempt by the

10   IRS to "buttress the government's litigation position in this and similar cases." 440 F.Supp. 2d at

11   625.  "There is no doubt that the government knew it was changing the law regarding 'liabilities'

12   under Section 752 with this new regulation.  Further, if there was not a change in the law, as the

13   government posits, there would have been no need to promulgate the Regulation. Indeed, from this

14   Court's view, the promulgation — and the statements made in conjunction with the promulgation

15   — is compelling evidence that the IRS knew it was seeking to change settled law to bar,

16   retroactively, the transactions engaged in by the Plaintiffs." *Id.* at 620.

17       201.   In *Stobie Creek*, the court similarly rejected Treasury's attempt to retroactively

18   apply the new regulations to a "Son of Boss" case.  The Court noted that "[a]lthough Congress

19   enacted 26 U.S.C. § 309 to provide a basis rule for contingent liabilities in the corporate context, it

20   did not make a comparable change to the Code in the partnership basis rules of U.S.C. § 752."

21   *Stobie Creek*, 82 Fed. Cl. at 670.  Finding that Treasury exceeded the scope of Congress's specific

22   authorization of retroactivity in § 309, the court concluded that the retroactive application of the

23   new regulations "cannot stand...." *Id.* at 671.

24       202.   The *Stobie Creek* court also noted that IRS Notice 2000-44 (issued August 11,

25   2000), providing that offsetting options positions contributed to a partnership did not create

26   substantive positive basis because the contingent obligation under the short option position was to

27   be considered a liability for purposes of § 752, does not support the retroactive application of

28   Treas. Reg. § 1.752-6.  As the court stated, IRS notices are merely "press releases stating the

PETITIONERS' POST-TRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

SIDEMAN & BANCROFT LLP
LAW OFFICES
ONE EMBARCADERO CENTER, 8TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111

1    IRS's position on a particular issue and informing the public of its intentions; such notices do not

2    constitute legal authority." *Stobie Creek*, 82 Fed. Cl. at 671, *citing Samonds v. Comm'r*, 66 T.C.M.

3    (CCH) 235 (1993) (IRS notice "is an administrative pronouncement which like a revenue ruling or

4    revenue procedure does not constitute authority for deciding a case in this Court"). *Id.*

5        203.    The court in *Sala* reached the same conclusion, stating that "Treasury Regulation §

6    1.752-6 not only alters settled prior law—as the Treasury acknowledged, *see* 68 Fed. Reg. 37434,

7    37437 (June 24, 2003) ("The definition of a liability contained in these proposed regulations does

8    not follow *Helmer v. Commissioner*, T.C. Memo 1975-160)—it directly contradicts the underlying

9    statutes—26 U.S.C. §§ 358 and 752—the abuse of which it supposedly prevents." *Sala*, 552

10   F.Supp.2d at 1204.  Moreover, the *Sala* court found the regulation was "an obvious effort to

11   bootstrap the government's litigating position with respect to so-called 'Son of Boss' cases."

12   Noting that "the regulation sought to reverse a policy the Treasury had relied upon - whenever

13   such reliance inured to its benefit - since 1975," the court declined to apply "what appears to be

14   nothing more than an agency's convenient litigating position." *Id.* at 1203.

15       204.    In *Murfam*, the court similarly rejected application of the regulation, holding that

16   "Treas. Reg. § 1.752-6 is invalid because [it] does not satisfy any exception to the statutory bar on

17   retroactive application of regulations relating to the internal revenue laws under U.S.C. §

18   7805(b)." *Murfam*, 88 Fed. Cl. at 528.  Acknowledging that two courts had applied § 1.752-6

19   retroactively – the Seventh Circuit in *Cemco Investors, LLC v. U.S.*, 515 F.3d 749, 752 (7th Cir.

20   2008), and the Central District of California in *Maguire Partners*, 2009 WL 4907033 (C.D. Cal.

21   2009) – the *Murfam* court noted that *Cemco* upheld the validity of the regulation as authorized by

22   § 309 of the Community Renewal Tax Relief Act of 2000, Pub. L. No. 106-554, § 309, 114 Stat.

23   2763A-638, solely because the retroactive date of the Regulation was identical to the date

24   authorized by § 309.  *Murfam*, 88 Fed. Cl. at 525-26.  The court concluded that "the mere fact that

25   the dates are the same does not answer the question of whether section 309 authorizes a reduction

26   of a partner's outside basis in the partnerships in the absence of duplication or acceleration of

27   losses, a line of inquiry that *Cemco* did not consider." *Id.* at 526.  The *Murfam* court referred to the

28

SIDEMAN & BANCROFT LLP
LAW OFFICES
ONE EMBARCADERO CENTER, 8TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111

1  reasoning used to justify retroactive application of the regulation in *Maguire Partners* as

2  "convoluted," stating:

> both *Cemco* and *Maguire Partners* simply do not come to grips with the fact that
> when the final version of the Regulation was promulgated, Treasury specified that
> the type of abuse that the Regulation was designed to prevent was "the same type[]
> of abuse[] that section 358(h) was designed to deter.... [T]he Regulation
> encompasses the assumption of any contingent liability of a partner in the
> definition of partnership liability. However, the basis rule in section 358(h) only
> applies to liabilities that are assumed in exchanges between a corporation and its
> shareholders, and the 2000 Tax Act did not direct a corresponding change to the
> basis rules in the partnership context as found in section 752.  As *Sala* held, 'a
> Treasury regulation that conflicts with the underlying statute is invalid, even if cast
> as an anti-abuse regulation.'"

9  *Murfam*, 88 Fed. Cl. at 527 (citations omitted).

10      205.    This Court agrees with the above cases, and holds that Treas. Reg. Section 1.752-6

11  is not applicable here.

### D.    The Transactions Had Economic Substance

13      206.    "[T]ransactions that comply with the literal terms of the tax code but lack economic

14  reality" are disregarded for tax purposes. *Coltec Indus., Inc. v. United States*, 454 F.3d 1340, 1352

15  (Fed. Cir. 2006).  The presence or lack of economic substance for federal tax purposes is

16  determined by a fact-specific inquiry on a case-by-case basis. *Frank Lyon,* 435 U.S. at 584.

17      207.    In determining whether a transaction has economic substance, the Court considers

18  two related factors: (1) The subjective factor – whether the taxpayer had a business purpose in

19  engaging in the transaction; and (2) the objective factor – whether the transaction had economic

20  substance "beyond the creation of tax benefits." *Casebeer v. Comm'r*, 909 F.2d 1360, 1363-65 (9th

21  Cir. 1990) *citing Bail Bonds by Marvin Nelson v. Comm'r*, 820 F.2d 1543, 1549 (9th Cir. 1987).

22  "[T]he consideration of business purpose and economic substance are simply more precise factors

23  to consider" in determining "whether the transaction had any practical economic effects other than

24  the creation of income tax losses." *Casebeer*, 909 F.2d at 1363 (*quoting Sochin v. Comm'r*, 843

25  F.2d 351, 354 (9th Cir. 1988).

26      208.    Under the subjective business purpose inquiry, taxpayers must show "that they had

27  a business purpose for engaging in the transaction other than tax avoidance." *Casebeer*, 909 F.2d

28  at 1363.

PETITIONERS' POST-TRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

209.    This analysis "often involves an examination of the subjective factors which motivated a taxpayer to make the transaction at issue." *Bail Bonds*, 820 F.2d at 1549*; see also Casebeer*, 909 F.2d at 1364.

210.    A common thread in cases analyzing the subjective business purpose prong of the analysis is that in order to have the requisite business purpose to support the tax benefits achieved, there must be a purported commercial reason for engaging in the transaction, the transaction must be consistent with such reason, and such reason must be supportable by contemporary evidence, including a showing that the transaction was handled in a business-like manner.

211.    A transaction can have an appropriate business purpose even if the transaction itself does not generate a profit. *Chisholm v. Comm'r*, 79 F.2d 14 (2d Cir. 1935), *cert. denied*, 296 U.S. 641 (1935) (a desire to pool and jointly manage assets was adequate business purpose for the formation of a partnership to own and manage such assets even though partnership form enabled taxpayers to achieve substantial tax benefit ).

212.    Moreover, because profit motive depends on the taxpayer's subjective and good faith intent to earn a profit, the fact that a venture fails to produce a profit in the anticipated amount or not at all does not indicate that the venture was not profit motivated. *Finoli v. Comm'r*, 86 T.C. 697, 722 (1986); *King v. United States*, 545 U.S. 700, 708 (10th Cir. 1976).  A taxpayer need not be correct in its judgment of possible economic benefits, only reasonable or rational. *Id.*

213.    Under the objective economic substance inquiry, the Court must determine "whether the transaction ha[s] economic substance beyond the creation of tax benefits." *Casebeer*, 90 F.2d at 1365, *citing Bail Bonds,* 820 F.2d at 1549.  The Court must analyze whether the "substance of the transaction reflects its form" and whether, objectively, "the transaction was likely to produce some economic benefits aside from a tax deduction." *Id.; Bail Bonds*, 820 F.2d at 1549; *Compaq Computer Corp. v. Comm'r,* 277 F.3d 778 (5th Cir. 2001); *IES Industries, Inc. v. United States*, 253 F.3d 350 (8th Cir. 2001).  A transaction will be upheld even where it was designed to achieve a tax benefit, so long as it was also endowed with positive pretax economics. *N. Ind. Pub. Serv. Co. v. Comm'r*, 115 F.3d 506 (7th Cir. 1997).

PETITIONERS' POST-TRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 8TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111

1      214.    Numerous courts have held that the transaction to be analyzed in determining

2   whether economic substance exists is the transaction that gives rise to the tax benefit.  *Coltec*, 454

3   F.3d at 1356-57; *Sala*, 613 F.3d 1249.  Other courts, however, have ruled that the determination of

4   economic substance requires a review of the entire transaction.  *Salina P'ship, LP, FPL Group*

5   *Inc. v. Comm'r*, T.C. Memo. 2000-352; *Kirchman v. Comm'r*, 862 F.2d 1486, 1493-94 (11th Cir.

6   1989); *Winn Dixie Stores, Inc. v. Comm'r*, 113 T.C. 254, 280 (1999).

7      215.    The evidence shows that the transaction had economic substance whether viewed in

8   its entirety (from 2000 until 2006), whether focusing on the transactions in November and

9   December 2000, or whether focusing on the contribution of the options to 2000-A, which is the

10  transaction that gives rise to the tax benefit.  There were several business purposes for engaging in

11  the transactions, and each component of the transactions, including the formation of the

12  partnerships, the investments, and the options, had substantial business purpose.  Moreover, the

13  transactions were likely to, and did, produce substantial economic consequences aside from the tax

14  benefits obtained and the options themselves produced a substantial profit.

### i.      The Transactions Had Legitimate Business Purposes

16     216.    There were several business purposes that led to the implementation of the

17  structure.

18     217.    First, the family and its Trusts, as shareholders of CPC, were concerned primarily

19  with managing the ongoing potential exposure to excess CPC liabilities.  Pursuant to the CPC

20  Recontribution Agreement, shareholders agreed to contribute their pro rata shares of any excess

21  liabilities incurred by CPC and to indemnify CPC and other shareholders.  This Agreement

22  increased the Martin family's and Trusts' needs for asset conservation and a mechanism for

23  bundling assets to ensure, to the maximum extent possible, each member paid no more than his,

24  her it its her fair share of excess CPC liabilities, including, in particular, potential liabilities from

25  an attack on CPC's S corporation status.

26     218.    Second, the five 1988 trusts that held a large percentage of the Martin family assets

27  needed to be reformed in order to clarify terms regarding distribution to beneficiaries upon the

28  death of one of them.  The reformation process was a complicated and time consuming process

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 8TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111

1   requiring extensive analysis regarding potential beneficiary scenarios and the obtaining of a

2   probate court order and an IRS private letter ruling.  In fact, this process was not finally completed

3   until 2005.  The uncertain status of the five 1988 trusts required that the CPC distributions

4   received by the trusts be prudently and conservatively reinvested in keeping with the divergent

5   investment views of the Martin family members in the interim period while the five 1988 trusts

6   were being reformed.

7           219.    Third, the 14 Martin Family Trusts needed to reinvest their CPC proceeds and

8   protect those investments, along with their previously invested non-S&P equity holdings including

9   Liberty Media, Young Broadcasting, AT&T and TCI, from any downturn in the market.

10          220.    The joint investment transaction, and the various partnerships within it, gave the

11  Martin family and the 14 Martin Family Trusts the ability to conserve and pool their assets in

12  order to meet the potential demand for contributions toward future excess CPC liabilities, and also

13  provided a flexible and asset-protective mechanism by which to prudently and conservatively

14  invest the CPC cash distributions pending the reformation of the 1988 trusts at a time when the

15  markets were extremely volatile.  Tr. p. 728:8-11.  The desire to pool and jointly manage assets is

16  an adequate business purpose for the creation of a partnership generating certain tax benefits.

17  *Chisholm*, 79 F.2d at 15-16.  Further, investing in the stock market has a clear business purpose.

18          221.    2000-A had a legitimate business purpose, namely to hold assets that were expected

19  to be sold in the short term.

20          222.    The options transactions provided an insurance policy against the volatility of the

21  market.  This policy paid off, generating almost $4 million in real dollars paid to the 14 Martin

22  Family Trusts after taking into account all related transaction costs.

23          223.    It must also be noted, with respect to the IRS's contention that the 14 Martin

24  Family Trusts were only trying to obtain tax benefits by virtue of the transactions at issue, that

25  substantial gains from the CPC sale were reported by the Martin family members on their 2000 tax

26  returns and taxed without any reduction or offset related to the losses related to the 2000-A

27  liquidation. Tr. p. 61:16-22-24; p. 116:22; p. 331:3-9; p. 331:5-8; pp. 331:16-332:5; pp. 688:20-

28  689:5; p. 689:18-19; p. 690:14-23; p. 697:2-12.

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 8TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111

1     224.     Indeed, two of the trusts, the Constance Goodyear 1997 Irrevocable Trust and the

2     Candyce Martin 1999 Irrevocable Trust, which are the Petitioners in these cases, reported but did

3     not use any of the capital loss reported by First Ship from the liquidation of its interest in 2000-A

4     on their 2000 tax returns.

5     225.     The fact that substantial gains from the CPC sale were subject to tax without any

6     reduction or offset from the transactions further establishes that the transactions had economic

7     substance beyond the creation of tax benefits, and that, contrary to the respondent's contention, tax

8     avoidance was not the Martin family's or the Trusts' motivation, primary or otherwise.

9     226.     The Court concludes that the transactions had non-tax business purpose and

10    satisfied the subjective prong of the economic substance test.

11    **ii.     The Transactions Had Economic Substance Aside From The Tax Benefits Obtained and Had the Requisite Profit Potential**

12    227.     2000-A, its partners and the 14 Martin Family Trusts received an economic benefit

13    from the transactions, and the potential for profit was sizeable, wholly apart from any tax benefits

14    that were generated.

15    228.     Specifically, in November, 2000, based on the advice of the Martin family's

16    investment advisor, JP Morgan, $121,452,146 in cash held by the Trusts and $1 million of cash

17    retained by LMGA Holdings were invested in SPDRs, an investment unit that tracks the

18    performance of the S&P 500.  At the same time, upon the advice of JP Morgan and Mark

19    Rubinstein, each of the Trusts executed a series of options designed to hedge the investment risk

20    of the Trusts' assets, including the various non-S&P stocks held by the Trusts, Liberty Mutual,

21    Young Broadcasting, AT&T and TCI.  In the last week of December, 2000, the options were

22    closed out in a manner that yielded a positive payout to 2000-A of $3,921,483, net of transaction

23    costs.

24    229.     The economic benefit from the options transactions, apart from tax, is apparent.

25    230.     Professor Rubenstein testified that the options transactions were the proper

26    transactions to evaluate from an economic perspective, and that the options transactions had a

PETITIONERS' POST-TRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 8TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111

1   reasonable expectation of making a profit, and, in fact generated a profit, thus demonstrating a

2   clear economic benefit.

3        231.    In an effort to get around this clear economic benefit, the respondent's expert,

4   Professor Grenadier, focused on the overall market losses of approximately $10 million sustained

5   by the partnerships and their partners in the underlying portfolio.  Professor Rubenstein testified,

6   however, that the overall market losses on the underlying portfolio were not the proper focus in

7   evaluating the economics of the transactions at issue, because the family had been advised and

8   intended all along to invest the cash distributions from the CPC sale into the market and to retain

9   its preexisting equity holdings.  Thus, the proper question was whether the overlay of the options

10  transactions on top of the underlying portfolio could generate an economic benefit.  Given that the

11  options transactions both provided a hedge against a possible downturn in the market, and actually

12  generated a profit net of transaction costs, Professor Rubinstein concluded that the options

13  transaction reduced the volatility of the underlying portfolio, could and did have a business

14  purpose and demonstrated a clear economic benefit. Tr. p. 736:19-25: p. 750:12-14; p. 781:14-19;

15  Ex. 52.

16       232.    Even according to Professor Grenadier's definition of the transaction, i.e., the

17  purchase of the S&Ps and the options, there was a possibility of a profit being earned overall.  He

18  further testified that if the value of the portfolio rose enough, these profits could be substantial.

19       233.    The potential gain that may have been generated from the overall transactions was

20  substantial.  At the time of the transactions, the market was extremely volatile.  No one could have

21  predicted whether the market would have gone up or down on any given day, and certainly could

22  not have predicted with any certainty the amount of potential rises or drops.  While the options

23  were obtained precisely for the purpose of insuring against a dramatic drop in the market, and they

24  in fact operated in this manner, both Professors Rubinstein and Grenadier testified that the Trusts

25  could have yielded sizeable gains if the market had gone up.

26       234.    According to Professor Rubinstein, only a 3.79% rise in the market was required to

27  yield a profit on the portfolio overall.  While Professor Grenadier suggested in his testimony that a

28  14% rise in the value of the portfolio was required in order to earn a profit overall, that suggestion

SIDEMAN & BANCROFT LLP
LAW OFFICES
ONE EMBARCADERO CENTER, 8TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 8TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111

1    was misleading because Professor Grenadier failed to include in his calculations to arrive at his

2    14% figure the non-S&P stocks held in the portfolio.  Profession Rubinstein demonstrated that had

3    Professor Grenadier included the non-S&P stocks in his calculations, their figures as to the

4    percentage of rise in the market necessary to yield a profit on the overall portfolio, would have

5    been the same at 3.79%.

6         235.    Thus, there was a reasonable possibility of profit both under Professor Rubinstein's

7    definition of the transaction and under Professor Grenadier's definition of the transaction.

8         236.    The fact that there was an overall loss, however, still shows that the transactions

9    had economic substance.  Indeed, as Grenadier testified, the entire portfolio was at risk of

10   completely losing its value.

11        237.    Moreover, the IRS's claim that the family would have been better off staying in

12   cash rather than investing in the market is based purely on hindsight and runs counter to accepted

13   rules of prudent investing.  A prudent investor with a sizeable amount of cash, who was exposed

14   to potential liabilities and uncertainty in an estate plan, would invest that cash in the market,

15   which, though volatile, certainly had the potential of far greater returns than merely holding funds

16   in a cash position, which lose money each day they are not invested.  That same prudent investor

17   would obtain insurance against possible losses – a hedge – to ensure that a possible drop in the

18   market suffered by the investment would be protected.  Tr. pp. 727:13-728:7.

19        238.    In the circumstances here, a reasonable possibility of profit existed exclusive of the

20   tax benefits, and indeed, the options transactions generated a material profit, net of all related

21   expenses, of almost $4 million.  Thus, objectively, the transactions had economic substance.

22        239.    The Respondent attacks the economic substance of the transactions here asserting

23   that the tax loss far exceeded any profit from the hedge.

24        240.    However, none of the cases to which the respondent compares this case involves a

25   profit as high, as a percentage of the tax loss involved, as in this case.  Indeed, virtually none of

26   these other cases involves any profit at all, any reasonable possibility of a profit, or any significant

27   exposure or risk of loss. *Stobie Creek*, 608 F.3d at 1372 (court found that for the transaction to

28   make any profit, two historically related currencies – the Swiss franc and the euro – had to

1   decouple and move in opposite directions.  If the currencies moved in the same direction relative

2   to the dollar, the most favorable outcome the taxpayers could hope for was breaking even or zero

3   profit); *Sala*, 613 F.3d at 1251-52 (options resulted in a profit of between $90,000 and $110,000

4   and had a potential to earn only $550,000 in profit compared to a tax loss of approximately $60

5   million and estimated $24 million in tax savings); *Palm Canyon X Invs. LLC v. Comm'r*, T.C.

6   Memo. 2009-288, 22-23 (taxpayer claimed actual profit of only $6,600 and argued it had a

7   potential for a profit of only $33,000 if the options were in the money; profit of almost $8 million

8   if the options hit the "sweet spot" had at best a 1% chance of occurring but was practically

9   impossible as calculation agent could have assured that options did not hit the sweet spot); *Jade*

10  *Trading*, 598 F.3d at 1378 (trial court determined that spread transaction was virtually guaranteed

11  to be unprofitable due to fees); *Fid. Int'l Currency Advisor A Fund, LLC v. United States*, 747 F.

12  Supp. 2d 49, 199-200 (D. Mass. 2010) (negative expected rate of return); *Nev. Partners Fund,*

13  *LLC v. United States*, 714 F. Supp. 2d 598, 630 (S.D. Miss. 2010) (transaction had no profit

14  potential and in fact made no profit); *Maguire Partners,* 2009 WL 4907033 at *49 ("extremely

15  remote possibility" of a return and no downside exposure); *Klamath*, 568 F.3d at 545 (loan

16  transactions could never have been profitable); *Cemco*, 515 F.3d at 751 (out of pocket cost of

17  $6,000 and no risk beyond that expense); *Belmont Invs., LLC v. United States*, 2010 WL 3057437

18  at * 5 (E.D. Tex. 2010) (probability of profit only 6.75% and probability of hitting "sweet spot"

19  less than half a percent and bank could manipulate sweet spot so it was not hit).

20      241.    In three of the cases relied upon by respondent, the taxpayer conceded the tax, so

21  there was no finding on economic substance.  *Murfam*, 88 Fed. Cl. at 518; *Alpha I, LP v. United*

22  *States*, 93 Fed. Cl. 280, 285 (2010); *106 Ltd v. Comm'r*, 136 T.C. No. 3, 74 (2011).

23      242.    Although the amount of the gain from the options transactions was substantially

24  less than the tax benefit obtained, it was a gain, nonetheless, and the reasonable possibility of a

25  much higher gain through a rise in the market existed. *See Coltec*, 454 F.3d at 1356.

26      243.    Since the law does not require any specific ratio of profit to tax loss, but rather only

27  that there be "practical economic effect other than the creation of tax benefits" the IRS's position

28  must be rejected.  *Casebeer*, *supra*.

SIDEMAN & BANCROFT LLP
LAW OFFICES
ONE EMBARCADERO CENTER, 8TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111

PETITIONERS' POST-TRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

244.   The Court holds that the transactions had economic substance.

**E.   Alternative Challenges to the Transactions Do Not Mandate a Different Result**

245.   The government also seeks to invalidate the tax effects of the transactions under the substance over form doctrine, the step transaction doctrine and the "anti-abuse" rules, and by arguing that the partnerships lacked a profit motive under § 165.

246.   However, none of these alternative theories invalidates the tax effects of the transactions.

**i.   The Substance Over Form Doctrine**

247.   The "substance over form" doctrine looks "... to the objective economic realities of a transaction rather than to the particular form the parties employed." *Frank Lyon,* 435 U.S. at 573*; Allen v. Commissioner*, 925 F.2d 348, 352 (9th Cir. 1991).

248.   "The substance-over-form doctrine is, however, bound by, and in some tension with, the principle, equally lauded in tax law, that 'anyone may so arrange his affairs that his taxes shall be as low as possible; he is not bound to choose the pattern which will best pay the Treasury.'" *Brown v. United States*, 329 F.3d 664, 671 (9th Cir. 2003) (citation omitted).

249.   The substance of the transaction at issue is not different than the form of the transaction.  The transaction involved multiple entities each with a specific and meaningful business purpose.  The entities each held valuable assets and engaged in actual investment activities.  2000-A held S&P positions and stocks that were worth approximately $240 million and were at risk in the transaction.  The options contributed to 2000-A were not merely paper contracts but had genuine economic effects and were not offsetting.  The options posed genuine economic risk to 2000-A and were structured to have the potential to generate economic profit.  Indeed, 2000-A made approximately $3.9 million on the options and could have made or lost many millions of dollars.  Respondent's substance over form argument does not account for the actual results of the transaction and therefore fails.

250.   Accordingly, the substance over form doctrine does not apply to invalidate the losses claimed.

48
PETITIONERS' POST-TRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

SIDEMAN & BANCROFT LLP
LAW OFFICES
ONE EMBARCADERO CENTER, 8TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111

SIDEMAN & BANCROFT LLP
LAW OFFICES
ONE EMBARCADERO CENTER, 8TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111

### ii.   The Step-Transaction Doctrine

251.    Under the step-transaction doctrine, "interrelated yet formally distinct steps in an integrated transaction may not be considered independently of the overall transaction." *Comm'r v. Clark,* 489 U.S. 726, 738 (1989).  The objective of the doctrine is to "give tax effect to the substance, as opposed to the form of a transaction, by ignoring for tax purposes, steps of an integrated transaction that separately are without substance." *Falconwood Corp. v. U.S.,* 422 F.3d 1339, 1349 (Fed. Cir. 2005) (citation omitted).

252.    Courts have endorsed three primary formulations of the step transaction doctrine: (a) The "binding commitment" test; (b) the "interdependence" test, which asks whether the individual transactions in a series would be "fruitless" without completion of the series; and (c) the "end result" test, which examines whether separate transactions are really component parts of a single transaction intended to attain the ultimate result. *Id.*

253.    Neither the Martin Trusts nor First Ship had any binding commitment to either purchase the Options or transfer them to 2000-A, and the value of the Martin Trusts' interest in First Ship and First Ship's interest in 2000-A was not fixed or determined before the date of the respective transfers.

254.    Further, each transaction – the Martin Trusts' purchase of the options, their investment in First Ship, and First Ship's investment in 2000-A – was independently undertaken, and presented the relevant parties with the separate potential for economic gain or loss.  Indeed, the economic realities of the options – the profit obtained – demonstrate that the options transactions had substance by themselves and were not fruitless without completion of the other steps of the transaction.

255.    Finally, the ultimate results of the various scenarios were neither mapped out prior to the implementation of the structure, nor assured.   Rather, the Martin Trusts and First Ship had a number of available alternatives with respect to both the options and their respective investments. The Martin Trusts bore the risk that either the long or short options might decline in value prior to their contribution to First Ship.  First Ship and 2000-A were each placed at risk with respect to their respective investments.

256.    The respondent's application of the step transaction doctrine ignores the economic realities of each part of the transaction, including in particular the profit earned on the options.

257.    For each of these reasons, this Court holds that the step transaction doctrine does not invalidate the tax effects claimed.

### iii.    The Anti-Abuse Rules

258.    Under the anti-abuse rules, the IRS claims authority to recast a transaction for federal income tax purposes if (i) "a partnership is formed or availed of in connection with a transaction a principal purpose of which is to reduce substantially the present value of the partners' aggregate federal tax liability," in a manner that is (ii) "inconsistent with the intent of Subchapter K."  Treas. Reg. § 1.701-2(b).

259.    The Treasury Department does not have the authority to promulgate a regulation that usurps the judiciary's authority to interpret the law.  As the Ninth Circuit held in *RLC Industries Co. v. Comm'r*, 58 F.3d 413, 416 (9th Cir. 1995) (*quoting Martin v. Occupational Safety & Health Review Comm'r*, 499 U.S. 144, 154-55 (1991)), "'making authoritative findings of fact and . . . applying the Secretary's standards to those facts in making a decision' are 'adjudicatory powers typically exercised by a court in the agency-review context.'"  In *RLC Industries*, the Ninth CU.S.C.uit held invalid a legislative Treasury regulation that purportedly gave the IRS "overriding power" to decide the reasonableness of a taxpayer's depletion allowance.  *Id.* at 419.  The regulation at issue provided that for "good and substantial reasons satisfactory to the district director, or as required by the district director on audit" the IRS could readjust a taxpayer's timber or land accounts.  *Id.* at 414.  As is the case with the partnership anti-abuse rule, the regulation in *RLC Industries* purported to provide the IRS with this authority regardless of whether the accounts otherwise comported with the Code.  *Id.*   The Government's position in this case would require the Court to construe the partnership anti-abuse rule to give the IRS the power to determine whether it will comply with the Code and Regulations, based on its unilateral interpretation of whether a transaction comports with the "intent" of the statute and produces results that were "contemplated" by the drafters.  Any such interpretation of the regulation would render it invalid under *RLC Industries*.

SIDEMAN & BANCROFT LLP
LAW OFFICES
ONE EMBARCADERO CENTER, 8TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111

260.    Even if the partnership anti-abuse rule were valid, it would not permit the IRS to recast the transaction.  As explained above, the IRS cannot recast the transaction unless the transaction is formed for a principal purpose of avoiding tax in a manner that is inconsistent with the intent of subchapter K.  Both elements must exist simultaneously for the Commissioner to recast the transaction.  However, neither prong is met under the facts here.

261.    The structure was not formed or availed of with a "principal" purpose to reduce tax.  Rather, the various entities within the structure were created as a repository of the Martin family's and the 14 Martin Family Trusts' investments to contend with the myriad concerns of the family.  Since implementation, the partnerships made numerous investments with varying degrees of risk.  The structure remained in existence long after the exercise of the hedge and maintained a complex portfolio of assets worth millions of dollars.

262.    Nor was the result of the transactions at issue inconsistent with the "intent" of subchapter K.  The evidence demonstrates that the partnerships were valid and the investments they made were in the ordinary course of its business, were intended to be profitable and were bona fide.  Moreover, the transactions were legitimate, independent economic transactions entered into in the ordinary course of business.  While the transactions resulted in tax benefits, the consequences of the transactions accurately reflected the economic arrangements among the partners.  There were no allocations among the partners that were inconsistent with Subchapter K or otherwise lacked substantial economic effect within the meaning of § 704(b).

### iv.    26 U.S.C. Section 165

263.    26 U.S.C. Section 165 allows taxpayers to deduct losses incurred in any transaction entered into for profit though not connected with a trade or business. 26 U.S.C. § 165(a); *see also* Treas. Reg. § 1.165-1.

264.    Section 165 on its face does not require that profit constitute the *primary* motive in order for a loss to be deducted.  26 U.S.C. § 165(c)(2).

265.    Numerous courts interpreting Section 165(c)(2) have not required a taxpayer to demonstrate that profit was a primary motivation but rather simply that there be a bona fide profit motive. *See Smith v. Comm'r*, 78 T.C. 350 (1982) ("The mere fact that petitioners may have had a

1   strong tax avoidance purpose in entering into their commodity tax straddles does not in itself result

2   in the disallowance of petitioners' losses under section 165(c)(2), provided petitioners also had a

3   nontax profit motive for their investments at the time. *See Knetsch v. United States,*172 Ct. Cl.

4   378, 348 F.2d 932, 936-37 (1965).  Such hope of deriving an economic profit aside from the tax

5   benefits need not be reasonable so long as it is bona fide. *See Bessenyey v. Commissioner,* 45 T.C.

6   261, 274 (1965), *aff'd.* 379 F.2d 252 (2d Cir. 1967)"), *aff'd without opinion*, 820 F.2d 1220 (4th

7   Cir. 1987), *superceded on other grounds by 26 U.S.C. § 1001*, *Twuy v. Comm'r.*, T.C. Memo

8   1993-212 * 23; *Dreicer v. Comm'r*, 78 T.C. 642, 646 (1982), *aff'd without published opinion*, 702

9   F.2d 1205 (D.C. Cir. 1983).

266.   However, other courts have held that a taxpayer's motive for entering into a

11   transaction must be primarily for profit for a resulting loss to be deducted if it is not connected

12   with a trade or business.  *See Landreth v. Comm'r*, 859 F.2d 643, 645 (9th Cir. 1988) (addressing

13   26 U.S.C. § 108); *Gonzalez v. United States*, 2011 WL 835554 at *8 (N.D. Cal. Mar. 4, 2011).

267.   The evidence established that the taxpayers had a profit motive for entering into all

15   aspects of the transactions, including the purchase of the SPDRs and S&Ps, as well as purchasing

16   the options, and, in fact, earned a profit on the options.

268.   Even if a primary profit motive is required, the taxpayers satisfy Section 165

18   because the evidence shows that tax savings was not the primary motive for entering into the

19   transaction, as was the case in *Gonzalez,* but that the primary motives were profit and other non-

20   tax concerns.

269.   Because the taxpayers had the requisite profit motive when they engaged in the

22   transactions, and in fact earned a profit on the options, this Court holds that they are entitled to the

23   losses.

**F.**   **Out of Pocket Expenses are Allowable**

270.   Section 212 allows a deduction for all ordinary and necessary expenses paid or

26   incurred during the tax year (1) for the production or collection or income; (2) for the

27   management, conservation, or maintenance of property held for the production of income; or (3) in

28   connection with the determination, collection, or refund of any tax. 26 U.S.C. § 212.

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 8TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111

271.    U.S.C. section 165 allows as a deduction for any loss in a transaction entered into for profit, though not connected with a trade or business.

272.    The deduction by 2000-A on its year 2000 Form 1065 for expenses of $4,308,787 representing fees related to the transactions is allowable under 26 U.S.C. § 165(c)(2) or 212 because the amounts in question were paid or incurred and satisfy the requirements of these sections.

273.    The deduction by First Ship on its year 2001 Form 1065 for expenses of $1,353,736 representing fees related to the transactions is allowable under 26 U.S.C. §§ 165(c)(2) and 212 as the amounts in question were paid or incurred and satisfy the requirements of these sections.

### G.    <u>Penalties Do Not Apply</u>

274.    The Respondent asserts that accuracy-related penalties apply. Stip. ¶¶ 20, 22; Stip. Exs. 9, 10 (Jt. Exs. 304, 305).

275.    With respect to 2000-A's 2000 taxable year, the Respondent asserts that an accuracy-related penalty applies for: (1) a substantial understatement of income tax; (2) a gross valuation misstatement; or (3) negligence or disregard of rules or regulations. Ex. 304.

276.    With respect to the First Ship's 2001 taxable year, the United States asserts that an accuracy-related penalty applies for: (1) negligence or disregard of rules or regulations; or (2) a substantial understatement of income tax.  Ex. 305.

277.    All of the penalties proposed by the IRS are "accuracy-related penalties" under Section 6662.  However, each penalty has its own criteria for application and a specific penalty rate. *Contrast* 26 U.S.C. § 6662(c), (d), (e), and (h).  The rate for the gross valuation misstatement penalty is 40%, while the rate for all of the other asserted penalties is 20%.  *See* § 6662(a) and (h)(1).

278.    Although the Respondent asserts up to three different accuracy-related penalties, there is no "stacking" of penalties. Treas. Reg. § 1.6662-2(c).  Thus, any one adjustment to tax can result in only one penalty, even if that adjustment meets the criteria for more than one penalty.

SIDEMAN & BANCROFT LLP
LAW OFFICES
ONE EMBARCADERO CENTER, 8TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111

279.   An accuracy-related penalty only applies to the extent that there is an actual underpayment of tax.  26 U.S.C. § 6662(a).  Because Petitioners prevail on the merits, penalties under Section 6662 are inapplicable.

280.   If the Court upholds the adjustments, imposition of penalties is nevertheless inappropriate because (i) the substantial understatement penalty does not apply as there was substantial authority for the tax positions taken, (ii) the negligence penalty does not apply because there was no negligence or disregard of rules or regulations, and (iii) the valuation misstatement penalty does not apply because there was no valuation misstatement.

281.   All three of the accuracy-related penalties asserted by the Respondent may be overcome by a showing of reasonable cause and good faith.  26 U.S.C. § 6664(c).

282.   Section 6664(c) operates by reducing the amount of any underpayment of tax that may be subject to a penalty by the portion for which there was reasonable cause and good faith. 26 U.S.C. § 6664(c)(1).  Thus, a determination that reasonable cause and good faith were satisfied with respect to the tax issues in this case would eliminate the need to address separately the substantive requirements for each of the penalties.

### i.   Penalty Jurisdiction

283.   In this TEFRA proceeding, the Court has jurisdiction to determine partnership items as well as the applicability of any penalty that relates to an adjustment to partnership items. 26 U.S.C. § 6226(f).

284.   The Court's jurisdiction also includes determinations as to defenses against the imposition of penalties, other than partner-level defenses that depend on facts specific to a particular partner.  For example, as discussed below, the substantial understatement penalty cannot apply unless the tax understatement exceeds the greater of $5,000 or 10% of the amount reported on the taxpayer's return.  Because that threshold amount varies from partner to partner, the current Treasury Regulations classify that threshold as a partner-level defense. Treas. Reg. § 301.6221-1(d).

285.   When promulgating regulations interpreting the 1997 TEFRA amendments, the IRS sought to exclude certain penalty defenses from partnership-level proceedings, principally the

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 8TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111

PETITIONERS' POST-TRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

1   reasonable cause defense of section 6664(c).  Treas. Reg. § 301.6226(f)-1(a).  This regulation does

2   not apply to the 2000 taxable year for 2000-A or the 2001 taxable year for First Ship, because

3   those taxable years began before October 4, 2001.  *See* Treas. Reg. § 301.6226(f)-1(c).

4          286.    Courts have allowed taxpayers to present a reasonable cause and good faith defense

5   in a partnership-level proceeding, particularly when the defense relates to the activity of the

6   manager or of a controlling partner. *See Klamath*, 472 F. Supp. 2d at 903-04 (rejecting efforts by

7   the government to prevent the partnership from introducing evidence relevant to the reasonable

8   cause defenses of individual partners); *see also Santa Monica Pictures, LLC v. Comm'r*, 89

9   T.C.M. (CCH) 1157, 1225 n.187 (2005) (stating in a footnote that partner-level defenses must be

10  determined in a partner-level proceeding, but addressing the application of the reasonable cause

11  and good faith defense); *Stobie Creek*, 82 Fed. Cl. at 703 (resolving issues concerning the

12  reasonable cause defense by looking to the actions of the partnership's manager).

13         287.    At the time the partnerships and the Trusts entered into the transactions, Mr. Folger

14  was the president of LMGA Holdings, which was the managing partner of 2000-A, and was also

15  the trustee of the 14 Martin Family Trusts and, thus, is the appropriate person to look to as to the

16  actions of the partnership and its partners when determining the application of penalties. Tr. pp.

17  287:24-288:19.

18              ii.    **The Substantial Understatement Penalty Does Not Apply**

19         288.    Section 6662(b)(2) imposes a 20% penalty for "[a]ny substantial understatement of

20  income tax" on a taxpayer's return.  26 U.S.C. § 6662(a), (b)(2) and (d)(1)(A).

21         289.    A substantial understatement penalty may apply if there is an understatement of

22  income tax that exceeds the greater of 10 percent of the tax required to be shown on the return or

23  $5,000.  26 U.S.C. § 6662(d)(1)(A).

24         290.    Because a partnership return does not report a tax liability, the substantial

25  understatement threshold is computed at the partner level.

26         291.    Whether any of the ultimate taxpayers meet the substantial understatement

27  threshold is a purely mathematical computation that would be performed, if necessary, after the

28  Court's determinations of partnership items are applied to their tax returns.

SIDEMAN & BANCROFT LLP
LAW OFFICES
ONE EMBARCADERO CENTER, 8TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111

SIDEMAN & BANCROFT LLP
LAW OFFICES
ONE EMBARCADERO CENTER, 8TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111

292.    The amount of the substantial understatement used to compute the penalty does not include any item for which there was substantial supporting authority.  26 U.S.C. § 6662(d)(2)(B)(i); Treas. Reg. § 16662-4(a).

293.    If substantial authority exists for the taxpayer's treatment of the item, the amount of the item is excluded from the determination of whether the taxpayer's understatement exceeds the applicable threshold.  26 U.S.C. § 6662(d)(2)(B)(i).  In the case of a tax shelter, in addition to substantial authority, the taxpayer must also have a reasonable belief that the claimed tax treatment is more likely than not the proper treatment. 26 U.S.C. §  6662(d)(2)(C)(i)(II).  For this purpose, a tax shelter includes any entity, plan, or arrangement a significant purpose of which is the avoidance or evasion of Federal income tax.  26 U.S.C. § 6662(d)(2)(C)(iii).   The transactions at issue did not have as a significant purpose the avoidance or evasion of Federal income tax.  Accordingly, the higher standard applicable to "tax shelters" does not apply here.  If the Court determines that the higher standard is applicable, petitioners satisfy that standard and the substantial understatement penalty does not apply because the partnership had a reasonable belief that the claimed tax treatment was more likely than not the proper treatment.

294.    Substantial authority is an objective standard that has two components—whether there was "authority" for a position, and if so, whether that authority was "substantial."  Treas. Reg. § 1.6662-4(d)(1).

295.    The substantial authority determination is based on the law as it existed at the time the return was filed; subsequent developments in the law are irrelevant.  Treas. Reg. § 1.6662-4(d)(3)(iv)(C).

296.    If the Court determines that Treas. Reg. § 1.752-6 applies, the partnerships nonetheless had substantial authority when their returns were filed.  Treasury Regulation § 1.752-6 was promulgated in temporary form in 2003 and did not exist at the time the partnership return was filed.  *See* T.D. 9062, 2003-2 C.B. 46 (June 24, 2003).  Indeed, the fact that the IRS promulgated Treas. Reg. § 1.752-6 is compelling evidence that, prior to such regulation, a short option was not a liability.  *Klamath*, 440 F.Supp. 2d at 620.  Or that it was at least reasonable to believe that this was the rule.

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 8TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111

1    297.    The substantial authority standard is "less stringent than the more likely than not

2    standard (the standard that is met when there is a greater than 50-percent likelihood of the position

3    being upheld), but more stringent than the reasonable basis standard."  Treas. Reg. § 1.6662-

4    4(d)(2).

5    298.    Substantial authority exists where "the weight of the authorities supporting the

6    treatment is substantial in relation to the weight of authorities supporting contrary treatment."

7    Treas. Reg. § 1.6662-4(d)(3)(i).

8    299.    "There may be substantial authority for more than one position with respect to the

9    same item."  Treas. Reg. § 1.6662-4(d)(3)(i).

10    300.    In addition to various explicitly identified authorities, "a taxpayer may have

11    substantial authority for a position that is supported only by a well-reasoned construction of the

12    applicable statutory provision."  Treas. Reg. § 1.6662-4(d)(3)(ii).

13    301.    In assessing whether the authority for a particular position is substantial, different

14    authorities are not entitled to equal weight.

15    302.    Court opinions receive greater deference than mere administrative pronouncements.

16    *United States v. Mead Corp.*, 533 U.S. 218, 226-27 (2001) (agency promulgations not considered

17    controlling authority).  Thus, *Helmer,* 34 T.C.M. 727 is entitled to greater deference than Notice

18    2000-44.

19    303.    "[A]n authority does not continue to be an authority to the extent it is overruled or

20    modified, implicitly or explicitly, *by a body with the power to overrule or modify the earlier*

21    *authority.*"  Treas. Reg. § 1.6662-4(d)(3)(iii) (emphasis added).  Thus, while the IRS may change

22    its administrative position, it cannot trump a court opinion because the IRS does not have the

23    authority to overrule judicial opinions.

24    304.    For purposes of evaluating substantial authority, Notice 2000-44 cannot trump a

25    judicial opinion such as *Helmer,* 34 T.C.M. 727, or *Brountas v. Comm'r*, 692 F.2d 152 (1st Cir.

26    1982), which hold that contingent obligations are not liabilities under section 752.

27    305.    As a general matter, the jurisdiction in which the taxpayer resides is not taken into

28    account for purposes of applying the substantial authority standard.  Treas. Reg. § 1.6662-

PETITIONERS' POST-TRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

1  4(d)(3)(iv)(B).  Thus, a taxpayer residing in the Ninth CU.S.C.uit may fully rely on an opinion of

2  another circuit, such as *Brountas*, for purposes of establishing substantial authority.

3      306.    Although the opinions of tax professionals and learned treatises are not authority

4  for substantial authority purposes, the authorities underlying the opinion of a tax professional or

5  treatise may give rise to substantial authority.  Treas. Reg. § 1.6662-4(d)(3)(iii).

6      307.    The substantial authority standard is not limited to legal issues, but extends to

7  factual issues as well.  Thus, if a taxpayer erroneously believes that a business was entered into for

8  profit, a substantial authority analysis can be applied to the factual question of profitability. *See,*

9  *e.g., Osteen v. Comm'r*, 62 F.3d 356, 359 (11th Cir. 1995) ("Only if there was a record upon which

10  the Government could obtain a reversal under the clearly erroneous standard could it be argued

11  that from an evidentiary standpoint, there was not substantial authority for the taxpayer's

12  position.").  *See also Estate of Kluener v. Comm'r*, 154 F.3d 630, 637-38 (6th Cir. 1998); *Streber v.*

13  *Comm'r*, 138 F.3d 216, 223 (5th Cir. 1998).

14      308.    Comprehensive written opinions were obtained for the transactions at issue.  The

15  opinions relied on the relevant authority at the time and addressed the specific facts involved.  The

16  advisers went over the opinions with the partnerships' representative, Mr. Folger,  and with the

17  Martin family, and confirmed they were reasonable.  Tr. p. 378:3-11; p. 473:1-6.

18      309.    An objective review of the opinions reveals that substantial authority existed for the

19  conclusions therein.  They were based on then-current, long-standing law.

20      310.    As such, there was substantial authority for the tax positions taken, and the

21  imposition of a substantial understatement penalty is inappropriate.

22      **iii.    The Negligence Penalty Does Not Apply**

23

24      311.    A negligence penalty of 20% applies where there is negligence or disregard of rules

25  or regulations.  26 U.S.C. Section 6662(b)(1), (c).

26      312.    The standards for the imposition of a penalty based on negligence or the disregard

27  of rules or regulations differ, along with the defenses to those penalties.  *See generally* 26 U.S.C. §

28  6662(c) and Treas. Reg. § 1.6662-3.

PETITIONERS' POST-TRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

SIDEMAN & BANCROFT LLP
LAW OFFICES
ONE EMBARCADERO CENTER, 8TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111

313.    Negligence includes any failure to make a reasonable attempt to comply with the Internal Revenue Code.  26 U.S.C. § 6662(c); Treas. Reg. § 1.6662-3(b).

314.    The negligence penalty does not apply if there is a reasonable basis for the taxpayer's position.  Treas. Reg. § 1.6662-3(b)(1).

315.    In determining whether a reasonable basis exists for return positions, the regulations direct taxpayers to the same list of authorities on which taxpayers may rely for substantial authority.  Treas. Reg. § 1.6662-3(b)(3) (citing Treas. Reg. § 1.6662-4(d)(3)(iii)).

316.    Substantial authority is a more stringent standard than reasonable basis.  Treas. Reg. § 1.6662-4(d)(2).

317.    Because, as described above, there was substantial authority for the positions reported by the partnerships, it follows that there must have been a reasonable basis.  Thus, the negligence penalty does not apply.  If the substantial authority standard is not met, those same authorities nonetheless satisfy the reasonable basis standard.

318.    The "disregard" of rules or regulations includes any careless, reckless or intentional disregard.  U.S.C. § 6662(c); Treas. Reg. § 1.6662-3(b).

319.    A taxpayer who takes a position contrary to a revenue ruling or notice has not disregarded the ruling or notice if the contrary position "has a realistic possibility of being sustained on the merits."  Treas. Reg. § 1.6662-3(b)(2).

320.    In determining whether a realistic possibility of being sustained on its merits exists for return positions, the regulations defining the realistic possibility standard direct taxpayers to the same list of authorities on which taxpayers may rely for substantial authority.  Treas. Reg. § 1.6694-2(b)(2) (citing Treas. Reg. § 1.6662-4(d)(3)(iii)).

321.    The "realistic possibility" standard is a lesser standard than substantial authority. Staff of Joint Comm. on Taxation, 106th Cong., Comparison of Joint Committee Staff and Treasury Recommendations Relating to Penalty and Interest Provisions of the Internal Revenue Code 13 (Comm. Print 1999).

SIDEMAN & BANCROFT LLP
LAW OFFICES
ONE EMBARCADERO CENTER, 8TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111

PETITIONERS' POST-TRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

322. To the extent that Notice 2000-44 applied, the taxpayers' position had a realistic possibility of being sustained on the merits and therefore the taxpayers have not disregarded a rule or regulation under section 6662.

323. Because, as described above, there was substantial authority for the positions reported by the partnerships, it follows that there must have been a realistic possibility of being sustained on the merits. Thus, the penalty for disregard of rules or regulations does not apply.

324. To the extent the Court determines that the taxpayers took a position contrary to a rule or regulation, the taxpayers' position had a realistic possibility of being sustained on the merits and therefore the taxpayers have not disregarded a rule or regulation under Section 6662 and the penalty is inapplicable.

### iv.   Reasonable Attempt To Comply With The Code

325. The negligence penalty does not apply even when the taxpayer reported a tax position that may seem too good to be true if the taxpayer makes a reasonable attempt to ascertain the correctness of the position. Treas. Reg. § 1.6662-3(b)(1)(ii). Even then, the negligence penalty would not apply if there was a reasonable basis for the position. Treas. Reg. § 1.6662-3(b)(1).

326. Many cases have upheld taxpayers' positions where the IRS alleged that the tax results were "too good to be true." An investment that yields tax benefits that are two times the amount invested is not necessarily too good to be true. *See Allison v. United States*, 80 Fed. Cl. 568, 595-96 (2008). Nor is eight or ten times. *Id*. at 596 (*citing Durrett v. Comm'r*, 71 F.3d 515, 517-18 (5th Cir. 1996); *Chamberlain v. Comm'r*, 66 F.3d 729, 733 (5th Cir. 1995)). Taxpayers have prevailed with respect to tax-motivated transactions in which they held an investment for as little as three days. *Compaq Computer Corp. v. Comm'r*, 277 F.3d 778 (5th Cir. 2001) (investment bought and sold within an hour on the same day, with a two-day settlement on the purchase and a five-day settlement on the sale, yielding up to a three-day holding period). *See also IES Indus. Inc. v. United States*, 253 F.3d 350 (8th Cir. 2001) (same transaction as *Compaq*). In light of this precedent, there is no support for a per se rule that imposes a penalty because the tax benefits

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 8TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111

1    appeared to be "too good to be true."  Rather, the issue is whether the taxpayer made reasonable

2    attempts to ascertain whether the tax return positions were correct.

3         327.   In the Ninth CU.S.Cuit, the question is whether taxpayers "reasonably investigate"

4    or make "reasonable inquiry." *Collins v. Comm'r*, 857 F.2d 1383, 1386 (9th Cir. 1988); *Zmuda v.*

5    *Comm'r*, 731 F.2d 1417, 1422 (9th Cir. 1984).

6         328.   Unlike *Collins*, where the investor merely relied on generic materials contained in a

7    prospectus, Mr. Folger and the Martin family received advice from Sideman & Bancroft and

8    PWC.  They did not rely on any promoter or any generic promoter material.  Rather, they relied on

9    lengthy presentations made by PWC and Sideman & Bancroft and to the efficacy and legitimacy

10   of the transactions and the tax effects. Tr. p. 173:8-10; p. 387:16-19; p. 462:1-4; p. 464:4-8; pp.

11   605:19-608:1; p. 769:18-23; p. 846:2-8; p. 997:5-9; Exs. 30, 39, 40, 47, 49-54, 120, 309.

12        329.   Unlike *Zmuda*, where the investor ignored the warning of an accountant, Mr.

13   Folger and the Martin family relied on the advice of PWC and Sideman & Bancroft.  Tr. p.

14   155:15-23; p. 264:3-10; p. 267:18-23; Exs. 30, 120, 309.   Indeed, the Ninth Circuit criticized the

15   taxpayer in *Zmuda* for not seeking legal advice, whereas the taxpayers here did precisely what the

16   Ninth Circuit suggested and sought the advice of experienced tax professionals at PWC and

17   Sideman & Bancroft, both of which were compensated at their normal hourly rates.  Tr. pp.

18   145:22-146:2; p. 346:21-24.  In addition, the taxpayers obtained investment advice from JP

19   Morgan and Professor Rubinstein and reasonably relied on that advice regarding the economic

20   viability of investing in the hedging transaction. Tr. p. 173:8-10; p. 387:16-19; p. 462:1-4; p.

21   464:4-8; pp. 605:19-608:1; p. 769:18-23; p. 846:2-8; p. 997:5-9; Exs. 30, 39, 40, 47, 49-54, 120,

22   309.

23        330.   The taxpayers made a reasonable attempt to ascertain the correctness of their

24   reporting positions.

25        **v.     The Valuation Misstatement Penalty Does Not Apply**

26

27        331.   The respondent has proposed a 40% gross valuation misstatement penalty against

28   2000-A under section 6662(h).  However, the Ninth Circuit has limited the imposition of penalties

SIDEMAN & BANCROFT LLP
LAW OFFICES
ONE EMBARCADERO CENTER, 8TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111

SIDEMAN & BANCROFT LLP
LAW OFFICES
ONE EMBARCADERO CENTER, 8TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111

1   to the 20% understatement penalty as provided in 26 U.S.C. § 6662(b)(2).  *See Keller v. Comm'r*,

2   553 F.3d 1056.  Indeed, the respondent has acknowledged that *Keller* is the applicable law in the

3   Ninth CU.S.uit and that it can, thus, only seek the imposition of a 20% penalty here. U.S. Trial

4   Brief, p. 22:18-19.

5          332.   A valuation misstatement penalty may be imposed on an underpayment that is

6   attributable to any substantial valuation misstatement or gross valuation misstatement.  U.S.C. §

7   6662(b)(3), (e), (h).

8          333.   An underpayment is attributable to a substantial valuation misstatement if the

9   underpayment is caused by the reporting of the value or basis of any property on a return that is at

10  least double what is determined to be the correct amount.  U.S.C. § 6662(e)(1)(A).

11         334.   In the case of a gross valuation misstatement, the threshold amount is four times the

12  value or basis, and the penalty rate is 40% rather than 20%.  U.S.C. § 6662(h).

13         335.   The mere existence of a valuation misstatement is not enough to trigger the penalty;

14  instead, the underpayment of tax must be *attributable to* that valuation misstatement.  U.S.C. §

15  6662(b)(3) (applying the penalty to understatements "attributable to" any substantial valuation

16  misstatement); Treas. Reg. § 1.6662-5(a) (same).  *See also Keller*, 556 F.3d at 1059-60; *Gainer v.

17  Comm'r*, 893 F.2d 225 (9th Cir. 1990); *Todd v. Comm'r*, 862 F.2d 540 (5th Cir. 1988).

18         336.   The determination of whether an underpayment of tax is attributable to a valuation

19  misstatement is made only after taking into account any other adjustments.  Thus if there are

20  alternative theories supporting an adjustment and any one of those theories does not involve a

21  valuation misstatement, the valuation misstatement penalty does not apply.  *Keller*, 556 F.3d at

22  1060 (citing Staff of Joint Comm. on Taxation, 97th Cong., General Explanation of the Economic

23  Recovery Tax Act of 1981 333 (Comm. Print 1981) ("The portion of a tax underpayment that is

24  attributable to a valuation overstatement will be determined *after taking into account any other

25  proper adjustments to tax liability*.  Thus, the underpayment resulting from a valuation

26  overstatement will be determined by comparing the taxpayer's (1) actual tax liability (i.e., the tax

27  liability that results from a proper valuation and which takes into account any other proper

28  adjustments) with (2) actual tax liability as reduced by taking into account the valuation

PETITIONERS' POST-TRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

1    overstatement. The difference between these two amounts will be the underpayment that is

2    attributable to the valuation overstatement.")).

3         337.    The valuation misstatement penalty does not apply where a court disregards a

4    transaction based on a lack of economic substance. *Keller*, 553 F.3d at 1056; *see also Heasley v.*

5    *Comm'r*, 902 F.2d 380, 382 (5th Cir. 1990) ("Whenever the I.R.S. totally disallows a deduction or

6    credit, the I.R.S. may not penalize the taxpayer for a valuation overstatement included in that

7    deduction or credit. In such a case, the underpayment is not attributable to a valuation

8    overstatement. Instead, it is attributable to claiming an improper deduction or credit."), *aff'd in*

9    *relevant part and rev'd in part on other grounds*, 967 F.2d 116.

10        338.    The same rationale applies to a disallowance based on section 165(c)(2). Section

11   165(c)(2) disallows losses that are not incurred in a transaction entered into for profit. Thus, if the

12   Court disallows a loss under section 165, it follows that the disallowance is *not* attributable to a

13   valuation misstatement. As a result, a valuation misstatement penalty could not apply to an

14   adjustment resulting from the application of section 165(c)(2). *See, e.g., Davis v. Comm'r*, 92

15   T.C.M. (CCH) 514, 524 n.14 (2006).

16        **vi.**    **Petitioners And The Partnerships Had Reasonable Cause And Acted In**

17              **Good Faith**

18        339.    Section 6664(c)(1) provides an absolute defense to any accuracy-related penalty. A

19   taxpayer that would otherwise be subject to an accuracy related penalty under section 6662(b) is

20   not liable if he can demonstrate that the underpayment was made with reasonable cause and he

21   acted in good faith. U.S.C. § 6664(c)(1); Treas. Reg. § 1.6664-4(a) & (c)(1).

22        340.    Though an inquiry of reasonable cause requires a case-by-case determination of all

23   pertinent facts and circumstances, generally "the most important factor is the extent of the

24   taxpayer's effort to assess the taxpayer's proper tax liability." Treas. Reg. § 1.6664-4(b)(1).

25        341.    The Court makes an independent determination of the application of the reasonable

26   cause and good faith defense, without deference to the IRS's determinations. *See* H.R. Rep. No.

27   101-247, at 1393 (1989) ("The committee believes that it is appropriate for the courts to review

28

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 8TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111

the determination of the accuracy-related penalties by the same general standard applicable to their review of the additional taxes that the I.R.S. determines are owed.").

### a.   Reliance On The Advice Of Tax Professionals Demonstrates Reasonable Cause

342.   Reliance on professional advice may constitute reasonable cause and good faith if, under the circumstances, "such reliance was reasonable and the taxpayer acted in good faith." Treas. Reg. § 1.6664-4(b)(1).

343.   The Ninth CU.S.C.uit broadly applies the reliance on advice standard.  For example, in *DHL Corp. & Subsidiaries v. Comm'r*, 285 F.3d 1210, 1225 (9th Cir. 2002), the government argued for, and the Tax Court imposed, a valuation misstatement penalty "because DHL sought the letter only after choosing an artificially depressed price," concluding that "parties can find experts who will advance and support values that favor the position of the person or entity that hired them."  The Ninth CU.S.C.uit reversed, stating:

> We are less inclined than the tax court to condemn a taxpayer who seeks a comfort letter from a respected financial firm in order to ensure compliance with IRS standards.  There is no evidence that DHL manipulated Bain's appraisal or that Bain blindly affirmed DHL's desired figure.

*DHL*, 285 F.3d at 1225.

344.   The fact that a taxpayer's adviser has a role in structuring a transaction is similarly irrelevant for purposes of determining reasonable reliance. *See, e.g., DeCleene v. Comm'r*, 115 T.C. 457, 477 (2000) (holding that the taxpayers were not liable for penalties because they "actually relied in good faith on disinterested professional advisers *who structured the transactions*." (emphasis added).

345.   Although the role of an adviser in the planning or structuring of a transaction may be relevant to penalty defenses under current law, for the years at issue, it is irrelevant to the issue of whether a taxpayer can rely on an adviser.  In 2004, Congress amended section 6664 to create a category of "disqualified tax advisers" and "disqualified opinions," but these rules were made

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 8TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111

1  prospective.  American Jobs Creation Act of 2004, Pub. L. No. 108-357, § 812(c), 118 Stat. 1418,

2  1579-80 (2004) (adding U.S.C. § 6664(d)).  Under these new rules, taxpayers may not rely on

3  opinions that are provided by certain tax advisers who are disqualified because of their role in

4  arranging the transaction.  *See* U.S.C. § 6664(d)(3)(B)(ii) (2004).  Likewise, certain opinions

5  cannot be relied upon under the new law if they don't meet certain criteria.  *See* U.S.C. §

6  6664(d)(3)(B)(iii) (2004).  Whether Sideman & Bancroft, PWC, or Brown & Wood would qualify

7  as disqualified tax advisers or whether the opinion issued by Brown & Wood would be a

8  disqualified opinion under today's standard is irrelevant—these provisions are effective only for

9  tax years ending after October 22, 2004.  American Jobs Creation Act of 2004 § 812(f).  In 2005,

10  Congress clarified and reinforced the prospective nature of the disqualified opinion rule, providing

11  that it:

12      shall not apply to the opinion of a tax adviser if—

13          (A) the opinion was provided to the taxpayer before the date of the
            enactment of this Act,

14

15          (B) the opinion relates to one or more transactions all of which were entered
            into before such date, and

16

17          (C) the tax treatment of items relating to each such transaction was included
            on a return or statement filed by the taxpayer before such date.

18  Gulf Opportunity Zone Act of 2005, Pub. L. No. 109-135, § 403(x)(3), 119 Stat. 2577, 2629

19  (2005).

20      346.  Taxpayers are not required to second-guess their advisers.  *United States v. Boyle*,

21  469 U.S. 241 (1985).

22          When an accountant or attorney *advises* a taxpayer on a matter of tax law,
        such as whether a liability exists, it is reasonable for the taxpayer to rely on that
23      advice.  Most taxpayers are not competent to discern error in the substantive advice
        of an accountant or attorney.  To require the taxpayer to challenge the attorney, to
24      seek a "second opinion," or to try to monitor counsel on the provisions of the Code
        himself would nullify the very purpose of seeking the advice of a presumed expert
25      in the first place.  "Ordinary business care and prudence" do not demand such
        actions.
26

27

28

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 8TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111

1    *Boyle*, 469 U.S. at 251 (citation omitted); *Chamberlain v. Comm'r*, 66 F.3d 729, 733 (5th Cir.

2    1995) (requiring a taxpayer to seek a second opinion and police the expert defeats the purpose of

3    hiring an expert).

4           347.    The viability of the structure and transactions was the subject of favorable tax

5    opinions provided by R.J. Ruble, who was not a promoter of the transactions at issue and was then

6    a widely known tax expert on partnership matters at the nationally recognized law firm Brown &

7    Wood, in exchange for a non-contingent fee.  Brown & Wood's thorough written opinions relied

8    on existing case law, detailed the proper tax treatment of the structure and transaction, and

9    concluded that the tax position to ultimately be taken on the relevant tax returns were "more likely

10   than not" correct.  The Brown & Wood opinions were not based upon any unreasonable factual or

11   legal assumptions and all factual assumptions were thoroughly and duly reviewed by Sideman &

12   Bancroft and PWC.

13          348.    The other legal and tax advisers on the structure and transactions, PWC and

14   Sideman & Bancroft, both of whom were paid on an hourly basis, advised Mr. Folger and the

15   family that the opinions were reasonable and could be relied upon.  In addition, PWC prepared and

16   signed the tax returns in issue.

17          349.    There was no relationship between the Martin family's advisors and any promoter

18   of the transaction.  If the Court determines that there was a such a relationship, it is nonetheless

19   irrelevant.  For example, in *Klamath*, the court upheld the taxpayers' reasonable cause defense,

20   which was based on their reliance on tax advisers who had also represented the promoters.

21   *Klamath*, 472 F. Supp. 2d at 894.  Likewise, in *NPR Invs. LLC v. United States*, 732 F. Supp. 2d

22   676 at 693 (E.D. Tex. 2010), the court held that the taxpayers' reliance on the advice of counsel

23   satisfied the reasonable cause standard even though the professionals on whom the taxpayer relied

24   also served as counsel for the promoters of the strategy, finding that "[t]he detailed opinions . . .

25   provided a reasonable interpretation of the law."

26          350.    While Respondent disagrees with the conclusions reached in the Brown & Wood

27   opinion, the opinions anticipated *every* issue raised in the FPAAs.

28

PETITIONERS' POST-TRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

SIDEMAN & BANCROFT LLP
LAW OFFICES
ONE EMBARCADERO CENTER, 8TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111

1      351.    Petitioners' expert, Stuart Smith, confirmed that the Brown & Wood opinions met

2   the professional standards that applied at the time.  Tr. p. 879:22-25; pp. 893:25-894:2.

3      352.    At the time, section 10.33 of Circular 230 set the "gold standard" of opinion

4   writing.  Tr. p. 891:22-23.

5      353.    The five elements of opinions conforming with section 10.33 of Circular 230 were

6   that they (1) set forth the facts with sufficient detail so that the reader can appreciate the fact that

7   the author understands the transaction; (2) relate the law to the facts; (3) set forth material tax

8   issues; (4) provide an opinion on each material tax issue, specifying whether it is more likely than

9   not that the taxpayer will prevail on the merits; and (5) make an overall evaluation on a more-

10  likely-than-not basis that the transaction will survive a challenged if scrutinized by the tax

11  authority.  31 C.F.R. § 10.33.

12      354.    In analyzing the Brown & Wood opinions to determine whether they met the

13  requirements of Circular 230, Mr. Smith read the opinions and the cases cited in them.  Based on

14  his review, he determined that the opinions met the Circular 230's "gold standard."  In short, the

15  Brown & Wood opinions met the professional standards of the time and could be relied upon. Tr.

16  p. 880:1-4; pp. 893:25-894:7.

17      355.    The use of templates is routine throughout the legal profession, including opinions

18  issued in connection with mergers and acquisitions and model jury instructions.  *See e.g.*, Carolyn

19  E.C. Paris, *Drafting a New Document*, in How to Draft for Corporate Finance § 2:1.1 (Practicing

20  Law Institute 2006) ("Rarely does a lawyer create an entire new contract without reference to any

21  form (a neutral, generic template) or precedent (a negotiated document from a prior deal).").  For

22  example, the tax disclosure sections of prospectuses and securities offering statements are highly

23  standardized.

24      356.    The taxpayers also relied upon Professor Rubinstein, who was provided all facts

25  that were relevant to his analysis and concluded that the transaction was economically viable and

26  could have a business purpose.

27

28

SIDEMAN & BANCROFT LLP
LAW OFFICES
ONE EMBARCADERO CENTER, 8TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111

PETITIONERS' POST-TRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

357.    The taxpayers had reasonable cause for any underpayment and acted in good faith here, based upon their reasonable reliance on professional advice.  The imposition of penalties is, therefore, inappropriate.

### b.    The Partnerships Reasonably Believed That Their Tax Treatment Was Proper

358.    To evaluate whether reasonable cause exists in a partnership proceeding, the courts look to the actions of the partnership through its managing partner.  *Klamath*, 568 F.3d 537 .  Until November 1, 2000, Francis Martin was the president of LMGA, which was the managing partner of 2000-A.  After November 1, 2000, Peter Folger, who was also the trustee of all of the Martin Trusts, was the president of LMGA.  The two individuals assembled and relied upon a team of advisers, including two law firms (Sideman & Bancroft and Brown & Wood), an accounting firm (PWC), an investment bank (JP Morgan), and an economist (Mark Rubinstein), to design a structure to meet the Martin family's objectives of risk management, asset conservation, flexible and prudent investment, maximization of returns, and equitable allocation among the Trusts of the attendant risks and rewards, and to advise the family regarding the tax aspects of the transactions. The advisers held meetings with the family, which were attended by Messrs. Martin and Folger, to discuss the various concerns and available options.  The advisors also had numerous separate conversations and meetings with the trustee, Mr. Folger, about the issues.  The advisers reviewed the opinions and all the representations contained therein.

359.    Neither Mr. Martin nor Mr. Folger is a tax lawyer, nor do they have any expertise in tax matters.  Instead, they relied on qualified, professional advisers for advice.  Because of the complexity of the tax treatment, it was necessary for these individuals to seek advice from qualified tax attorneys and accountants concerning the applicable law to the facts of the structure and transactions, the resulting tax effects, and the proper reporting position on the tax returns.

360.    Mr. Feusier testified that he would not have allowed PWC to have prepared or signed the returns reporting the tax effects of the transactions, if he had had any questions about the efficacy of transactions.  Tr. pp. 362:16-363:7.

SIDEMAN & BANCROFT LLP
LAW OFFICES
ONE EMBARCADERO CENTER, 8TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111

361.    Respondent's position that Mr. Folger made no attempt to assess the proper tax treatment of the transaction at issue is simply not supported by the facts.

362.    In similar cases, courts have found penalties inapplicable.  *See, e.g.*, *NPR,* 732 F.Supp.2d at 693 (in a transaction subsequent to the issuance of Notice 2000-44, the court rejected penalties where taxpayers relied upon their personal accountant and a Ruble opinion letter and Stuart Smith testified that the opinions complied with professional standards.  The taxpayer representative testified: "at every step, we followed the advice of people we relied on, people who were supposed to have known what they were doing and did know what they were doing.  And what else could we have done except follow their advice?"); *Klamath,* 472 F. Supp. 2d at 904-05 (taxpayers relied in good faith on qualified accountants and tax lawyers and opinion letters that Stuart Smith concluded complied with professional standards); *Am. Boat*, 583 F.3d 471 (finding reasonable reliance and not imposing penalties even though author of opinion letter structured transaction where fee was a flat fee not a percentage of the tax benefits and even though there were significant tax benefits which IRS argued were "too good to be true;" two reputable accounting firms raised no objection to tax treatment of transactions).

363.    The cases cited by respondent where penalties have been applied are distinguishable.  *Stobie Creek, supra* (advisers had financial stakes in transaction); *106 Ltd., supra* (reliance on advisers not reasonable where advisers were promoters in that they profited from implementation of the transaction as opposed to billing at regular hourly rates); *Palm Canyon, supra* (reliance not reasonable where opinion writer was promoter); *Murfam, supra* (reliance not reasonable where adviser's fee was tied to tax loss); *Alpha I LLP, supra* (reliance not reasonable where fee to promoter based upon percentage of tax saved); *Maguire Partners*, *supra* (transaction was widely marketed and promoter generated almost $15 million in fees from selling transaction).

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 8TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111

69
PETITIONERS' POST-TRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

LAW OFFICES

SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 8TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### vii.   Notice 2000-44 Is Immaterial To Reasonable Cause

364.   The fact that the IRS had issued Notice 2000-44 before the transaction was consummated does not preclude a finding of reasonable cause and good faith since the professional advisers reasonably distinguished the Notice and the Notice was merely a statement of the IRS's position.  *NPR, supra.*

365.   The taxpayers reasonable concluded, based upon the advice of their advisers, that IRS Notice 2000-44 was distinguishable from the transaction at issue.

366.   An IRS Notice is not legally controlling precedent.  Courts generally treat IRS Notices as nothing more than a statement of a party and therefore Notices are given little to no precedential value or weight in litigation.  *See Phillips Petroleum Co. v. Comm'r*, 101 T.C. at 99 n.17 (1993) (stating that Notices "do not have the force of law, are merely statements of the Commissioner's position, and are entitled to no special deference") (citations omitted); *Samonds v. Comm'r*, 66 T.C.M. 329 (1993) (An IRS Notice is an "administrative pronouncement which like a revenue ruling or revenue procedure does not constitute authority for deciding a case in this Court"); *Follender v. Comm'r*, 89 T.C. 943, 958 (1987) (A "Revenue Ruling is not authority; it is merely the position of one of the parties before us."); *Cf. Texaco Inc., v. United States*, 528 F.3d 703 (9th Cir. 2008).

367.   Taxpayers have prevailed in litigation notwithstanding the presence of IRS Notices covering the transactions being litigated.  For example, taxpayers prevailed with respect to a transaction identified in Notice 98-5, 1998-1 C.B. 334, which the IRS later characterized as a listed transaction in Notice 2000-15, 2000-1 C.B. 826.  *See e.g., Compaq Computer,*  277 F.3d at 778; *IES Industries*, 253 F.3d at 350.  As a result, the IRS was effectively forced to "de-list" that notice.  *See* Notice 2004-19, 2004 C.B. 606 (withdrawing Notice 98-5 after the IRS's stated position was defeated).

368.   Moreover, even without losing in litigation, the IRS has reversed course and "de-listed" a transaction it had previously "listed" as abusive in an IRS Notice.  *Compare* Notice 2002-70, 2002-2 C.B. 765 (listing transactions and stating the IRS's intention "to challenge the

PETITIONERS' POST-TRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

1 | purported tax benefits from these transactions on a number of grounds") *with* Notice 2004-65,

2 | 2004-2 C.B. 599 (de-listing the same transactions).

3 | 369.   The partnerships were reasonable in their consideration of Notice 2000-44.

4 | 370.   The criteria under the reasonable cause exception of section 6664(c) are satisfied

5 | and that the imposition of accuracy-related penalties is inappropriate.

6 | 371.   Accordingly, the following relief is granted:

7 | a.   The proposed adjustments in the FPAAs are redetermined and all

8 | adjustments to income, losses, distributions, basis, net earnings for self-employment and penalties

9 | are rejected;

10 | b.   The deposit of $1,347, for the 2000 tax year, plus interest, shall be refunded

11 | to the respective petitioners;

12 | c.   The deposit of $19,267 for the 2001 tax year, plus interest shall be refunded

13 | to the respective petitioners; and

14 | d.   All tax, interest, and penalty assessments made as a result of the

15 | adjustments proposed in the FPAAs shall be abated.

16 |

17 | DATED:  September 9, 2011          Respectfully submitted,

18 | SIDEMAN & BANCROFT LLP

19 |

20 | By:   *Jay R. Weill*

Jay R. Weill

21 | Attorneys for Petitioners

22 | CANDYCE MARTIN 1999 IRREVOCABLE TRUST and CONSTANCE GOODYEAR 1997

23 | IRREVOCABLE TRUST, PARTNERS OTHER THAN THE TAX MATTERS PARTNERS