United States District Court

For the Northern District of California

1
2
3
4            UNITED STATES DISTRICT COURT
5            NORTHERN DISTRICT OF CALIFORNIA
6
7
8   CANDYCE MARTIN 1999
    IRREVOCABLE TRUST,
9
              Petitioner,                    No. C 08-5150 PJH
10
         v.                                  **ORDER DENYING PETITION AND**
11                                           **ENTERING FINDINGS OF FACT AND**
    THE UNITED STATES OF AMERICA,            **CONCLUSIONS OF LAW**
12
              Respondent.
13  _____/
14         This matter came on for a court trial on August 22, 23, 25, 26, 29, and 30, 2011.
15  The parties appeared through counsel at trial and filed post-trial proposed findings of fact
16  and conclusions of law on September 9, 2011.  Having carefully considered the papers, the
17  evidence presented at trial, the argument of counsel and the relevant legal authority, and
18  good cause appearing, the court hereby DENIES the petition for readjustment of
19  partnership items pursuant to 26 U.S.C. § 6226, and makes the following findings of fact
20  and conclusions of law.
21                        **I.  FACTUAL BACKGROUND**
22         This action was consolidated on May 22, 2009, with the case of Constance
23  Goodyear 1997 Irrevocable Trust et al. v. United States of America, C-08-5151 (PJH), for
24  all purposes.  Petitioners contest the adjustment of certain partnership items proposed by
25  the Internal Revenue Service ("IRS") in Notices of Final Partnership Administrative
26  Adjustment ("FPAAs") dated June 19, 2008, issued to First Ship 2000-A, LLC ("2000-A") for
27  the taxable year 2000, and to First Ship, LLC ("First Ship") for the taxable year 2001.  The
28  court has jurisdiction over this action pursuant to 28 U.S.C. § 1346(e) and 26 U.S.C.

United States District Court

For the Northern District of California

§ 6226(b)(1).  <u>See</u> doc. no. 74, Stipulated Facts set forth in Joint Pretrial Statement, ("Stip.") ¶ 1.

**A.      The Chronicle Publishing Company**

Michael deYoung ("M.H. deYoung") and his brother, Charles deYoung, founded the San Francisco Chronicle in 1865.  Trial Transcript ("Tr.") at 48:21-23; Stip. ¶ 23.  Charles deYoung was shot and killed in his office in the Chronicle in 1880 by a disgruntled politician who shot him over an editorial Charles deYoung had written.  Tr. 48:23-25; 307:13-15.  At the time of his death, Charles deYoung wasn't married and had no children, and sole ownership of the San Francisco Chronicle passed to M.H. deYoung. Tr. 48:25-49:1; 307:15-17.  In 1906, M.H. deYoung incorporated the Chronicle Publishing Company ("CPC") as a Nevada corporation. Stip. ¶ 23.  M.H. deYoung had five children, one boy, Charles, who died with no children, and four girls, Helen Cameron, who had no children, and Constance Tobin, Phyllis Tucker, and Kathleen Thieriot, each of whom had children. Tr. 49:1-6; 307:15-17.  M.H. deYoung placed the ownership of CPC into trust for the benefit of his five children.  Tr. 307:20-21.  M.H. deYoung ran CPC until his death in 1925.  Tr. 49:16.

Upon the death of M.H. deYoung, Helen Cameron's husband, George Cameron became the C.E.O. or President of CPC, and ran CPC until his death in 1955. Tr. 49:17-24.  During his tenure, CPC acquired one of the very first television stations, KRON, and then other properties, including book publishing. Tr. 49:20-23.  Upon George Cameron's death in 1955, Kathleen Thieriot's son, Charles, took over control of CPC, and ran the company until he died in 1977.  Upon his death, his son, Richard, became the C.E.O.  Tr. 49:24-50:4.  Michael deYoung's trust for the benefit of his five children did not end until 1988, when his last child, Phyllis Tucker, died. Tr. 307:21-24.  Constance Tobin had three children, Patricia, Michael and Consuelo. Tr. 49:6-9.  Consuelo Tobin Martin ("CTM") is the mother of the "Martin siblings:" Candyce Martin, Francis A. Martin, III, Constance Martin Goodyear, Priscilla Martin Tamkin, and Helen Spalding (collectively, the "Martin family").  Tr. 48:10-14.

**United States District Court**
For the Northern District of California

1    During Richard Thieriot's tenure as C.E.O. of CPC, Francis Martin was the head of

2  Chronicle Broadcasting Company.  Richard Thieriot's cousin, Peter Thieriot, was the head

3  of CPC's Real Estate company.  They retained these roles until 1993, when Phyllis

4  Tucker's sole surviving child, Nan McEvoy, became Chairman of the CPC Board, and

5  brought in John Sias as C.E.O., and  together they did some "housecleaning" by firing

6  Richard Thieriot, Francis Martin, Peter Thieriot, and others who had previously held

7  positions at CPC.  Tr. 50:14-51:3.  The other deYoung family members who were

8  shareholders of CPC, retaliated and, in 1995, Nan McEvoy was fired.  She later sued the

9  company for age discrimination and lost.  Tr. 51:4-5.

10    In 1995, CPC, which had before then elected to be treated as a Delaware S

11  Corporation, owned largely four businesses: (a) the newspaper business, including the San

12  Francisco Chronicle, the Worcester paper, and the Pantagraph paper in Illinois; (b) a

13  television business, including television station KRON and a couple of other stations; (c) a

14  cable business; and (d) Chronicle Books.  Tr. 49:21-22; 309:24-310:3.

15  **B.    The Martin Family Trusts**

16    As of the year 1999, the Martin siblings collectively owned through various trusts or

17  outright, 630,000 shares (or 16.67%) of the stock of CPC.  Stip. ¶ 24; Ex. 25.  Each of the

18  Martin siblings owned an equal amount of 126,000 CPC shares, either through various

19  trusts or outright. Tr. 54:25-55:10; 313:24-314:1; Ex. 25.  Of the 630,000 shares of CPC

20  Stock held by the Martin siblings, 380,500 shares were held in fourteen (14) trusts related

21  to the Martin family (the "14 Martin Family Trusts").  Stip. ¶ 25; Ex. 25.  The 14 Martin

22  Family Trusts included five non-grantor trusts that Consuelo Tobin Martin created in 1988

23  for the benefit of each of her five children as the income beneficiaries, with her

24  grandchildren as the remaindermen (the "1988 Trusts"). Tr. 52:17-21; Stip. ¶ 5.a; Ex. 25.

25  Consuelo Tobin Martin placed 23,100 shares of CPC stock into each of the five 1988

26  Trusts. Tr. 53:20-23; 259:17-19; 311:9-13; Ex. 25.  The 1988 Trusts included:

27    a. The CTM Children's Trust FBO Candyce Martin (1988 Trust);

28    b. The CTM Children's Trust FBO Francis Martin, III (1988 Trust);

United States District Court

For the Northern District of California

1    c. The CTM Children's Trust FBO Constance Goodyear (1988 Trust);

2    d. The CTM Children's Trust FBO Priscilla Tamkin  (1988 Trust); and

3    e. The CTM Children's Trust FBO Helen Spalding (1988 Trust).

4  Stip. ¶ 5.a.; Ex. 25.

5    The 14 Martin Family Trusts also included five grantor trusts that Consuelo Tobin

6  Martin created for the benefit of her five children in 1999 (the "1999 Trusts"). Tr. 54:18-24;

7  310:22-23; 311:14-16; Stip. ¶ 26.  Consuelo Tobin Martin placed 26,000 shares of CPC

8  stock into each of the five 1999 Trusts. Tr. 54:25-55:2; 259:20-22; 311:15-23; Stip. ¶ 26;

9  Ex. 25.  The 1999 Trusts included:

10    a. CTM 1999 Trust FBO Margaret Candyce Martin;

11    b. CTM 1999 Trust FBO Francis Augustus Martin, III;

12    c. CTM 1999 Trust FBO Constance Martin Goodyear;

13    d. CTM 1999 Trust FBO Priscilla Martin Tamkin; and

14    e. CTM 1999 Trust FBO Helen Martin Spalding.

15  Stip. ¶ 26; Ex. 25.

16    The 14 Martin Family Trusts also included four trusts created by three of Consuelo

17  Tobin Martin's children for the benefit of their own children, into which they placed a varying

18  number of shares of CPC stock they had previously owned outright.  These trusts included

19  the following into which the reflected amounts of shares were contributed:

20    a. The Francis A. Martin III 1997 Irrevocable Trust, 50,000 CPC shares;

21    b. The Francis A. Martin III 1998 Irrevocable Trust, 25,000 CPC shares;

22    c. The Constance M. Goodyear 1997 Irrevocable Trust, 40,000 shares; and

23    d. The Candyce Martin 1999 Irrevocable Trust, 20,000 shares.

24  Stip. ¶ 27; Ex. 25; Tr. 310:23-25.  In addition to the CPC stock, certain of the 14 Martin

25  Family Trusts also owned, directly or indirectly, stock in Liberty Media Group ("Liberty

26  Media"), AT&T, and TCI Satellite. Stip. ¶ 34.

27    Peter M. Folger, a management labor lawyer who co-founded the San Francisco law

28  firm Folger, Levin & Kahn, LLP, was appointed to act as trustee of the 14 Martin Family

4

United States District Court

For the Northern District of California

1   Trusts.  Tr.  53:24-54:1; 258:10-20; 258:24-259:12; 318:9-10; 687:15-17; Ex. 25.  Mr.

2   Folger had graduated from Stanford University and obtained his law degree from the

3   University of San Francisco law school.  Tr. 258:4-8.  Mr. Folger had been a long time close

4   family friend of the Martin family.  Tr. 54:2-7; 258:22-23; 318:11-15.  His parents had been

5   friends of Consuelo Tobin Martin and her husband.  Id.  Consuelo Tobin Martin wanted

6   someone of her children's generation with whom she felt comfortable.  Tr. 54:15-17.

7   Members of the Martin family testified that Mr. Folger had "some really wonderful personal

8   characteristics that make him a great trustee for everybody.  No one feels that he's closer

9   to and would represent one sibling's interest over another.  He listens to everybody.  He

10  takes everybody's views into account.  And that's really a rare quality."  Tr. 318:15-21.  He

11  had a calming influence and relied on a consensus among the beneficiaries.  Tr. 91:16-25.

12      Mr. Folger was also the Trustee of the trusts of Richard Thieriot, including the

13  Richard T. Thieriot 1997 Trust and the Thieriot Family 1999 Irrevocable Trusts.  Richard

14  Thieriot was a cousin of the Martin siblings and also a shareholder of CPC.  Ex. 25; Tr.

15  279:18-22.

16      From 1988 through 1998, Mr. Folger's position as Trustee required only that he

17  periodically attend CPC's annual meetings and give stock voting proxies to the Trusts'

18  beneficiaries.  Tr. 259:23-260:7.  Mr. Folger generally did not receive a fee for his services

19  as trustee, except for a period when he received compensation at an hourly rate for his

20  time spent dealing with reformation issues surrounding the five 1988 Trusts.  Tr. 65:1-3;

21  259:14-16; 260:17-261:4.

22      On June 2, 1999, Consuelo Tobin Martin formed LMGA Holdings, Inc. ("LMGA

23  Holdings") as a Delaware S Corporation.  Prior to November 1, 2000, Francis Martin was

24  the director of LMGA Holdings, and Peter Folger was a corporate officer.  Tr. 287:23-

25  288:19; Ex. 1 at 110, 111.  On November 1, 2000, Francis Martin resigned as President of

26  LMGA Holdings and on November 2, 2000, Peter Folger became President of LMGA

27  Holdings.  Tr. 287:23-288:19; Ex. 1 at 110, 111.  On June 15, 1999, each of the five 1999

28  Trusts purchased a 20% share of LMGA Holdings.  Stip. ¶¶ 8, 29.  On June 15 and June

United States District Court

For the Northern District of California

1   16, 1999, 4,130,728 shares of Liberty Media stock and $13.8 million in cash were

2   transferred to LMGA Holdings.  Stip. ¶ 30.

3          First Ship was formed as a California limited liability company on March 6, 2000,

4   and remains in existence today.  Stip. ¶¶ 3, 15; Stip. Ex. 1.  First Ship's members (or

5   partners, for tax purposes) were the 14 Martin Family Trusts.  Stip. ¶ 4; Stip. Ex. 2.   On

6   October 10, 2000, 2000-A was formed as a California limited liability company. Stip. ¶ 6,

7   Stip. Ex. 3 (Articles of Organization of 2000-A).  2000-A had three partners with the

8   following percentage holdings:  First Ship (77.03%); Fourth Ship, LLC ("Fourth Ship")

9   (22.22%); and LMGA Holdings (0.75%). Stip. ¶ 6; Stip. Ex. 4 (Operating Agreement of

10  2000-A).

11         LMGA Holdings was the managing member of 2000-A.  Stip. Ex. 4.  As President of

12  LMGA Holdings, Mr. Folger had the authority to act as the managing member of 2000-A.

13  Fourth Ship was formed as a California limited liability company on October 12, 2000.

14  Fourth Ship had nine partners: (1) the five 1988 Trusts; (2) the Francis Martin 1997 Trust;

15  (3) the Francis Martin 1998 Trust; (4) the Constance Goodyear 1997 Trust; and (5) the

16  Candyce Martin 1999 Trust.  Stip. ¶ 7.

17  **C.     Sale of the Chronicle Publishing Company**

18         After a great deal of turmoil among the CPC owners caused the deYoung family's

19  relations to deteriorate to such an extent that no one could get along, on June 16, 1999,

20  CPC's board of directors announced its decision to accept bids for the sale of all of CPC's

21  assets.  Tr. 52:2-7; 308:19-21; Stip. ¶ 31.  At this time, Helen Spalding was a member of

22  the CPC board of directors.  She had been on the board since 1994, and remained a board

23  member until the final liquidation of CPC.  Tr. 51:16-24; 694:14-23.  CPC completed the

24  sale of substantially all of its business assets in 1999 and 2000.  Stip. ¶ 31.  The total final

25  sales price for all of the CPC assets was $2,119,955,144, comprised of cash equal to $479

26  per share of CPC stock, and shares of Young Broadcasting, Inc. stock.  Id.  CPC made

27  large distributions of cash and securities to its shareholders.  Id.  After the sale of CPC's

28

United States District Court

For the Northern District of California

assets and distribution of the proceeds to its shareholders, the 14 Martin Family Trusts held

the following assets:

| Asset | Number of Shares | Value as of 11/8/00 |
|---|---|---|
| Cash | NA | $121,452,146 |
| Cash in Escrow | NA | $    3,019,841 |
| Liberty Media | 5,435,370 | $  97,496,949 |
| Young Broadcasting | 391,444 | $  11,376,341 |
| AT&T | 267,533 | $    5,885,726 |
| TCI Satellite | 33,785 | $     221,714 |
| Total | | $239,452,518 |

Stip. ¶ 34.

In the midst of the efforts to sell CPC's assets, its board of directors realized that

there were certain types of liabilities that might arise after the proceeds from the sale of

CPC's assets had been distributed to its shareholders, and that the responsibility to cover

such liabilities could fall first and foremost to the board of directors as individuals to

personally cover the liabilities and that such liabilities might be unlimited. Tr. 57:8-58:22;

696:4-10. These potential future liabilities included but were not limited to contractual

matters, buyer's remorse, union or worker's contract issues, environmental issues, and

CPC's status as a Subchapter S corporation, and it was feared that these potential

liabilities could exist long into the future. Tr. 57:8-58:22; 309:10-19; 314:12-315:9;

597:20-598:9.

As a director, Ms. Spalding understood that her potential exposure for CPC liabilities

was unlimited and it was therefore very important that there be some mechanism whereby

all shareholders would share these possible responsibilities equitably. Tr. 696:4-10. In

order to more equitably share the responsibility for these potential future liabilities amongst

the CPC shareholders, the board of directors discussed with the shareholders and

ultimately caused to be prepared "The Chronicle Publishing Company Recontribution

Agreement" (the "Recontribution Agreement"), which governed shareholder responsibility

for potential future CPC debts or liabilities. Ex. 25; Tr. 54:24-55:2; 56:6-10, 12-17;

62:11-19. The Recontribution Agreement provided that CPC shareholders would contribute

on a pro rata basis funds to cover any excess liabilities incurred by CPC, and would

United States District Court

For the Northern District of California

1  indemnify CPC and other shareholders at least to the extent of the distributions they had

2  received, and possibly beyond the extent of their distributions.  Ex. 25; Tr. 136:4-5;

3  351:11-22.

4      On August 10, 2000, as a prerequisite to receiving a distribution of the CPC sales

5  proceeds and securities, each CPC shareholder, including the 14 Martin Family Trusts, was

6  required to sign the Recontribution Agreement. Ex. 25; Tr. 54:24-55:2; 56:6-10, 12-17;

7  350:1-4.  The Recontribution Agreement gave rise to a concern among the Martin family

8  and the 14 Martin Family Trusts about ongoing potential exposure to excess CPC liabilities

9  faced by its shareholders pursuant to the Recontribution Agreement.  The Martin family

10  was concerned that potential future CPC liabilities would extend many years into the future,

11  until various state and federal statutes of limitation had expired.  Tr. 87:18-88:11.

12      One of the major issues that could have caused a recontribution of assets by the

13  CPC shareholders was a possible revocation of CPC's "Subchapter S" status.  Tr.

14  79:15-19; 80:11-13.  Subchapter S of the Internal Revenue Code, 26 U.S.C. §§ 1361 to

15  1379, allows a single tax on the shareholders of a corporation upon the distribution of

16  income, as opposed to the double taxation possible with a "C" corporation, first at the

17  corporate level and then again at the shareholder level. Tr. 79:15-19; 137:15-19;

18  137:25-138:6.  There are certain eligibility requirements in order to elect and maintain

19  "Subchapter S" status, and problems as to eligibility might not surface for years.  Tr.

20  79:19-80:7; 138:12-139:10; 271:8-17; 314:19-315:25.  For example, CPC's Subchapter S

21  status could have been revoked: (a) if a non-US citizen acquired shares; (b) if the

22  maximum number of shareholders were exceeded through the death of one of the living

23  shareholders who had a large number of children; or (c) if the wrong kinds of trusts were

24  shareholders.[1] Tr. 314:12-315:6; 353:1-8.  If CPC's Subchapter S status had been revoked

25

26      [1]    One of these possible scenarios nearly occurred but was avoided.  One of the
27  Martin family cousins, Bob Thieriot, had established a number of unqualified trusts; he
   discovered he had brain cancer about three months before he died.  When his brother, Peter
28  Thieriot, who had worked for CPC, discovered the nature of these trusts, Bob Thieriot agreed
   to make changes to the trusts so that they would qualify under the Subchapter S rules at his

United States District Court

For the Northern District of California

for any of these reasons, the IRS could have gone back and taxed CPC as a C corporation and then taxed the shareholders again as recipients of dividends and the sale proceeds. Tr. 80:14-20; 137:15-19; 135:25-138:6; 315:6-14.

The Martin family and the 14 Martin Family Trusts had no way of knowing or controlling what other CPC shareholders might have done to affect CPC's eligibility for Subchapter S status, yet could become jointly and severally liable for a potentially colossal tax owing at the corporate level at a time when CPC no longer had the assets.  Tr. 138:12-139:10; 314:15-18.  Given CPC's $2 billion value at the time of sale, the extent of this additional tax liability just on the sale alone could have been more than $800 million. Tr. 352:5-13.  Concerned about possible revocation of CPC's Subchapter S status, the Martin family and the 14 Martin Family Trusts determined to preserve a portion of their distributions and hold them in a pooled fashion until after the statute of limitations on the Subchapter S issue had expired.  Ex. 25; Tr. 54:24-55:2; 56:6-10, 12-17; 62:11-19; 135:13-24; 139:12-21; 271:13-17; 352:20-22.

Besides the possible exposure to liability under the Recontribution Agreement, the Martin family and the 14 Martin Family Trusts shared other concerns following the sale of CPC.  They were also concerned about dealing with and reforming the ambiguous distribution provisions of the five 1988 trusts, which held a large percentage of the Martin family's assets.  There was an urgent need to clarify the terms of distribution to beneficiaries upon the death of one of the Martin siblings.  The remaindermen of the trusts were comprised of the 10 grandchildren of Consuelo Tobin Martin and the five 1988 Trusts provided that they receive equally on a pro rata instead of per stirpes basis.  This was not a problem while the Trusts simply held CPC shares.  But, when those shares were converted to cash upon the sale of CPC, distribution under the Trusts in their then current form became extremely difficult.  Tr. 75:12-16; 76:2-9; 136:12-137:10; 270:24-271:7; 312:3-8; 316:9-318:5.

---

death.  Tr. 315:14-25.

United States District Court

For the Northern District of California

1    In 1998 or 1999, the five 1988 Trusts had previously been revised in order to

2 eliminate a provision that prohibited inheritance by an adopted child.  Richard Sideman, a

3 Harvard Law School Graduate, a holder of a Masters in Tax from NYU, and a co-founder of

4 the San Francisco law firm Sideman & Bancroft, LLP, who had been hired by Consuelo

5 Tobin Martin in 1991 with respect to a gift tax issue, was hired again in 1998 or 1999 to

6 assist the Martin family in this first revision.  Tr. 53:4-16; 80:25-81:71; 123:3-5;

7 123:24-124:1; 127:7-16; 128:13-18.  Reformation of the trusts was a complicated and time

8 consuming process requiring extensive analysis as to potential beneficiary scenarios, and

9 obtaining a probate court order and an IRS private letter ruling, all of which finally

10 concluded in 2005.  Tr. 142:24-143:1; 161:21-163:24; Exs. 322, 323, 324, 325.

11    The uncertain status of these trusts in the interim affected the Martin family's and the

12 14 Martin Family Trusts' investment decisions.  In particular, given the complicated legal

13 tontine created by the Trusts' provisions, and to eliminate the possibility of a conflict of

14 interest between the trustee and unexpected beneficiaries, all of the 1988 Trusts had to be

15 managed as a unit.  In addition, trust assets needed to be completely pooled in order to

16 assure there would be total equality for known and potentially unknown beneficiaries until

17 the 1988 trusts could be clarified. Tr. 53:4-10; 75:12-16; 76:2-9; 136:12-137:10; 142:9-11;

18 270:24-271:7; 275:13-21; 335:8-11.

19    The third concern shared by the Martin family and the 14 Martin Family Trusts was

20 the volatility of the Martin family's and the 14 Martin Family Trusts' investments.  The

21 Martin family and the 14 Martin Family Trusts had received a large amount of cash and

22 stock from the sale of CPC's assets.  These assets were held by the trusts and there were

23 interests of both income beneficiaries and remaindermen to be addressed.  The Martin

24 family and Mr. Folger as trustee of the 14 Martin Family Trusts considered proposals for

25 investing the assets because keeping the funds in cash would not protect the interests of

26 the remaindermen in light of inflation or altered markets.  Tr. 140:20-142:11.

27

28

**United States District Court**
For the Northern District of California

**D.     Development of the Joint Investment Transaction**

   **1.     Arthur Andersen Proposal**

   In late 1998 or 1999, in anticipation of the CPC sale, Arthur Andersen, LLP ("AA"), at that time the public accounting firm for both CPC and the Martin Family and their various trusts, approached Francis Martin with a proposal that addressed the liabilities concerns and also potentially had some tax benefits.  Tr. 127:24-128:4; 129:24-130:11; 130:7-11; 130:19-22; 320:5-11; 598:11-16.  The Arthur Andersen transaction was also proposed to the cousins of the Martin family, the Theriots, who also faced large gains from the sale of the Chronicle.  Peter Folger was also the decision maker for the Theriot family trusts. Ex.101 at RTS 176.

   Because of their prior work for Consuelo Tobin Martin and their work on the first reformation of the five 1988 Trusts, Richard Sideman and his firm, Sideman & Bancroft, LLP, were well known to the Martin family. Tr. 53:4-16; 67:24-68:4; 80:25-81:71; 127:7-16; 128:13-18; 598:19-22.  As such, at the request of his siblings, Francis Martin engaged Sideman, briefed him about the family's many concerns, and requested that he meet with AA in order to learn about and independently review its proposal. Tr. 59:6-24; 63:11-15; 127:24-128:4; 129:24-130:11; 130:19-131:1; 262:18-22; 319:4-9; 589:11-16; 597:9-600:14. Mr. Sideman's job was to look at AA's proposal and give independent advice to the Martin family and Mr. Folger as trustee of the 14 Martin Family Trusts.  Tr. 130:24-131:1; 270:20-23.  He was also to address the family's many concerns arising from the CPC sale and to find a way to help them manage and potentially mitigate their potential exposure under the Recontribution Agreement.  Tr. 319:11-16; 598:11-16.  Mr. Sideman had not known Mr. Folger prior to this time, but came to learn that he was a contemporary of the Martin siblings, and a childhood friend of Mr. Martin.  Tr. 131:3-14.

   In January and February 2000, Mr. Sideman and his partner, Kristina Harrigan, of the Sideman firm had discussions with Arthur Andersen about the terms under which tax attorney R.J. Ruble of the Brown and Wood law firm would issue an opinion letter concerning an investment strategy for Francis Martin.  Mr. Ruble had been asked by Arthur

United States District Court
For the Northern District of California

1   Andersen to provide a tax opinion with respect to the proposed transaction for the Martin

2   Family.  Tr. 132:19-25.  On January 29, 2000, John Mullen from Arthur Andersen stated,

3   "R.J. [Ruble] does know all the facts.  He knows that the trustee will contribute the

4   proceeds of CPC to the Corporation."  Ex. 218.

5           On February 24, 2000, the Sideman firm and AA discussed competitive pricing of

6   shelter strategies.  John Mullen of AA said that the AA strategy was a proprietary strategy

7   that AA could only market jointly with AIG; thus AA could not carry it out with JP Morgan

8   (the Martin Family's financial advisor and private bank) instead of AIG.  John Mullen told

9   the Sideman firm that AA did not want to share any information on the AA strategy with JP

10  Morgan because JP Morgan was a competitor of AA in that type of product.  Ex. 127.

11          On February 25, 2000, the Sideman firm sent a memo to trustee Peter Folger

12  describing the AA shelter strategy.  Ex. 98.  In that memo, Ms. Harrigan explained the

13  mechanics of the Son of BOSS transaction as follows:

> Why does this work to help with Rani[']s problem? When you
> contribute assets to an entity, your basis in the entity reflects the
> basis of the assets you put in, less any liabilities the entity takes off
> your hands in the process. Here, you are contributing an asset–the
> call that you BOUGHT–with basis of $30, which is the price you paid
> for the call exercisable at $70. **While the entity will also assume
> your obligations under the call that you SOLD, for which you
> received $50 premium, that liability is contingent in the eyes of
> the Tax Code, and ignored for purposes of computing your
> basis in the entity.** The net effect is to create $30 of basis for the
> call that you BOUGHT, and another $20 basis for the net cash that
> you kept in Step Two above. Although this $20 basis (and the cash
> that goes with it) is going to disappear if the market value of the
> baskets is $70 or more on the 180th day, **you have still created $30
> of basis where there was none before.** If the volume of these calls
> is large enough, this basis will be large enough to equal the missing
> basis of other valuable assets that you contribute to the entity, e.g.,
> LMGA stock, AT&T stock.

28  Ex. 98 at RTS 000148-149 (emphasis added).  After seeing this memo, Mr. Mullen

United States District Court

For the Northern District of California

expressed concern to the Sideman firm because it had been Sideman's counsel not to have anything in the files that detailed the tax aspects of the transaction. Ex. 98 at RTS000151. Mr. Mullen suggested that another memo, provided earlier to the Theriots, be sent to Folger for his files. Id.

On March 2, 2000, Peter Folger faxed Richard Sideman an engagement letter signed by R.J. Ruble, hiring Mr. Ruble to act as special tax counsel to the Martin Family Trusts for the AA shelter strategy. Ex. 100. On March 2, 2000, Francis Martin called Richard Sideman to say that he wanted to go forward with the AA shelter strategy without waiting for the Ruble opinion letter, while his sisters preferred to wait until Mr. Sideman had reviewed R.J. Ruble's opinion letter. Ex.101 at RTS 176.

On March 8, 2000, John Mullen of AA faxed Peter Folger a representation letter concerning the options portion of the AA proposed shelter transaction, which AIG requested Mr. Folger complete and return. Ex. 102. On March 15, 2000, AA provided the Sideman firm with a list of "competitors pricing" of tax shelter products sold by Ernst & Young (COBRA), PWC, KPMG, UBS, and Presidio. Ex. 222. Mr. Sideman testified that he was not aware that this was a list of tax shelters. Tr. 188:6-8.

On March 16, 2000, the Sideman firm faxed a list of the steps of the AA shelter transaction to Owen Harper of JP Morgan. This document showed the various steps of the contemplated tax shelter to be part of a single integrated transaction. Ex. 255. On April 5, 2000, Richard Sideman faxed to R.J. Ruble his comments on Ruble's draft opinion letter for the AA shelter transaction. Ex. 224. On April 19, 2000, AA sent Peter Folger and Richard Sideman engagement letters dated March 17, 2000 and signed by R.J. Ruble, hiring Mr. Ruble to act as special tax counsel to the Martin Family Trusts for the AA shelter strategy. Mr. Ruble's fee was $700,000. Ex. 103. On or about April 24, 2000, Arthur Andersen sent to the Sideman firm a draft Ruble opinion letter entitled "Investment in Foreign Currency," on which the Sideman firm made substantial editorial comments. Ex. 227.

On June 6, 2000, Richard Sideman sent AA and R.J. Ruble a memo prepared by the Sideman firm comparing the pricing of competing shelter transaction proposals made by

United States District Court

For the Northern District of California

AIG and Lehman Brothers.  Ex. 230.  The Martin family's fees for the AIG proposal were $17.5 million if the options contracts had a 90-day term or $139.5 million if the options contracts had a 12-month term.  The Martin family's fees for the Lehman Brothers proposal (taking into account the adjusted notional amount because the Lehman proposal was blind) were $4.7 million if the options contracts had a 90-day term or $18.9 million if the options contracts had a 12-month term.  Ex. 230.

Sometime after meeting with AA and reviewing its proposal, Mr. Sideman and Ms. Harrigan recommended against it.  Tr. 132:2-13; 273:9-12.  They had come to the conclusion that there had been misleading statements by AA that were material and important.  Tr. 247:2-8.  Mr. Sideman and Mr. Folger found the proposal inappropriate, unworkable, and not economically viable.  Tr. 320:15-23; 324:21-22; 462:17-19.  The AA proposal was never close to completion.  Tr. 215:24-216:1.  Ultimately, the family lost confidence in AA and on June 28, 2000, Francis Martin terminated AA's services as the Martin Family's accountant.  Ex.105.  By letter dated July 7, 2000, Mr. Folger as trustee for the 14 Martin Family Trusts, terminated AA's services for the Trusts.  Tr. 133:15-16; 285:12-23; 321:4-14; Ex. 105.

On June 9, 2000, AA informed AIG that the Martin Family would not be engaging in any shelter transaction with AIG.  In response, AIG requested that all proprietary information concerning its shelter proposals be returned to AIG.  By letter dated June 21, 2000, the Sideman firm declined to return any such information to AIG (explaining that the information is not proprietary because the firm is required to maintain a client list of firms that participate in tax motivated transactions under the "listed transaction regulations.") Exs. 45; 51.

### 2.    Dr. Rubinstein

One component of the AA proposal had been a purported hedging transaction.  A hedge was of some interest to the Martin family and the 14 Martin Family Trusts, as they already had a large portfolio of stock in the market and had been further advised by JP Morgan, their long time investment bankers, to invest the large amount of the cash

United States District Court
For the Northern District of California

1   distributions they had received or expected to receive from the CPC sale into the equity

2   market.  Tr. 90:2-11; 326:4-8; 462:17-23; 464:4-8; 605:25-606:1; 607:19-22.  They were

3   interested in maximizing the benefits from potential increases in the market while at the

4   same time insuring themselves against a possible decrease in the market.  Tr. 144:4-19;

5   489:15-490:16; 606:9-607:14.  Mr. Sideman sought an expert in economic modeling to

6   design or approve an economically viable options transaction that would both maximize the

7   potential upsides and mitigate the potential downsides in the market.  Tr. 143:8-144:19;

8   189:8-10; 236:10-11; 248:17-249:24; 462:17-19.

9       Mr. Sideman was directed by Mukesh Bajaj, an economics and financial expert with

10  whom he'd previously worked, to Mark Rubinstein, an Economics Professor at the Haas

11  School of Business at the University of California, Berkeley, who has an economics degree

12  from Harvard University, an MBA from Stanford University, a PhD in Finance from UCLA.

13  Dr. Rubinstein, an expert on derivatives and portfolio structures, is considered by

14  investment banks to be the "godfather of derivatives," and with two other professors

15  developed the "binomial option pricing model," which is widely used to value options.  Tr.

16  82:25-83:9; 143:15-144:1; 150:24; 385:23-386:5; 703:7-23; 704:15-705:22.

17      On April 11, 2000, Mr. Sideman engaged Dr. Rubinstein under a <u>Kovel</u>[2] agreement

18  to provide independent advice only with respect to the options portion of the transaction

19  that purportedly would enable the Martin family and the 14 Martin Family Trusts to

20  maximize the potential upsides in the market while mitigating their potential downside risk

21  and to otherwise address their business and financial objectives.  Tr. 143:8-144:19;

22  189:8-10; 236:10-11; 248:17-249:24; 326:9-17; 462:17-19; Ex. 39.  Dr. Rubinstein

23  understood his task was to analyze the options transaction to determine whether there

24  "could" be a business purpose to the transaction, that is, whether a rational risk-averse

25  investor would want to engage in the transaction to improve his position.  This

26  determination was not based on any forward-looking view of the market, as to whether a

27  ────────────

    [2]      See <u>U.S. v. Kovel</u>, 296 F.2d 918 (2d Cir. 1961).

28

United States District Court

For the Northern District of California

1    particular investor expected the market to go up or down. Tr. 707:18-709:2; 731:20-22;

2    791: 4-8. Dr. Rubenstein was not asked to consider tax implications of the transaction.

3         **3.    Pricewaterhouse Coopers**

4         On June 14, 2000, Mr. Sideman formally engaged the global accounting and

5    consulting firm Pricewaterhouse Coopers ("PWC") to design a joint investment structure to

6    meet the objectives of the Martin family and the 14 Martin Family Trusts of risk

7    management, asset conservation, flexible and prudent investment, maximization of returns,

8    and equitable allocation amongst the trusts of the attendant risks and rewards.  Tr.

9    142:16-19; 145:10-16: 188:22-189:2; 322:21-25; Ex. 125.  On June 19, 2000, Roger

10   Feusier of PWC sent Sideman a list of requests, including a request for "[a] more detailed

11   description of the specific mechanics of the hedging transaction and the commercial

12   reasons for undertaking it."  Ex. 129 at Priv Log 3888.

13        Having terminated AA as its accountant and tax return preparer, the Martin family

14   and the 14 Martin Family Trusts separately engaged PWC to handle the family's and

15   Trusts' accounting and tax return preparation needs.  Tr. 170:10-171:8; Exs. 300, 301.

16   Over several months, PWC gathered information about the CPC sale, the Martin family and

17   the 14 Martin Family Trusts, and their objectives.  Tr. 179:11-23; Ex. 129.  Mr. Sideman

18   and his Sideman & Bancroft colleagues, Ms. Harrigan and C. Jean Ryan, worked closely

19   on the project with PWC and its partners and employees, principally Roger Feusier, a

20   Certified Public Accountant with a Masters in Tax Law, and Duane Pellervo, a lawyer with a

21   Masters in Tax Law from Georgetown University, speaking almost everyday and providing

22   PWC anything it requested in order to do its work.  Tr. 180:2-6.

23        On June 19, 2000, Duane Pellervo and Roger Feusier, both PWC partners,

24   investigated and discussed the reputation of R.J. Ruble in the tax shelter area.  This

25   investigation revealed Mr. Ruble's reputation as very aggressive, and that he had gained

26   much financial success from writing tax opinions. Tr. 366:22-24.  Because of his

27   aggressive reputation, PWC felt that his opinion letter should be fully evaluated for

28   accuracy.  Tr. 367:11-17.

**United States District Court**
For the Northern District of California

1    At Ruble's recommendation, Sideman decided to bring Lehman Brothers into the

2  transaction. Tr. 150:10-15.  On July 11, 2000, Richard Sideman faxed to Roger Feusier a

3  draft engagement letter with regard to Lehman Brothers.  Ex 132; Tr. 400:8-19.  In

4  September 2000, the Sideman firm solicited proposals for the Martin family from both

5  Lehman Brothers and JP Morgan.

6    **4.    Notice 2000-44**

7    On August 11, 2000, PWC sent the Sideman firm a copy of IRS Notice 2000-44, as

8  well as some news articles about the government's efforts to combat the Son of BOSS tax

9  shelter.  At trial, Mr. Sideman testified about his understanding, at the time that Notice

10  2000-44 was issued, that the IRS took the position that transactions similar to the one

11  being proposed for the Martin family were abusive tax shelters, but that the Notice had no

12  binding effect at all.

13    On August 14, 2000, Mr. Pellervo of PWC informed the Sideman firm that R.J. Ruble

14  was still willing to provide an opinion letter for the Martin Family Trusts' shelter transaction,

15  proposed by Lehman Brothers, notwithstanding the issuance of Notice 2000-44.  Mr.

16  Pellervo was interested in Mr. Ruble's rationale for "what seems to be a very optimistic

17  position in the face of the notice."  Ex. 168.

18    **5.    Presentation to the Martin Family**

19    PWC prepared and put on several iterative presentations of a proposed joint

20  investment structure it had designed to members of the Martin family, Mr. Folger as the

21  Trustee of the 14 Martin Family Trusts,  Mr. Sideman, and Ms. Ryan.  These presentations

22  described the various concerns and objectives that the joint investment structure was

23  intended to address and achieve and the components of a proposed joint investment

24  structure. Tr. 147:2-10; 153:1-24; 176:6-15; 323:1-22; Tr. 348:20-349:18; 372:6-373:4;

25  454:8-455:16; 533:17-536:18; Exs. 30, 120, 309.  The tax ramifications of the transaction

26  were clearly described to the Martin Family, as well as the potential for IRS examination,

27  because of the issuance of IRS Notice 2000-44.  Tr. 359:16-360:16.

28

United States District Court

For the Northern District of California

At these meetings, Mr. Folger asked a lot of questions.  He saw it as his role to understand and vet the proposed joint investment structure.  In the course of this process, while he listened and might defer to the Martin family, it was ultimately his decision, based on the advice of Mr. Sideman, Ms. Ryan, and PWC, as to whether to approve and finally recommend the joint investment structure to the Martin family and to allow its implementation by the 14 Martin Family Trusts.  Tr. 233:12-20; 323:23-324:5; 324:14-15; 335:17-19.  In addition to attending the PWC meetings, Mr. Folger also frequently met and talked with Mr. Sideman separately about the proposed joint investment structure and met with the Trusts' beneficiaries. Tr. 154:9-158:4;  266:8-18; 267:18-23; 268:7-12; 273:16-274:20; 325:21-25; 454:1-22.

At the same time that PWC was working to design a joint investment structure, Dr. Rubinstein had been evaluating and rejecting various options transactions proposed by Lehman Brothers and JP Morgan.  Over the course of several months, he communicated with Sideman & Bancroft his various concerns with respect to the rejected proposed options transactions.  Tr. 173:1-10; 733:18-25; Exs. 40, 47, 49, 50.  After extensive analysis and consultation with Dr. Rubinstein, JP Morgan finally designed an options transaction that Dr. Rubinstein deemed could have economic purpose, to achieve the business and financial objectives as understood by Dr. Rubinstein.  Tr. 173:1-10; 733:18-25; 769:18-23; Exs. 51, 52.  Once Dr. Rubinstein approved the last JP Morgan proposed options transaction, Mr. Sideman also agreed to approve the options transaction as a component of the joint investment transaction.  Tr. 173:3-13.  Mr. Sideman would not have recommended or approved an options transaction that was not approved by Dr. Rubinstein.  Tr. 225:11-15.

On September 20, 2000, the Sideman firm and PWC made a presentation to the Martin family in regards to the Lehman Brothers proposal.  The family briefing document for this presentation was titled "Martin Family Presentation, Joint Investment and Management Proposal."  Ex. 30.  The presentation included an explanation of the tax ramifications and tax risks of the proposal.  Ex. 30 at Priv Log 3564; Tr. 444:20-445:10; Ex. 309.  This

18

presentation was attended by the Martin family (either in person or by phone), Folger, and representatives from PWC and the Sideman firm.  Tr. 407:8-408:4; Tr. 543: 16-24.

At that presentation, the proposed transaction was described to the Martin family as having "the same basic mechanics" as the transaction described by the IRS in Notice 2000-44.  Ex 30 at Priv Log 3577.  The proposed transaction was presented to the Martin family as one that could completely eliminate their taxable gain on the sale of CPC.  Ex 30 at Priv Log 3620.  The written proposal states, "the joint investment management proposal may yield through the hedging component of the overall proposal significant tax benefit in the form of large capital loss."  Ex. 30 at Priv. Log. 3571.  At that presentation, the Martin family was informed of what rate of return they would need to achieve on the investment of their tax savings in order to be indifferent to an IRS examination and ultimate repayment of the tax, plus interest and penalties.  Ex 30 at Priv Log 3622; Tr. 405:8-25.  The tax aspects of the transaction were explained to the Martin family at the presentation, with questions asked by the Martin family and answered by Roger Feusier and Richard Sideman.  Tr. 408:24 - 409:20.

The written proposal discusses the importance of the IRS Notice 2000-44:

> Also it is important to note that on August 11, 2000 the IRS announced in Notice 2000-44 that transactions involving the same basic mechanics as the instant one did not give rise to the intended capital loss. . . . As consequence, the Martin family should expect to incur significant litigation expenses in defending any capital loss resulting from the contemplated transaction.

Ex. 30 at Priv. Log. 3577.  The written proposal also discusses the importance of the Ruble opinion letter to avoid IRS penalties.  Ex. 30 at Priv. Log. 3577.  In the section titled "Non-Tax Financial Considerations," the written proposal states, "If the Parent LLCs were to be eliminated shortly after the short term assets were disposed of or if it distributed substantially all of its assets to its shareholders shortly thereafter the intended tax benefits of the transaction would be seriously jeopardized."  Ex. 30 at Priv. Log. 3577.

19

United States District Court
For the Northern District of California

1    As part of the presentation, PWC prepared a spreadsheet that showed the effect of

2    the proposed transaction on the Martin family income. This spreadsheet shows that

3    expected tax loss would completely eliminate all gains from the sale of CPC.  Ex. 30 at

4    Priv. Log 3620.  The mechanics and structure of the tax shelter portion of the transaction

5    presented in the Martin family briefing document were identical to the abandoned Arthur

6    Andersen proposal.  Tr. 218:18-20.

7    On September 27, 2000, Lehman Brothers made a new proposal to the Sideman

8    firm.  The Sideman firm solicited the views of Dr. Rubinstein, PWC, and JP Morgan, on the

9    proposal.  Ex. 49.  On September 29, 2000, R.J. Ruble provided to the Sideman firm a new

10   draft opinion letter for the Martin Family Trusts' shelter transaction.  Ex. 179.  PWC and

11   Jean Ryan of the Sideman firm provided comments on the opinion letters written by R.J.

12   Ruble for the Martin Family Trusts.  Tr. 428:25-429:6; 522: 24-25; 458:7-15; Ex. 214 at Priv

13   Log 5341.  On September 29, 2000, Dr. Rubinstein informed the Sideman firm that the

14   Lehman Brothers options strategy did not make sense, the pricing and payoff structure was

15   strange, and the options were still too expensive.  Ex. 50.  The Lehman Brothers proposals

16   were rejected as too expensive.  Ex. 50.

17   In October 2000, the Sideman firm, PWC, and JP Morgan continued working

18   together on a proposed shelter transaction for the Martin family.  Throughout the month of

19   October, JP Morgan made a variety of updated transaction proposals to the Sideman firm

20   with respect to the Martin family.  On October 6, 2000, another draft Ruble opinion letter,

21   also entitled "Investment in Foreign Currency," was sent from Sideman to Folger with a

22   cover memo that states, "If the transaction occurs, we expect to close next week."  Ex. 235.

23   On October 16, 2000, Dr. Rubinstein told Richard Sideman that he was even more

24   troubled by the JP Morgan options proposal than he was with the prior proposals from

25   Lehman Brothers.  He characterized the only possible argument for business purpose for

26   this proposal as "a bit shakey [sic]."  Ex. 51 at First Ship Summons 0736.  On October 16,

27   2000, Mr. Sideman informed Francis Martin of Dr. Rubinstein's concerns about the JP

28   Morgan shelter proposal, and also informed Mr. Martin that the cost of the JP Morgan

**United States District Court**
For the Northern District of California

1    transaction was $10 million, rather than $9 million.  Ex. 123.  On October 21, 2000, Francis

2    Martin called Mr. Sideman and told him that he disagreed with Dr. Rubinstein's concerns

3    and wanted to proceed with the proposed transaction anyway.  Ex. 143.  On October 24,

4    2000, Dr. Rubinstein told the Sideman firm that the options as proposed by JP Morgan

5    were overpriced by $7 million, but later accepted JP Morgan's explanation for its fees to

6    account for the risk it was assuming for hedging this transaction.  Ex. 51 at First Ship

7    Summons 0745; Tr. 751-753.  On October 27, 2000, Mr. Sideman provided the Martin

8    family with a description of the transaction proposed by JP Morgan.  Tr. 81:19-82:15.

9         PWC gave a final presentation to the Martin family, Mr. Folger, Mr. Sideman and Ms.

10   Ryan in late October or early November, 2000.  Tr. 372:6-373:4; 454:8-455:5;

11   543:16-544:3; Ex. 309.  Following this presentation, the Martin family and Mr. Folger on

12   behalf of the 14 Martin Family Trusts determined to go forward with a joint investment

13   structure and the hedging transaction.  Mr. Folger, on behalf of 2000-A and the 14 Martin

14   Family Trusts, and the Martin family relied on Sideman & Bancroft and PWC to provide

15   them with advice as to whether to enter into the joint investment transaction and its

16   propriety.  Tr. 151:18-22; 172:21-173:10; 264:3-10; 267:21-23; 268:7-23; 473:4-6;

17   477:9-16; 324:23-25; 325:1-10; 543:23-544:3.  The Martin family understood that the

18   transaction had a tax component as well as the business objectives of risk management,

19   asset conservation, flexible and prudent investment, maximization of returns, and equitable

20   allocation amongst the trusts of the attendant risks and rewards.  Tr. 62:5-10; 323:1-11;

21   450:13-15; 651:13-17.

22   **E.    LLC Structure**

23        The Martin Family Trusts formed several limited liability companies to implement the

24   joint investment structure.  See Ex. 30 (Joint Investment and Management Proposal); Ex. 6

25   (Ruble opinion letter).  The implementation of the LLC structure, contemplated in November

26   2000, was completed in 2001.  The Parent LLCs formed multiple lower tier LLCs (11 in all)

27   to hold specific pools of assets, with those pools further divided into "Discretionary

28   Investments" and "Common Investments."  In general, assets held by the Parent LLCs at

United States District Court

For the Northern District of California

1   the close of 2000 were not distributed to the ultimate owners but, rather, were invested

2   within the structure.  Each owner of a Parent LLC indirectly owned interests in those two

3   categories of investments.  Discretionary Investments were intended to provide a degree of

4   investment flexibility to individual Martin family members, whereas Common Investments

5   were intended to consist of conservative and uniform investments that were jointly agreed

6   to by the family members, in order to facilitate the objective of maintaining a relatively

7   stable pool of assets to cover the various exposures described above.  Tr. 161:6-20;

8   374:10-375:14; 479:2-10; 482:3-16; 536:1-18; 575:21-24; Exs. 198, 266, 310.  The joint

9   investment structure stayed in place until 2006, when the reasons for its implementation

10   were no longer of consequence.  Tr. 87:13-88:15; 476:20-478:9.

11        The LLC structure and partnership at issue here involves the 2000-A partnership.

12        On June 2, 1999, LMGA Holdings was formed as a California C corporation.  The

13   five 1999 Trusts were each 20 percent shareholders in LMGA.  Stip. ¶ 8.  On June 15,

14   1999, and June 16, 1999, the 1999 Trusts transferred 4,130,728 shares of Liberty Media

15   Group (LMGA) Stock and $13.8 million in cash to LMGA Holdings.  Stip. ¶ 30.

16        On March 6, 2000, First Ship, LLC was formed as a California limited liability

17   company.  Stip. ¶ 3.  The 14 Martin Family Trusts were the partners of First Ship, with

18   petitioners Constance M. Goodyear 1997 Irrevocable Trust and Candyce Martin 1999

19   Irrevocable Trust having partnership interests of 7.13% and 3.40%, respectively.  Stip. ¶ 4

20   and Ex. 6 (First Ship's Form 1065 for tax year ended Dec. 31, 2000).

21        On October 10, 2000, First Ship 2000-A, LLC ("2000-A") was formed as a California

22   limited liability company with three partners: First Ship (77.03%); Fourth Ship LLC

23   (22.22%); and LMGA Holdings, Inc. (0.75%).  Stip. ¶ 6.

24        On October 12, 2000, Fourth Ship LLC was formed as a California limited liability

25   corporation with nine partners: the five 1988 Trusts; the Francis Martin 1997 Trust; the

26   Francis Martin 1998 trust; the Constance Goodyear 1997 Irrevocable Trust; and the

27   Candyce Martin 1999 Irrevocable Trust.  Stip. ¶ 7.

28

United States District Court

For the Northern District of California

**F.    Implementation of the Joint Investment Transaction**

The steps for implementing the joint investment transaction were outlined in the "Joint Investment and Management Proposal" briefing document prepared by PWC, and are described below.  Ex. 30.

**1.    Step One: Consolidation of Assets in Martin Family Trusts**

On November 9, 2000, LMGA Holdings distributed back to the five 1999 Trusts all of its Liberty Media shares (4,130,728 shares) along with $12.5 million of the $13.8 million in cash that LMGA then held.  Stip. ¶ 30; Ex. 1 at MTCB 00116-00121.  On that same date, based on the advice of JP Morgan, $121,452,146 in cash held by the 14 Martin Family Trusts and $1 million of cash retained by LMGA Holdings was invested in Standard & Poor's Depositary Receipts ("SPDRs"), an investment unit that tracks the S&P 500.  Stip. ¶ 36.  Investing in SPDRs purportedly permitted the Trusts to quickly and conveniently convert the CPC proceeds into an investment that was intended to perform in a manner similar to, and that promised a return measured by, S&P 500 equities to which the SPDRs were later converted.  Tr. 464:4-16; Exs. 30, 120, 309.

**2.    Step Two: Purchase SPDRs**

Each of the 14 Martin Family Trusts then invested its cash proceeds into S&P Depository Receipts ("SPDRs").  On November 9, 2000, the Martin Family Trusts invested most of their cash, $121,452,146, in SPDRs, an exchange-traded fund ("ETF") that tracks the performance of the S&P 500.  Stip. ¶ 36.

**3.    Step Three: Options**

Concurrently with Step Two, the Martin Family Trusts entered into a set of options transactions with JP Morgan.  The options were European-style options written against a notional portfolio (the "option notional portfolio") that was virtually identical to the assets owned by the Trusts after the purchase of the SPDRs.  Instead of SPDRs, the option notional portfolio included units of the S&P 500 index (86,230 shares).  The number of shares of Liberty Media, Young Broadcasting, AT&T, and TCI Satellite included in the portfolio were exactly the same as the Trusts owned (i.e., 267,533 shares of AT&T,

United States District Court

For the Northern District of California

5,435,370 shares of Liberty Media Group, 33,785 shares of TCI Satellite, and 391,444 shares of Young Broadcasting).  Based on the initial stock prices and the initial level of the S&P 500 index used to value the portfolio, its initial value (the "notional value") was $226.3 million. Ex. 3; Stip. ¶¶ 37, 40.

On November 10, 2000, the 14 Martin Family Trusts purchased six European-style option contracts (the long options) from JP Morgan for premiums paid totaling $315,781,658.59.  Ex. 332 at US011130.  Also on November 10, 2000, the 14 Martin Family Trusts sold (or wrote) five European style option contracts (the short options) to JP Morgan for premiums received totaling $314,885,515.96.  Ex. 332 at US011150.  The Martin Family Trusts paid JP Morgan a net up-front premium payment of $896,142.64, which amount is the difference between the premiums paid on the long options and the premiums received on the short options.  Stip. ¶ 37; Tr. 937:4-25; 938:1-939:5; Ex. 6 at 5-6; Ex. 3 at MTCB00578-MTCB00830.

The trusts entered into a total of eleven options contracts: six purchased options, consisting of five calls and one put, and five sold or written options, consisting of four calls and one put:

| Purchased Options | | | Sold/Written Options | | |
|---|---|---|---|---|---|
| Option Type | Exercise Price* | Scale Parameter** | Option Type | Exercise Price | Scale Parameter** |
| Call | 80.50% | 2.7 | Call | 83.5% | 3.7 |
| Call | 86.75% | 1.0 | Call | 88.25% | 1.0 |
| Call | 91.50% | 1.0 | Call | 93.00% | 1.0 |
| Call | 96.25% | 1.0 | | | |
| Put | 119.00% | 2.684 | Call | 119.00% | 2.684 |
| Call | 119.65% | 2.684 | Put | 119.65% | 2.684 |

* Percentages are derived by dividing the call strike price by the Initial Notional Amount.

** The scale parameter scales the notional portfolio on which the option is written.

Ex. 332 at US011129-31; US011149-51.

United States District Court

For the Northern District of California

1    The put-call pairs with exercise prices of 119.00% and 119.65% (and an identical

2  multiplicative factor of 2.684) collectively constituted a "box-spread," which has a fixed

3  dollar payoff at expiration.  The combined effect of these four options was that the 14

4  Martin Family Trusts would pay JP Morgan an incremental $3.95 million embedded within

5  the options at expiration, regardless of the value of the underlying portfolio in exchange for

6  a smaller up-front premium.  Tr. 995:1-16; 1075:23-1077:22.

7    The options expired on December 29, 2000.  Stip. ¶ 37.  The options were ordinary

8  European-style options in all but one respect: the payoffs on the options did not depend on

9  the value of the option notional portfolio at expiration.  Rather, the payoffs depended on the

10  average value of the options over three days leading up to and including expiration—that is,

11  the option payoffs depended on the average value of the portfolio as of the market close on

12  December 27, 28, and 29, 2000.  Dr. Rubinstein testified that this feature of the options

13  effectively prevented any attempt by JP Morgan to control the option payoffs.  Tr.

14  773:19-774:8; Ex. 332 at US011129.

15    a.    The Long Options

16    The Martin family entered into a long call-spread with a lower exercise price of

17  80.5% and an upper exercise price of 83.5%.  Ex. 332 at US011129-31, US011149-51.

18  The six long (purchased) options bought were as follows:

| Type | Premium | Strike Price | Multiplier |
|------|---------|--------------|------------|
| Call Strike 1 | $123,805,727.02 | $182,170,411.18 | 2.7 |
| Call Strike 2 | $ 33,729,813.40 | $196,314,076.64 | 1.0 |
| Call Strike 3 | $ 24,935,847.96 | $207,063,262.40 | 1.0 |
| Call Strike 4 | $ 17,520,041.28 | $217,812,448.15 | 1.0 |
| Call Strike 5 | $  2,998,457.08 | $270,766,331.65 | 2.684 |
| Put Strike 1 | $112,791,772.85 | $269,295,390.44 | 2.684 |
| Total | $315,781,658.59 | | |

Ex. 332 at US011130-31.

United States District Court
For the Northern District of California

1   For the call options, if the final notional amount of the portfolio on December 29,

2   2000, was greater than the call strike price, JP Morgan was required to pay the Martin

3   Family Trusts the difference between such amount and the call strike price, multiplied by

4   the 2.684 multiplier.  If the final notional amount was below the call strike price, no

5   payments or settlements were due from either party.  The final notional amount of the

6   portfolio could trigger payments on more than one of the call options.  Ex. 332 at

7   US011131.

8   For the put option, if the final notional amount of the portfolio on December 29, 2000,

9   was below the put strike price, JP Morgan was required to pay the Martin Family Trusts the

10  difference between such amount and the put strike price, multiplied by the above multiplier.

11  If the final notional amount was greater than the put strike price, no payments or

12  settlements were due from either party.  Ex. 332 at US011131.

13              **b.      The Short Options**

14  The Martin family entered into three short call-spreads with the following

15  non-overlapping exercise prices:

16  | Lower Exercise Price (sold call) | Upper Exercised Price (purchased call) |
17  | --- | --- |
    | 83.50% | 86.75% |
18  | 88.25% | 91.50% |
    | 93.00% | 96.25% |

19  Ex. 332 at US011129-31; US011144-51.

20  The terms of the five sold options were as follows:

21
22  | Type | Premium | Strike Price | Multiplier |
    | --- | --- | --- | --- |
22  | Call Strike 1 | $145,235,838.80 | $188,959,370.60 | 3.7 |
23  | Call Strike 2 | $ 29,160,843.71 | $199,708,556.35 | 1.0 |
24  | Call Strike 3 | $ 20,760,637.91 | $210,457,742.11 | 1.0 |
25  | Call Strike 4 | $   3,297,171.29 | $269,295,340.44 | 2.684 |
    | Put Strike 1 | $116,408,024.24 | $270,766,331.65 | 2.684 |
26  | Total | $314,885,516.96 | | |

27  Ex. 332 at US011150-51.

28

United States District Court
For the Northern District of California

1   For the call options, if the final notional amount of the portfolio on December 29,

2   2000, was greater than the call strike price, the Martin Family Trusts were required to pay

3   JP Morgan the difference between such amount and the call strike price, multiplied by the

4   above multiplier.  Ex. 332 at US011151.  If the notional amount was below the call strike

5   price, no payments or settlements were due from either party.  The final notional amount of

6   the portfolio could trigger payments on more than one of the call options.  Id.

7   For the put option, if the final notional amount on December 29, 2000, was below the

8   put strike price, the Martin Trusts were required to pay JP Morgan the difference between

9   such amount and the put strike price multiplied by the above multiplier.  Ex. 332 at

10   US011151.  If the final notional amount was greater than the put strike price, no payments

11   or settlements were due from either party.  Id.

12   **c.   Underlying Basket of Stocks**

13   The payouts on the option contracts were based upon the average closing price of

14   the company stock owned by the Martin Family Trusts in an "underlying basket" or "notional

15   portfolio" of stocks for the three business days leading up to and including December 29,

16   2000.  Ex. 3 at MTCB00578-MTCB00830.  The option notional portfolio was virtually

17   identical to the asset portfolio owned by the Martin Family Trusts after the purchase of the

18   SPDRs.  Instead of SPDRs, the option notional portfolio included units of the S&P 500

19   index. The number of shares of Liberty Media, Young Broadcasting, AT&T, and TCI

20   Satellite included in the portfolio were exactly the same as the trusts owned.  These stock

21   positions remained unchanged throughout the entire transaction, and continued even after

22   it ended.  Tr. 941:1-4.  Based on the initial stock prices and the initial level of the S&P 500

23   index used to value the portfolio, its initial value (the"notional value") was $226.3 million.

24   Specifically, the underlying basket of stocks, as of November 8, 2000 (at or before the date

25   the options contracts were about to be entered into) was as follows:

26

27

28

**United States District Court**
For the Northern District of California

| Company | Number of Shares | Initial Share Price | Initial Notional Amount |
|---|---|---|---|
| AT&T | 267,533 | $ 21.1614 | $5,661,372.83 |
| Liberty Media | 5,435,370 | $ 16.4766 | $89,556,417.34 |
| TCI Satellite | 33,785 | $ 5.6250 | $190,040.63 |
| Young Broadcasting | 391,444 | $ 26.8003 | $10,490,816.63 |
| S&P 500 Index | 86,230 | $ 1,396.2620 | $120,399,672.26 |
| Total | | | $226,298,319.69 |

Ex. 6; Tr. 940:16-941:10.

### 4.    Step Four: Contributions to Parent LLCs

The next step of the transaction was to have the Martin Family Trusts contribute their assets, including the long and short options, to their first-tier partnerships, First Ship and Fourth Ship, referred to as the "parent LLCs." Ex. 6 at US006475-76.  On or about November 17, 2000, the Martin Family Trusts purportedly contributed $485 million to First Ship as follows:

| Description | Fair Market Value ($) |
|---|---|
| 650,066 SPDRs | 90,725,160 |
| 391,444 shares of Young Broadcasting | 10,813,617 |
| 4,130,730 shares of Liberty Media Group | 64,542,655 |
| 33,785 shares of TCI Satellite | 162,575 |
| KRON Holdback | 3,019,838 |
| Long Option Positions | 315,781,636 |
| Total | $ 485,045,481 |

Stip. Ex. 2 at PWC02784-89; Ex. 37 at Priv Log 5434; Ex. 6 at 5-6; Ex. 3 at MTCB00839-MTCB00850, MTCB00870-MTCB00875.

As reflected in the table above, the amount of the purported contributions to First Ship included the premiums on the long options totaling $315,781,658.59, unreduced by the premiums on the short options totaling $314,885,515.96, although the Martin Family Trusts only paid $896,142.64 net premium to enter into the option agreements.  The

**United States District Court**
For the Northern District of California

1   transfer of the purchased and sold options to the partnership caused a purported increase

2   in the Trusts' bases in First Ship, as the Martin Family Trusts did not treat the short position

3   on the sold options as a liability in computing the basis for the partnership.

4       Also on or about November 17, 2000, the five 1988 Martin Family Trusts and the

5   Francis Martin 1997 Irrevocable Trust, the Francis Martin 1998 Irrevocable Trust, the

6   Constance Goodyear 1997 Irrevocable Trust, and the Candyce Martin 1999 Irrevocable

7   Trust contributed 210,880 SPDRs with a fair market value of $29.4 million to Fourth Ship.

8   Ex. 3 at MTCB 00859-00867; Ex. 37 at Priv Log 5437.

9       **5.**    **Step Five: Contributions to 2000-A**

10       The next step of the transaction was to transfer the assets from the first-tier

11   partnerships, First Ship and Fourth Ship, to the second-tier partnership, 2000-A.  On

12   November 27, 2000, First Ship purportedly contributed over $415 million to 2000-A as

13   follows:

14
| Description | Fair Market Value ($) |
| --- | --- |
| 650,066 SPDRs | $   88,368,347 |
| 391,444 shares of Young Broadcasting, Inc. | 11,033,828 |
| Long Option Positions Purchased from JP Morgan | 315,781,636 |
| Total | $ 415,183,811 |

17   Ex. 37 at Priv Log 5433; Ex. 3 at MTCB00879-87.  2000-A also took on First Ship's

18   obligations under the short options.

19       Also on November 27, 2000, Fourth Ship contributed its 210,880 SPDRs, with a fair

20   market value of $28,666,500, to 2000-A.  On the same date, LMGA Holdings contributed its

21   7,151 SPDRs, with a fair market value of $972,089, to 2000-A.  As of November 27, 2000,

22   2000-A held all of the 868,111 SPDRs that the 14 Martin Family Trusts and LMGA Holdings

23   had purchased.  Ex. 3 at MTCB 00886-88.  First Ship continued to hold its shares of Liberty

24   Media stock, its shares of TCI Satellite stock, and the KRON Holdback of $3,019,838.  Ex.

25   37 at Priv Log 5434.

26       **6.**    **Step Six: Sale of 2000-A Assets**

27       Immediately after the transfer of the SPDRs to 2000-A, JP Morgan directed the

28   reinvestment of the SPDRs in stock of S&P companies.  On November 29, 2000, 2000-A

United States District Court

For the Northern District of California

1   sold the SPDRs for $116 million, resulting in a lost of approximately $5.4 million.  On or

2   about December 1, 2000, 2000-A used the proceeds from that sale to purchase various

3   S&P 500 securities for $112.2 million.  These securities were sold on December 27, 2000

4   for $106.9 million, resulting in an additional loss of $5.3 million. The combined loss on the

5   Martin Family Trusts' S&P 500 investments (SPDRs and S&P securities) during November

6   and December 2000 was $10,756,230.  Stip. ¶ 38.

7       Although the options were European-style, an agreement was reached to terminate

8   them roughly a week prior to their expiration date, on December 21, 2000.  Stip. ¶ 39.  On

9   or about December 20, 2000, JP Morgan advised Mr. Sideman that the options had

10  achieved a positive return (net of transaction costs) of approximately $3.9 million.  Mr.

11  Sideman confirmed this information with Dr. Rubinstein, and, after informing Mr. Martin that

12  they were "in the money," Mr. Sideman advised that the options should be closed out.  Tr.

13  235:2-12; 608:22-609:6.  JP Morgan sought authorization to close out the options from Mr.

14  Folger, 2000-A's managing member, who authorized the termination of the options by

15  signing a Termination Agreement dated December 22, 2000.  Ex. 4 at MTCB 01182-84.  At

16  termination, JP Morgan paid the trusts approximately $4.8 million, resulting in a net profit

17  (after subtracting the upfront premium) of $3.9 million.  Stip. ¶ 39.   The purchased options

18  had a value of $237,087,693, while the sold options cost the taxpayers $232,270,067 to

19  close out.  Ex. 37 at Priv Log 5423.

20      From December 26 to December 28, 2000, 2000-A sold all of its stock.  Specifically,

21  on December 26, 2000, 2000-A sold all of its 391,444 shares of Young Broadcasting, Inc.

22  stock for $11,596,138.68, resulting in a gain of $562,300.  On December 27, 2000 and

23  December 28, 2000, 2000-A sold its remaining stock, resulting in a loss of $5,308,240.  Ex.

24  4 at MTCB01182-1218; Ex. 37 at Priv Log 5416, 5421.  2000-A was cancelled on

25  December 28, 2000.  Stip. ¶ 14 and Stip. Ex. 7.

26

27

28

**United States District Court**

For the Northern District of California

1

### 7.     Step Seven: Distributions by 2000-A

The proceeds of the liquidation and closing of the hedge positions distributed by 2000-A to its partners, including the parent LLCs First Ship and Fourth Ship, consisted of cash in the amount of $127,168,869:

| Partner | Distribution |
|---|---|
| First Ship | $ 97,960,224 |
| Fourth Ship | $ 28,250,657 |
| LMGA Holdings | $     957,988 |
| Total: | $127,168,869 |

Ex. 4 at MTCB01211-18; Ex. 37 at Priv Log 5433.

2000-A also paid a $100,000 advisory fee to JP Morgan in 2000.  Ex. 37 at Priv Log 5433.  After December 29, 2000, 2000-A had no remaining assets, having distributed all of its stock and cash in complete liquidation.  Id.; Ex. 4 at MTCB01182-1218.

2000-A was designed at the outset of the transaction as a partnership, funded by the parent LLCs (First Ship LLC and Fourth Ship LLC) and LMGA Holdings, to be a short-term vehicle that would be sold or liquidated before the close of the taxable year.  See Ex. 6 at US006477 ("In essence, 2000-A LLC functions as the repository for all assets of the Family Trusts that have been designated for prompt sale by the Martin Family.").  The Martin family knew at the outset that if they wanted the capital loss to offset their gain from the sale of CPC, then they would have to sell or liquidate 2000-A before the close of the taxable year 2000.  Tr. 424:23-425:22; Tr. 578:5-579:3.

### G.     Allocation of Losses

The Martin Family Trusts realized a loss of $5,447,984 on the sale of the SPDRs, a loss of $5,308,240 on the sale of the S&P 500 securities, and a loss of $320,031,270 on the liquidation of 2000-A.  The Trusts realized a gain of $4,817,626 on the offsetting options.  Ex. 37 at Priv Log 5416, 5419, 5420, 5422, 5423.  Each of the 14 Martin Family Trusts that participated in the transaction was allocated a portion of the over $320 million loss generated on the liquidation of 2000-A.  The losses were allocated as follows:

| Trust | Loss Allocated |
|-------|----------------|
| Consuelo T. Martin Trust fbo Francis A. Martin III (1988 Trust) | ($19,352,930) |
| Consuelo T. Martin Trust fbo Priscilla Tamkin (1988 Trust) | ($19,352,930) |
| Consuelo T. Martin Trust fbo Constance Goodyear (1988 Trust) | ($19,352,930) |
| Consuelo T. Martin Trust fbo Candyce Martin (1988 Trust) | ($19,352,930) |
| Consuelo T. Martin Trust fbo Helen Spalding (1988 Trust) | ($19,352,930) |
| CTM 1999 Trust fbo Francis A. Martin III | ($23,832,110) |
| CTM 1999 Trust fbo Priscilla Tamkin | ($23,832,110) |
| CTM 1999 Trust fbo Constance Goodyear | ($23,832,110) |
| CTM 1999 Trust fbo Candyce Martin | ($23,832,110) |
| CTM 1999 Trust fbo Helen Spalding | ($23,832,110) |
| Francis A. Martin III, 1997 Irrevocable Trust | ($38,485,350) |
| Francis A. Martin III, 1998 Irrevocable Trust | ($17,487,623) |
| Constance Goodyear 1997 Irrevocable Trust | ($29,205,415) |
| Candyce Martin 1999 Irrevocable Trust | ($18,927,653) |

Ex. 37 at Priv Log 5418.

**H.      The Opinion Letters**

The viability of the recognized tax loss was the subject of favorable tax opinions written by Mr. Ruble of Brown & Wood, a nationally recognized law firm.  Brown & Wood had been engaged by Mr. Sideman prior to the implementation of the joint investment transaction to provide a tax opinion with respect to its potential tax implications.  Over the course of several months, Sideman & Bancroft and PWC worked closely with Brown & Wood, providing it with facts and information relevant to the Martin family and the Trusts, the then-developing joint investment transaction, and the issues to be addressed in the tax opinion, assuring the accuracy of the representations to be made therein.  Tr. 368:15-20; 369:15-18; 371:18-22; 372:3-5; 377:25-378:2; 475:10-17; 537:22-538:11.

By letters dated November 8, 2000, Mr. Ruble of Brown & Wood advised the Martin Family Trusts that his firm accepted their request to represent them as their federal income tax counsel "in connection with the restructuring and hedging of certain interests with respect to certain investments (the 'Transaction')."  Brown & Wood agreed to provide advice as to the structuring of the transaction, and to provide an opinion as to the federal

United States District Court

For the Northern District of California

tax consequences which were "more likely than not to occur" as a result of the transaction. Ex. 4 at MTCB 01236.

Brown & Wood provided the 14 Martin Family Trusts with identical favorable opinions concerning the consequences of the transaction. The opinions, dated November 15, 2000, were provided at a non-contingent fee of $700,000.  Separate opinions were issued to each of the five 1988 Trusts, the Francis Martin 1997 Trust, the Francis Martin 1988 Trust, the Constance Goodyear Trust, and the Candyce Martin Trust.  One opinion was also issued to the five 1999 Trusts.  Ex. 109; Exs. 6, 8, 10, 12, 14, 16, 18, 20, 22, 24; Tr. 458-459.  Although the Brown & Wood opinion letter has a section entitled "Investor Representations," neither the Martin family nor Peter Folger provided the representations to Brown & Wood.  Rather, the "Investor Representations" in the opinion letters were authored by Brown & Wood and reviewed by Sideman & Bancroft and PWC.  Tr. 418:22-420:19; 474:22-475:2; Ex. 184.  At trial, Dr. Rubinstein disagreed with certain statements in the opinion letter and clarified that he did not review the complete transaction, and disagreed with the statement in the opinion letter that attributed to him a declining market view.  Tr. 834:24-835:21.

Brown & Wood also provided a six-page letter dated January 31, 2001 to each of the Trusts, concerning the tax consequences of the distributions from First Ship 2000-A in December 2000.  Stip. ¶ 42; Exs. 5, 7, 9, 11, 13, 15, 17, 19, 21, 23.   Years later, Mr. Ruble would be indicted and then convicted of tax evasion, and sentenced to 78 months in prison.

**I.      Tax Returns**

**1.      2000-A**

For the year ending December 31, 2000, 2000-A reported income, gain, loss and deductions related to the transactions at issue on its 2000 partnership tax return, Form 1065.  The 2000 partnership tax return of 2000-A was filed on or about March 22, 2001, and was prepared and signed by PWC.  Stip. ¶ 9; Stip. Ex. 5.  The Schedule K, "Partner's Shares of Income, Credits, Deductions, etc.," of 2000-A's Form 1065 reported ordinary dividends of $159,264, net short-term capital losses of $5,376,293, deductions related to

portfolio income of $100,082, investment income of $159,264, investment expenses of $100,082, and total cash distributions of $127,168,869.  Stip. ¶ 10 and Stip. Ex. 5.

Each member's distributive share of the reported items of income, gain, loss and deductions from 2000-A was reported on Schedules K-1 issued to its members, including First Ship, Fourth Ship and LMGA Holdings.  Stip. ¶ 10; Stip. Ex. 5.  The Schedules K-1, "Partner's Share of Income, Credits, Deductions, etc.," of 2000-A's Form 1065 reported First Ship's, Fourth Ship's, and LMGA Holding's distributive share of 2000-A's $5,376,293 net short-term capital loss as follows:

| Partner | Short-Term Loss |
|---|---|
| First Ship | ($4,067,455) |
| Fourth Ship | ($1,265,910) |
| LMGA Holdings | ($  42,928) |
| Total | ($5,376, 293) |

The Schedules K-1 of 2000-A's Form 1065 reported First Ship's, Fourth Ship's and LMGA Holding's distributive share of 2000-A's $127,168,869 distributions as follows:

| Partner | Distributions |
|---|---|
| First Ship | $ 97,960,224 |
| Fourth Ship | $ 28,250,657 |
| LMGA Holdings | $   957,988 |
| Total | $127,168,869 |

**2.   First Ship**

First Ship reported its distributive share of each item of income, gain, loss, and deductions from 2000-A on its 2000 partnership tax return, Form 1065.  Stip. Ex. 6.  The return was timely filed on or about March 22, 2001, and was prepared and signed by PWC.  On the attached Schedule D, First Ship reported a short term capital loss from the liquidation of its interest in 2000-A of $318,018,377.  Stip. ¶ 11.  First Ship reported a net short-term capital loss of $321,865,645, reported on the Schedule D as follows:

**United States District Court**

For the Northern District of California

| Description | Date Acquired | Date Sold | Sales Price | Cost Basis | Gain/(Loss) |
|---|---|---|---|---|---|
| Contrib. of Young Stock to 2000-A | 11/20/00 | 11/27/00 | $ 11,033,828 | $ 10,813,641 | $ 220,187 |
| Liquidation of 2000-A | 11/27/00 | 12/29/00 | $ 97,960,224 | $ 415,978,601 | ($318,018,377) |
| Net S-T Loss from 2000-A | | | | | ($ 4,067,455) |
| Total | | | | | ($321,865,645) |

First Ship reported $415,978,601 as its basis in its partnership interest in 2000-A, which included the premiums on the long options totaling $315,781,636, unreduced by the premiums received on the short options totaling $314,885,516. First Ship's purported $415,978,601 basis in its partnership interest in 2000-A also included its $3,319,128 pro rata share of the partners' purported total fees of $4,308,787 paid for the transaction. First Ship distributed its reported $321,865,645 net short-term capital losses to the 14 Martin Family Trusts, including petitioners. Stip. ¶ 47. Each member's distributive share of the items of income, gain, loss, and deductions from First Ship was reported on Schedules K-1 issued to its members, including the Martin Family Trusts. Stip. ¶ 12. Each of the 14 Martin Family Trusts reported its distributive share of the items of income, gain, loss and deductions from First Ship, including its share of the short term capital loss reported by First Ship from the liquidation of its interest in 2000-A, on its 2000 income tax returns. Stip. ¶ 13. On its Form 1065 for the period ending December 31, 2001, First Ship reported a deduction of $1,353,736 for legal and professional fees relating to the transaction, which deduction was passed through to the Martin Family Trusts. Stip. ¶ 48.

### 3.    Fourth Ship

On its Form 1065 for the period ending December 31, 2000, Fourth Ship reported a net short-term capital loss of $1,910,955, including a net short-term capital loss of $1,265,910 from the liquidation of 2000-A. Stip. ¶ 49.

United States District Court

For the Northern District of California

1

### 4.    LMGA Holdings

2    On its Form 1065 for the period ending December 31, 2000, LMGA Holdings

3    reported a net short-term capital loss of $64,801, including a net short-term capital loss of

4    $42,928 from the liquidation of 2000-A.  Stip. ¶ 50.

5    **J.    Audit**

6    In 2004, the IRS commenced an audit of 2000-A's taxable year 2000 partnership tax

7    return and of First Ship's taxable years 2000 and 2001 returns.  Stip. ¶ 17.  Both 2000-A

8    and First Ship are subject to the unified audit rules under the Tax Equity and Fiscal

9    Responsibility Act ("TEFRA") as codified in §§ 6221-6233.  Stip. ¶ 18.  On April 8, 2004,

10   and successively thereafter, the IRS, the 14 Martin Family Trusts that were members of

11   First Ship, and individual Martin family members ("Taxpayers") executed Forms 872-I,

12   Consent to Extend the Time to Assess Tax As Well As Tax Attributable To Items of a

13   Partnership, with respect to taxable year 2000 ("Consents").  Stip. ¶ 18.  The Consent

14   forms contained the following language, as agreed to by the IRS and the Taxpayers:

15   
16   
17   
18   
19

> The amount of any deficiency assessment is to be limited to that resulting from any adjustment directly or indirectly (through one or more intermediate entities) attributable to partnership flow-through items of First Ship LLC, and/or to any adjustments attributable to costs incurred with respect to any transaction engaged in by First Ship LLC, any penalties and additions to tax attributable to any such adjustments, any affected items, and any consequential changes to other items based on any such adjustments.

20   The first Consent forms extended the statute of limitations to April 15, 2005.  Several

21   successive consents were signed by the same parties extending the statute of limitations to

22   June 30, 2008.  Each consent contained the same language reflected in the above

23   paragraph.  Stip. ¶ 19.

24   By order dated December 11, 2009, the court denied petitioners' motion for partial

25   summary judgment on the issue whether the FPAA issued to 2000-A for the 2000 tax year

26   was time barred, holding that  "the court finds that the extension agreements encompass

27   the adjustments made by the IRS in the FPAA issued to 2000-A.  Since the extension

28   agreements extended the statutory period to June 30, 2008, and the FPAA was issued on

1  June 19, 2008, the FPAA is not time-barred."  Following the pretrial conference in this

2  matter, the court deemed this ruling as established for purposes of trial.  See Final Pretrial

3  Order.

### 1.   FPAA Issued to 2000-A

5  On June 19, 2008, the IRS issued an FPAA to 2000-A, determining that certain

6  items on 2000-A's 2000 tax return should be adjusted and that an accuracy-related penalty

7  under 26 U.S.C. § 6662(a) was applicable to underpayments of tax attributable to

8  adjustments of partnership items of 2000-A.  In the FPAA, the Service disallowed the items

9  reported on 2000-A's Form 1065 for the period ending December 31, 2000, consisting of

10  ordinary dividends of $159,264, net short-term capital loss of $5,376,293, deductions

11  relating to portfolio income of $100,082, investment income of $159,264, investment

12  expenses of $100,082, and distributions of money of $127,168,869.  Stip. Ex. 9.

13  First, the Service determined that 2000-A was formed solely for tax avoidance by

14  artificially overstating the basis in the partnership interests of its purported partners, First

15  Ship, Fourth Ship, and LMGA Holdings.  The Service determined that the formation of

16  2000-A, the acquisition of any partnership interests by the purported partners, the purchase

17  and sale of options, the transfer of the options to a partnership in return for a partnership

18  interest, the purchase of assets by the partnership, and the subsequent sale of the assets

19  and distribution of the sale proceeds to the purported partners in complete liquidation of the

20  partnership interest, all within a period of three months, had no business purpose other

21  than tax avoidance, lacked economic substance, and constituted an economic sham for

22  federal tax purposes.  Accordingly, the Service disregarded the transactions and disallowed

23  any purported losses resulting from the transactions as deductions for federal income tax

24  purposes.

25  Second, the Service determined that 2000-A was a sham, lacked economic

26  substance, and under Treas. Reg. § 1.701-2, was formed in connection with a transaction,

27  a principal purpose of which was to reduce the present value of its partners' aggregate

28  federal tax liability in a manner inconsistent with the intent of the Internal Revenue Code's

United States District Court

For the Northern District of California

1  Subchapter K.  The Service determined that: (a) 2000-A is disregarded and that all

2  transactions engaged in by the purported partnership are treated as engaged in directly by

3  its partners: First Ship, Fourth Ship; and LMGA Holdings; (b) the European-style options

4  purportedly contributed to 2000-A and any gains or losses purportedly realized by 2000-A

5  on the options should be treated as having been realized by its purported partners: First

6  Ship, Fourth Ship; and LMGA Holdings; (c) the purported partners of 2000-A should be

7  treated as not being partners in 2000-A; and (d) contributions to 2000-A will be adjusted to

8  clearly reflect the partnership's or the purported partners' income.

9       Third, the Service determined that the obligations under the short option positions

10  (written options) transferred to 2000-A constituted liabilities for purposes of Treas. Reg.

11  § 1.752-6, the assumption of which by 2000-A should reduce First Ship's basis in 2000-A in

12  the amount of $314,885,516, but not below the fair market value of the purported

13  partnership interest.

14      Fourth, the Service determined that, even if the option positions were treated as

15  having been contributed to 2000-A, the amount treated as contributed by the partners

16  under IRC § 722 should be reduced by the amounts received by the contributing partners

17  from the contemporaneous sale of the short option positions to the same counter-party.

18  Thus, the Service determined, the basis of the contributed options should be reduced, both

19  in the hands of the contributing partners and 2000-A.  Consequently, the Service

20  disallowed any corresponding claimed increases in the outside basis in 2000-A resulting

21  from the contributions.

22      Fifth, the Service determined that the adjusted bases of the purchased options

23  purportedly contributed by the purported partners to 2000-A had not been established

24  under IRC § 723 in an amount greater than zero.

25      Sixth, the Service determined that the legal, accounting, consulting and/or advisory

26  fees paid by 2000-A or its partners, or both, in connection with the option transactions were

27  not allowable as deductions because they related to transactions that lack economic

28  substance, were prearranged and predetermined, and were without legitimate business

United States District Court

For the Northern District of California

1   purpose.  In addition, the Service determined that it had not been established that such

2   expenditures were incurred, and if incurred, were deductible under any provision of the

3   Internal Revenue Code, including but not limited to IRC §§ 162, 212, and 1011.  As a

4   result, the Service disallowed in full the deduction of $100,082 shown on 2000-A's

5   partnership return, and determined that fees of $4,308,787 were not includible in any

6   partner's basis in 2000-A.

7        Seventh, the Service determined that neither 2000-A nor its purported partners

8   entered into the option positions with a profit motive for purposes of IRC § 165(c)(2).

9        Eighth, the Service determined that the option positions constituted an arrangement

10  under IRC § 465(b)(4) to limit the exposure to risk of loss and that neither 2000-A nor its

11  purported partners established any other amounts considered to be at risk for purposes of

12  IRC § 465 that would allow the partners to deduct losses arising from or in connection with

13  2000-A.

14       Ninth, the Service determined that 2000-A and its purported partners lacked the

15  requisite profit intent and that their activities and any investment in the partnership lacked

16  the requisite economic substance in order to allow deductions arising from or related to

17  2000-A or its activities.

18       Tenth, the Service determined that the adjustments of partnership items of 2000-A

19  were attributable to a tax shelter for which no substantial authority has been established for

20  the position taken, and for which there was no showing of reasonable belief by the

21  partnership or its partners that the position taken was more likely than not the correct

22  treatment of the tax shelter and related transactions.  The Service also determined that all

23  of the underpayments of tax resulting from the adjustments of partnership items were

24  attributable to, at a minimum, (1) substantial understatements of income tax, (2) gross

25  valuation misstatement(s), or (3) negligence or disregarded rules or regulations.  The

26  Service determined that there had not been a showing by the partnership or its partners

27  that there was reasonable cause for any of the resulting underpayments, that the

28  partnership or its partners acted in good faith, or that any exceptions to the penalty apply.

39

United States District Court

For the Northern District of California

1   As a result, the Service determined that, at a minimum, the accuracy-related penalty

2   under IRC § 6662(a) applied to all underpayments of tax attributable to adjustments of the

3   partnership items of 2000-A.  The Service determined that the penalty should be imposed

4   on the components of underpayment as follows: (1) a 40% penalty on the portion of any

5   underpayment attributable to the gross valuation misstatement as provided by IRC

6   §§ 6662(a), 6662(b)(3),6662(e), and 6662(h); (2) a 20% penalty on the portion of the

7   underpayment attributable to negligence or disregard of rules or regulations as provided by

8   IRC §§ 6662(a), 6662(b)(1), and 6662(c); (3) a 20% penalty on the underpayment

9   attributable to the substantial understatement of income tax as provided by IRC §§ 6662(a),

10  6662(b)(2), and 6662(d); and (4) a 20% penalty on the underpayment attributable to the

11  substantial valuation misstatement as provided by IRC §§ 6662(a), 6662(b)(3), and

12  6662(e).

13          **2.    FPAA Issued to First Ship**

14          On June 19, 2008, the IRS issued an FPAA to First Ship, determining that

15  deductions for certain legal and professional fees claimed on First Ship's 2001 tax return

16  are disallowed and that an accuracy-related penalty applied to underpayments of tax

17  attributable to adjustments of partnership items of First Ship.  Stip. Ex. 10.  No FPAA was

18  issued to First Ship for taxable year 2000.

19          In the FPAA issued to First Ship, the Service disallowed legal and professional fees

20  of $1,353,739.  First, the Service determined that the deduction for legal and professional

21  fees was disallowed in full because they related to transactions that lack economic

22  substance, were prearranged and predetermined, and were without legitimate business

23  purpose. Additionally, the Service determined that it had not been established that the

24  expenditures were incurred, and if incurred, were deductible under any provision of the

25  Internal Revenue Code, including but not limited to IRC §§ 162 and 212.

26          Second, the Service determined that the adjustments of partnership items of First

27  Ship were attributable to a tax shelter for which no substantial authority had been

28  established for the position taken, and for which there was no showing of reasonable belief

40

United States District Court

For the Northern District of California

by the partnership or its partners that the position taken was more likely than not the correct treatment of the tax shelter and related transactions.  Additionally, the Service determined that all of the underpayments of tax resulting from the adjustments of partnership items were attributable to, at a minimum, (1) substantial understatements of income tax, or (2) negligence or disregarded rules or regulations.  The Service determined that there has not been a showing by the partnership or any of its partners that there was reasonable cause for any of the resulting underpayments, that the partnership or any of its partners acted in good faith, or that any exceptions to the penalty apply.

As a result, the Service determined that, at a minimum, the accuracy-related penalty under IRC § 6662(a) applied to all underpayments of tax attributable to adjustments of the partnership of First Ship. The Service determined that the penalty should be imposed on the components of underpayment as follows: (1) a 20% penalty on the portion of the underpayment attributable to negligence or disregard of rules or regulations as provided by IRC §§ 6662(a), 6662(b)(1), and 6662(c); and (2) a 20% penalty on the underpayment attributable to the substantial understatement of income tax as provided by IRC §§ 6662(a), 6662(b)(2), and 6662(d).

**K.    Expert Testimony**

On the issue of whether the transactions had economic substance, petitioners presented expert testimony by Dr. Rubinstein, and the government presented expert testimony by Dr. Steven Grenadier.  The relevant portions of the expert testimony presented at trial is discussed below.

On the issue whether penalties are applicable, petitioners offered the expert testimony of Stuart Smith.  Prior to trial, the government filed a motion to exclude Smith's testimony pursuant to FRE 702 on the ground that Smith's expert opinions impermissibly consist of legal conclusions, applying law to facts, thereby invading the province of the court.  By order dated July 8, 2011, the court denied the motion to exclude Smith's testimony, and held that to the extent that Smith's testimony purports to apply the law or offer legal conclusions, the court will disregard such testimony.  See Final Pretrial Order.

**II.  DISCUSSION**

**A.     Jurisdiction**

This matter is governed by the partnership-level procedures under the Tax Equity and Fiscal Responsibility Act of 1982 ("TEFRA"), see 26 U.S.C. §§ 6221–6234 (2000). Under section 6226(f), the court has jurisdiction "to determine all partnership items of the partnership for the partnership taxable year to which the notice of final partnership administrative adjustment relates, . . . and the applicability of any penalty, addition to tax, or additional amount which relates to an adjustment to a partnership item."  26 U.S.C. § 6226(f).

Petitioners seek redetermination of the adjustments in the FPAAs issued to 2000-A and to First Ship, and seek readjustment of partnership items for 2000-A for the taxable year 2000 and for First Ship for the taxable year 2001.  Petitioners seek readjustment of the tax, to allow petitioners to claim the losses and related deductions, on the following grounds: that the transactions at issue complied with the Internal Revenue Code because short options are not liabilities and do not decrease the partner's basis in the partnership under 26 U.S.C. § 752; that the transactions had economic substance; and that the tax effects of the transactions are not invalidated under the step-transaction doctrine, anti-abuse rules, or for lack of profit motive or bona fide loss under § 165.  Further, petitioners seek adjustment of the determination that penalties should apply on the ground that penalties should not be imposed because there was substantial authority for the tax positions taken and reasonable reliance on the advice of professionals.

The court has jurisdiction to determine de novo the partnership items of 2000-A and First Ship that were adjusted by the FPAAs.  See 26 U.S.C. § 6226(f).  Petitioners bear the burden of proving their entitlement to the claimed losses and deductions.  U.S. v. General Dynamics Corp., 481 U.S. 239, 245 (1987) (citing Helvering v. Taylor, 293 U.S. 507, 514 (1935)).

42

United States District Court

For the Northern District of California

**B.      2000-A Adjustment**

     **1.      Partnership's Assumption of Liability for Purposes of Section 752**

     Under federal tax law, a partnership itself is not subject to federal income tax.  26 U.S.C. § 701.  Rather, a partnership must file an annual information return (Form 1065) that reports its partners' distributive shares of income, gains, deductions, and credits.   Partners are responsible individually for reporting their share of tax on their own income tax returns. 26 U.S.C. § 702.

     Where a partnership acquires property, it has a basis in that property.  Each partner also has a basis in his or her own interest in the partnership.  The partnership's basis in its assets is referred to as "inside basis," whereas the partner's basis in his or her own partnership interest is referred to as "outside basis."  Kornman & Assoc. v. U.S., 527 F.3d 443, 456 n.12 (5th Cir. 2008).  Under the Internal Revenue Code, no gain or loss is recognized when a partner contributes property to a partnership in exchange for a partnership interest.  26 U.S.C. § 721(a).  The contributing partner's basis in the partnership interest, acquired by contribution of property, including money, to the partnership, is defined as "the amount of such money and the adjusted basis of such property to the contributing partner at the time of the contribution increased by the amount (if any) of gain recognized under section 721(b) to the contributing partner at such time." 26 U.S.C. § 722.

     Section 752 of the I.R.C. governs the change in basis that occurs when a partner's liabilities are either increased or decreased.[3]   Under § 723, when a partner contributes

------

     [3]      Section 752 provides in full as follows:

**§ 752.  Treatment of certain liabilities**

     **(a)      Increase in partner's liabilities.**  Any increase in a partner's share of the liabilities of a partnership, or any increase in a partner's individual liabilities by reason of the assumption by such partner of partnership liabilities, shall be considered as a contribution of money by such partner to the partnership.

     **(b)      Decrease in partner's liabilities.**  Any decrease in a partner's share of the liabilities of a partnership, or any decrease in a partner's individual liabilities by reason of the assumption by the partnership of such individual liabilities, shall be

property to a partnership, the partnership succeeds to the basis of the property in the contributing partner's hands.  When a partnership assumes a liability of a partner, the partner's basis in his partnership interest is (1) decreased by the amount of the liability, and (2) increased by the partner's share of the partnership liability resulting from such assumption.  26 U.S.C. §§ 722, 733(1), and 752(a) and (b).  See Kornman, 527 F.3d at 457.  On the subsequent satisfaction of the liability, the partner's basis in his partnership interest is decreased by the amount of the liability.  26 U.S.C. §§ 733(1), 752(b).

As demonstrated at trial, the Martin Family Trusts entered into a series of option contracts which included purchasing long options and selling short options.  The long options and the obligation on the short options were contributed to First Ship and then to 2000-A.  The parties dispute whether the obligation on the short options is treated as a partnership liability under Section 752 for purposes of calculating partnership basis.

The government contends that the obligation on the short options sold by the Martin Family Trusts should be treated as a liability for the purposes of Section 752, which would yield the following effects on First Ship's outside basis:

---

considered as a distribution of money to the partner by the partnership.
**(c)**   **Liability to which property is subject.**  For purposes of this section, a liability to which property is subject shall, to the extent of the fair market value of such property, be considered as a liability of the owner of the property.
**(d)**   **Sale or exchange of an interest.**  In the case of a sale or exchange of an interest in a partnership, liabilities shall be treated in the same manner as liabilities in connection with the sale or exchange of property not associated with partnerships.

26 U.S.C. § 752.

**United States District Court**
For the Northern District of California

| Date | Action | Description | Effect on First Ship's Basis | I.R.C. Provision |
|---|---|---|---|---|
| 11/27/2000 | Contribution of long options to 2000-A | Generates First Ship's outside basis | + 315.7 million | § 722 |
| 11/27/2000 | Assumption of liability for short options by 2000-A | Decreases First Ship's individual liabilities | - $314.8 million | § 752(b) |
| 11/27/2000 | Allocation of partnership liability among partners under § 752 regs. | Increases First Ship's share of partnership liabilities | + $314.8 million | § 752(a) |
| 12/21/2000 | Satisfaction of liability for short options by 2000-A, by closing out option position | Decreases First Ship's share of partnership liabilities | - $314.8 million | § 752(b) |

Petitioners agree that First Ship's basis in 2000-A was increased by the costs of its its long option position contributed to 2000-A, but contend that no adjustment to the basis for the short options position was required under 26 U.S.C. § 752, because the short option positions were contingent or speculative obligations and therefore not "liabilities." Petitioners rely on Helmer v. Comm'r, 34 T.C.M. 727 (1975), where the Tax Court held that a partnership's receipt of money pursuant to an option and the partnership's obligation to deliver property upon exercise of that option did not create a partnership liability under Section 752.  Adopting the position advocated by the IRS, the court determined there that the holder's claim to the property under the option was not a liability for purposes of Section 752, since the obligation of the partnership to credit the payments was contingent upon the option being exercised.  Helmer, 34 T.C.M. 727.  Petitioners also cite other decisions of the Tax Court and of the First and Fifth Circuits to support their position that the short options purchased by the 14 Martin Family Trusts and contributed to 2000-A did not create a partnership liability.  Ps' Post-Trial Prop. Findings ¶ 188 (citing Brountas v. Comm'r, 692 F.2d 152 (1st Cir. 1982); Gibson Prods. Co. v. U.S., 637 F.2d 1041 (5th Cir. 1981) (contingent obligations not "liabilities" under § 752); Long v. Comm'r, 71 T.C. 1 (1978)

United States District Court

For the Northern District of California

1  (contingent or contested obligations not "liabilities" for purposes of partnership basis); and

2  La Rue v. Comm'r, 90 T.C. 465, 479 (1988) (reserves for liabilities that cannot be

3  determined with reasonable accuracy were not "liabilities" included in basis pursuant to §

4  752)).

5      More recent appellate authority has rejected this application of Helmer to

6  transactions where the asset and liability were "inextricably intertwined," such as the long

7  and short options at issue here, because allowing the partner to consider the asset to

8  increase its outside basis, but not the offsetting liability to decrease its basis, "flies in the

9  face of reality." Kornman & Assoc. v. U.S., 527 F.3d 443, 461 (5th Cir. 2008). Kornman

10  distinguished Helmer on the ground that the partnership at issue there did not receive

11  assets giving rise to a partnership obligation. Id. See Marriott Int'l Resorts L.P. v. U.S.,

12  586 F.3d 962 (Fed. Cir. 2009) (per curiam) (affirming grant of summary judgment for the

13  government on ground that obligation to close a short sale qualified as liability under I.R.C.

14  § 752 where taxpayer treated contingent asset "asymmetrically" with respect to outside

15  basis); Cemco Investors LLC v. U.S., 515 F.3d 749, 751 (7th Cir. 2008) (declining to decide

16  whether Tax Court's decision in Helmer applied to long and short options transaction "for it

17  is not controlling in this court - or anywhere else").

18      The government characterizes the Martin Family Trusts' transaction as a Son-of-

19  BOSS tax shelter.[4]   Petitioners argue that the obligations under the short options assumed

20  _____

21      [4]      A Son–of–BOSS transaction is described as follows:

22              a variation of a slightly older alleged tax shelter known as BOSS, an acronym for
                "bond and options sales strategy." There are a number of different types of
23              Son–of–BOSS transactions, but what they all have in common is the transfer of
                assets encumbered by significant liabilities to a partnership, with the goal of
24              increasing basis in that partnership. The liabilities are usually obligations to buy
                securities and typically are not completely fixed at the time of transfer. This may
25              let the partnership treat the liabilities as uncertain, which may let the partnership
                ignore them in computing basis. If so, the result is that the partners will have a
26              basis in the partnership so great as to provide for large—but not
                out-of-pocket—losses on their individual tax returns . . . .
27

28  Kligfeld Holdings v. Comm'r, 128 T.C. 192, 194 (2007).

46

United States District Court

For the Northern District of California

by 2000-A were contingent because the options were exercisable on or before December

29, 2000, and would only be exercised if the aggregate value of the short term assets held

in the portfolio declined within the range of 81.2 to 90.5 percent.  Ps' Post-Trial Prop.

Findings ¶ 191.  The transaction was designed, however, as a putative "short term" hedging

strategy consisting of both the long and short options.  Ex. 30 at Priv Log 3576.  Here, the

long and short options were entered into on the same day, both sets of options were

contributed to the partnership, and simultaneously closed out.  The transactions here, as in

Jade Trading v. U.S., "'cannot be separated because they were totally dependent on one

another from an economic and pragmatic standpoint.'"  Jade Trading v. U.S., 598 F.3d

1372, 1378 (Fed. Cir. 2010) (quoting Jade Trading v. U.S., 80 Fed.Cl. 11 at *51 (2007)).

By characterizing the short options position as a purely contingent obligation, and therefore

not a liability to offset First Ship's basis in 2000-A, petitioners created an artificially high

basis by claiming a basis in the long options contributed to 2000-A but disregarding the

obligation on the short options which was assumed by 2000-A.  This inflated basis

generated a purported $315.7 million tax loss.  As other courts have determined with

respect to similarly structured transactions, the transaction at issue here is a Son-of-BOSS

tax shelter.  See American Boat Company, LLC v. U.S., 583 F.3d 471, 474 (7th Cir. 2009)

(the key characteristic of a Son-of-BOSS shelter is "the transfer to a partnership of assets

laden with significant liabilities" to achieve the goal of creating "a large, but not out-of-

pocket, loss on a partner's individual tax return").

Following the reasoning of Kornman, the court finds that the obligation on the short

options, contributed to 2000-A by First Ship, was a liability of the partnership pursuant to

Section 752, where the long options were purchased and contributed to the partnership at

the same time as the "inextricably intertwined" short options but were treated as an asset

that increased the basis.  527 F.3d at 456-61.  By application of Section 752, when the

liability for the short options was satisfied by 2000-A at the closing of the options positions

on December 21, 2000, First Ship's basis must be reduced by $314.8 million.  This results

in a net increase of $0.9 million in First Ship's partner basis.  By failing to treat the short

United States District Court

For the Northern District of California

1   options as a partnership liability, First Ship's outside basis (and accordingly, the Martin

2   Family Trusts' bases in their partnership interests in First Ship) was artificially inflated by

3   $314,885,515.96, equal to the amount of the premiums received on the short options,

4   which should have reduced the basis created by the premiums due on the long options.[5]

5        **2.   Economic Substance Doctrine**

6        Petitioners further challenge the adjustments under the economic substance

7   doctrine on the ground that petitioners had a business purpose in the options transactions

8   and the transactions had economic substance beyond creation of tax benefits.

9        Taxpayers may structure transactions in a manner that takes advantage of benefits

10   under the Internal Revenue Code to generate the most tax-advantageous results.  Avon

11   Prods., Inc. v. U.S., 97 F.3d 1435, 1443 (Fed. Cir. 1996) (that a transaction may have been

12   structured for tax purposes does not render it impermissible).  However, "transactions that

13   comply with the literal terms of the tax code but lack economic reality" are disregarded for

14   tax purposes.  Coltec Indus., Inc. v. U.S., 454 F.3d 1340, 1352 (Fed. Cir. 2006).

15        The economic substance doctrine requires "disregarding, for tax purposes,

16   transactions that comply with the literal terms of the tax code but lack economic reality."

17   Coltec, 454 F.3d at 1352.  In Coltec, the Federal Circuit explained that the doctrine

18   "represents a judicial effort to enforce the statutory purpose of the tax code."  Id. at 1353.

19   The doctrine, "[f]rom its inception, ... has been used to prevent taxpayers from subverting

20   _____

21        [5]     The parties further dispute whether Treasury Regulation § 1.752-6 may be
     applied retroactively to petitioners here.  Treas. Reg. § 1.752-6 was issued in temporary form
22   in 2003, and the final regulations, dated May 26, 2005, expanded the definition of "liability"
     under Section 752 to include "any fixed or contingent obligation to make payment."  See Treas.
23   Reg. § 1.752-1(a)(4)(ii), §1.752-6(a).   The regulation was given retroactive effect to
     transactions occurring between October 19, 1999 and June 24, 2003, requiring a partner to
24   reduce his basis in his partnership interest by the amount of any contingent obligation
     assumed by the partnership during that time.  As the Federal Circuit noted in Marriott, "[c]ourts
25   have struggled with the question whether the retroactivity provisions of Treasury Regulation
     § 1.752 are valid and enforceable."  586 F.3d at 977 n.21 (citations omitted).  The government
26   contends that Treas. Reg. § 1.752.6 is applicable to the November 2000 options transactions
     at issue here, citing evidence that petitioners were fully aware of IRS Notice 2000-44, whereas
27   petitioners challenge retroactive application of the regulations.  Having determined that the
     basis was properly adjusted under Section 752, the court need not reach the question whether
28   Treasury Regulation § 1.752-6 may be applied retroactively in this case.

United States District Court

For the Northern District of California

1  the legislative purpose of the tax code by engaging in transactions that are fictitious or lack

2  economic reality simply to reap a tax benefit."  Id. at 1353-54.

3      Under Ninth Circuit authority, the court considers two related factors to determine

4  whether a transaction has economic substance: (1) the subjective factor – whether the

5  taxpayer had a business purpose in engaging in the transaction; and (2) the objective factor

6  – whether the transaction had economic substance "beyond the creation of tax benefits."

7  Casebeer v. Comm'r, 909 F.2d 1360, 1363-65 (9th Cir. 1990) (citing Bail Bonds by Marvin

8  Nelson v. Comm'r, 820 F.2d 1543, 1549 (9th Cir. 1987)).  The consideration of business

9  purpose and economic substance is not a rigid two-step analysis, but the inquiries are

10  "'simply more precise factors to consider in the application of [the Ninth Circuit's] traditional

11  sham analysis; that is, whether the transaction had any practical economic effects other

12  than the creation of income tax losses.'"  Casebeer, 909 F.2d at 1363 (quoting Sochin v.

13  Comm'r, 843 F.2d 351, 354 (9th Cir. 1988)).

14          a.      Subjective Business Purpose

15      Under the subjective business purpose test, the court determines "whether the

16  taxpayers have shown that they had a business purpose for engaging in the transaction

17  other than tax avoidance."  Casebeer, 909 F.2d at 1363.  "'The business purpose factor

18  often involves an examination of the subjective factors which motivated a taxpayer to make

19  the transaction at issue.'"  Id. at 1364 (quoting Bail Bonds, 820 F.2d at 1549).

20      At trial, the Martin family members testified about the business purpose of the joint

21  investment transaction among the Martin Family Trusts, which was motivated by several

22  concerns.  First, the Martin family and the Martin Family Trusts, as shareholders of CPC,

23  were concerned with managing the ongoing potential exposure to excess CPC liabilities

24  under the Recontribution Agreement.  This Agreement increased the Martin Family Trusts'

25  need for asset conservation and a mechanism for bundling assets to ensure, to the

26  maximum extent possible, that each trust paid no more than its fair share of excess CPC

27  liabilities, including, in particular, potential liabilities from an attack on CPC's S corporation

28  status.

United States District Court

For the Northern District of California

The second concern was the need to reform the five 1988 trusts that held a large percentage of the Martin family assets in order to clarify terms regarding distribution to beneficiaries upon the death of one of them. The reformation process, which was a complicated and time consuming process requiring extensive analysis regarding potential beneficiary scenarios and the obtaining of a probate court order and an IRS private letter ruling, was not finally completed until 2005. The uncertain status of the five 1988 trusts required that the CPC distributions received by the trusts be prudently and conservatively reinvested in keeping with the divergent investment views of the Martin family members in the interim period while the five 1988 trusts were being reformed.

Third, the 14 Martin Family Trusts needed to reinvest their CPC proceeds and protect those investments, along with their previously invested non-S&P equity holdings including Liberty Media, Young Broadcasting, AT&T and TCI, from any downturn in the market.

Petitioners contend that the joint investment transaction, and the various partnerships within it, had a clear business purpose by giving the Martin family and the 14 Martin Family Trusts the ability to conserve and pool their assets in order to meet the potential demand for contributions toward future excess CPC liabilities, and also provided a flexible and asset-protective mechanism by which to prudently and conservatively invest the CPC cash distributions pending the reformation of the 1988 trusts at a time when the markets were extremely volatile. The stated business purpose of the overall joint investment transaction is not at issue here, however. The joint investment partnerships, or Parent LLCs, that were formed among the various Martin Family Trusts survived after the dissolution of 2000-A, when the assets were redistributed to the Parent LLCs. With respect to the 2000-A partnership at issue in the readjustment petition, petitioners contend that 2000-A had a legitimate business purpose, namely to hold assets that were expected to be sold in the short term. However, the documentary and testimonial evidence demonstrates that the series of transactions executed over a period of seven weeks was designed to generate a loss for each partner entity on the liquidation of 2000-A.

United States District Court

For the Northern District of California

1    The evidence at trial shows that the Martin family and Mr. Folger, trustee of the

2    Martin Family Trusts, are sophisticated people, each possessing a college-level or higher

3    education, and they have served on boards and/or worked in the professional fields of

4    journalism, television production, law, and business management.  In particular, Ms.

5    Tamkin, Ms. Candyce Martin and Mr. Martin testified with a strong understanding of

6    tax-related issues involving trust formation (and reformation), gift and estate tax, and the

7    complex tax risks and benefits of CPC's status as an S-Corporation under the IRC.

8    As informed by a letter from CPC to all shareholders, the Martin family understood

9    that the sale of CPC would result in significant taxable gain due to the taxable distribution to

10   CPC shareholders and the relatively low tax basis in CPC stock owned by the Martin family

11   members and the Martin Family Trusts.  See Ex. 155.  As early as February 2000, Mr.

12   Martin and Mr. Folger considered a strategy proposed by Arthur Andersen to buy and sell

13   calls to create "basis where there was none before."  Ex. 98.  Although the Arthur Andersen

14   proposal was rejected, the Martin family and Mr. Folger engaged the Sideman firm and

15   PWC to advise the Martin Family Trusts on other proposals with a similar basis-creating

16   feature.

17   At the September 20, 2000 presentation to the Martin family, PWC and the Sideman

18   firm presented a briefing memo to the Martin family and Mr. Folger which outlines the

19   structure of the proposed transaction at that time, which was later modified and approved.

20   Ex. 30.  The aspect of the proposal to use offsetting options and contribute the options to a

21   partnership to generate a high basis resulting in tax losses was explained in the family

22   briefing memo and remained part of the final transaction that was ultimately approved.  In

23   particular, the Martin family and Mr. Folger were informed about the tax ramifications and

24   the need to dispose of the 2000-A partnership prior to the close of the tax year in order to

25   generate the losses to offset their gains.  They were also informed of IRS Notice 2000-44,

26   which was released on August 13, 2000 and warned taxpayers that the IRS planned to

27   challenge transactions having the "same basis mechanics" as the one entered into by the

28   Martin Family Trusts.  The Martin family was advised that "[p]articularly in light of Notice

2000-44,[ ] the Martin family should assume not only that the IRS will identify this issue but will vigorously litigate rather than settle it[, and] should expect to incur significant litigation expenses in defending any capital loss resulting from the contemplated transaction." Ex. 30 at Priv Log 3577.

Roger Feusier testified that PWC prepared a spreadsheet projecting the rate of return required to generate cash in the event of a tax controversy:

| Rate of Return | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | 4 Year Projection | | | 5 Year Projection | | |
| | Taxpayer wins | Taxpayer loses | | | Taxpayer loses | | |
| | No Penalties | 0.0% No Penalties | 20.00% Penalties | 40.00% Penalties | 0.00% No Penalties | 20.00% Penalties | 40.00% Penalties |
| Tax to be paid back | 0 | 127,477,761 | | | | | |
| Interest and penalties | 0 | 55,095,889 | 90,261,904 | 125,427,919 | 72,241,647 | 110,709,337 | 149,177,026 |
| Estimated future liability | 0 | 182,573,650 | 217,739,665 | 252,905,681 | 199,719,409 | 238,187,098 | 276,654,787 |
| Cash available for Investment | 117,477,761 | 117,477,761 | 117,477,761 | 117,477,761 | 117,477,761 | 117,477,761 | 117,477,761 |
| Pre Tax Rate of Return required to generate required cash | 0.0000% | 13.8327% | 19.0010% | 23.2826% | 13.1881% | 17.2620% | 20.6454% |
| *** If the controversy period is shorter than 4 and 5 years, the rate of return required on investment would be significantly higher. | | | | | | | |

Exs. 30 at Priv Log 3622; 174.  This spreadsheet was attached to the family briefing memo and was presented to the Martin family.  Thus, the Martin family and Mr. Folger knew the potential risks and tax benefits of the transaction that they were considering.

United States District Court

For the Northern District of California

Though petitioners contend that the joint investment transaction had several non-tax business purposes, neither the Martin family nor Mr. Folger could explain how the offsetting options portion of the transaction through contributions to the 2000-A partnership could mitigate the concerns about exposure to potential liability under the CPC Recontribution Agreement or the unsettled reformation of the 1988 trusts.  The transaction at issue began on November 9, 2000, when the Martin Family Trusts converted their cash holdings into SPDRS, then purchased and sold long and short options.  The Martin Family Trusts then contributed their assets, including the long and short options at issue, to the parent LLC First Ship on November 17, 2000.  First Ship held those assets and liabilities until November 27, 2000, when it contributed to 2000-A all of its SPDRs ($88,368,347 FMV), its Young Broadcasting stock (FMV $11,033,828), and its long and short options ($315,781,658.59 - $314,885,515.96 = $896,142.64 net premium paid to JP Morgan), but retained its other stocks and holdings.  By December 29, 2000, 2000-A liquidated all its assets and distributed all its stock and cash back to its three partners, including First Ship.

In the five weeks that the 2000-A partnership held the assets of First Ship and its other partners, Fourth Ship and LMGA Holdings, it conducted the following transactions:

| | |
|---|---|
| 11/29/2000: | 2000-A sells the SPDRs at total $5.4 million loss. |
| 12/1/2000: | Using proceeds from the sale of SPDRs, 2000-A purchases S&P 500 securities |
| 12/21/2000: | 2000-A exercises all the options, resulting in a net profit of $3.9 million. |
| 12/26/2000: | 2000-A sells all its shares of Young Broadcasting at $562,300 gain. |
| 12/27/2000: | 2000-A sells the S&P 500 securities at $5.3 million loss. |
| 12/28/2000: | 2000-A is cancelled; distributes assets to its partners, including $97,960,224 to First Ship. |

Looking to the economic realities of the transaction, First Ship contributed assets, including the offsetting options, worth about $100,298,295 to the 2000-A partnership, and five weeks later, recovered $97,960,224 in the partner distribution upon 2000-A's

United States District Court

For the Northern District of California

1   dissolution.  Yet, First Ship claimed a short term capital loss of about $321 million, primarily

2   by claiming a partner basis of $315.7 million in the long options without deducting the

3   premiums for the short options.

4          The $315.7 million tax loss reported on the options transaction was not the result of

5   an actual economic loss, as petitioners were fully aware.  This artificial $315.7 million tax

6   loss was then used to offset the taxable gains from the sale of CPC.  By contributing First

7   Ship's assets to 2000-A, the Martin Family Trusts enabled 2000-A to sell the assets by the

8   end of the taxable period ending December 31, 2000, so that the non-economic loss

9   resulting from the partners' artificially inflated bases in their partnership interest of 2000-A

10  could be recognized for that period.  Thus, the loss-generating transaction, including the

11  Martin Family Trusts' purchase of SPDRs and the options positions, contribution to 2000-A

12  through First Ship, and liquidation of the 2000-A partnership,[6] did not further the joint

13  investment goal other than to generate an artificial tax basis and preserve capital through

14  non-payment of federal taxes.  The business explanations for engaging in the co-

15  investment strategy that continued after 2000-A's dissolution do not legitimize the tax

16  avoidance scheme achieved by conducting the series of steps involving purchase and sale

17  of SPDRs and S&P securities, offsetting options, contribution to the 2000-A partnership

18  through First Ship, and dissolution of the 2000-A partnership.  "Any anticipated benefit from

19  participating in [the 2000-A partnership] for a few weeks, and then quickly liquidating the

20  partnership before year's end is negligible in comparison to the [ ] tax benefit which would

21  not have been achieved but for this pre-determined course of action."  Sala v. U.S., 613

22  F.3d 1249, 1254 (10th Cir. 2010).  As a matter of "common-sense examination of the

23  evidence as a whole," the options transaction involving the 2000-A partnership generated

24

25          [6]       As petitioners' advisor, Mr. Pellervo, testified at trial, it was always assumed and
    understood that 2000-A would be sold or liquidated before the end of the year.  See Ex. 189
26  ("Assuming that . . . an exercise/termination of the options will not give us the loss we need,
    . . . [if 2000A is not sold this year,] the question is whether we liquidate 2000A this year or
27  defer a trigger until next year. . . . [I]f we conclude that IRS scrutiny of a loss carryback is
    unacceptable, then I think we need to liquidate 2000A this year, notwithstanding how awful that
28  looks.") (12/19/2000 email from E Ulhaq to D Pellervo and R Feusier).

United States District Court

For the Northern District of California

$3.9 million in net profit, which is an insignificant amount (about 1.2%) in relation to the tax benefits of the transaction.  Id.

The court finds that petitioners have failed to show that they had a business purpose for engaging in the options transaction other than tax avoidance.

### b.    Objective Economic Substance

Under the objective economic substance inquiry, the court determines whether the transaction had economic substance beyond the creation of tax benefits.  Casebeer, 909 F.2d at 1365 (citing Bail Bonds, 820 F.2d at 1549).  "The economic substance factor involves a broader examination of whether the substance of a transaction reflects its form, and whether from an objective standpoint the transaction was likely to produce economic benefits aside from a tax deduction."  Id. (quotation marks omitted).

In the transaction at issue, on November 9, 2000, $121,452,146 in cash held by the Martin Family Trusts and $1 million of cash retained by LMGA Holdings were invested in SPDRs, an investment unit that tracks the performance of the S&P 500.  At the same time, each of the Trusts executed a series of long and short options purportedly designed to hedge the investment risk of the Trusts' assets, including the various non-S&P stocks held by the Trusts: Liberty Media, Young Broadcasting, AT&T and TCI.  Much of the stock and SPDRs and all of the options were contributed to First Ship, then to 2000-A, except for the Liberty Media stock, TCI Satellite stock and KRON holdback retained by First Ship.  On November 28, 2000-A sold the SPDRs and purchased S&P 500 securities.  On December 21, 2000-A terminated the options contracts, yielding a positive payout to 2000-A of $3,921,483, net of transaction costs.  In the last week of December 2000, the stock holdings were sold and 2000-A was liquidated.  Thus, within a seven week period, the Martin Family Trusts ended up in almost the same position where they started: starting in cash and a portfolio of four individual stocks, and ending with cash (subject to loss on the sale of the SPDRs and the S&P 500 securities) and a stock portfolio of the same individual stocks except Young Broadcasting.

United States District Court
For the Northern District of California

1    The parties offered competing expert testimony about the potential for profit from the

2    transaction.  On behalf of petitioners, Dr. Rubinstein, whose background and expertise is

3    discussed above, testified that the options transactions were the proper transactions to

4    evaluate from an economic perspective, and that the options transactions had a reasonable

5    expectation of making a profit.  The government's expert, Dr. Grenadier, is currently the

6    chair of the Finance Department at Stanford University and received his undergraduate

7    degree in finance and economics at U.C. Berkeley and his PhD in financial economics at

8    Harvard University.  Dr. Grenadier opined that the series of transactions at issue lacked

9    objective economic substance because any gain in the options transactions would be offset

10   by a larger drop in the value of the underlying portfolio caused by downturn in the market.

11   At the core of the experts' dispute is the starting point of the analysis.  Dr.

12   Grenadier's analysis begins at the Martin Family Trusts' position of holding cash and

13   individual stocks before purchasing the SPDRs on November 9, 2000 (referred to by the

14   experts as "Portfolio A"), whereas Dr. Rubinstein begins his analysis with the assumption

15   that the Martin Family Trusts had already purchased the SPDRs ("Portfolio B"), to

16   determine whether the options transaction, which changed the Martin Family Trusts'

17   holdings to stocks and options ("Portfolio C"), had a business purpose.  In other words, the

18   experts disputed whether to assess the business purpose of the transaction beginning from

19   Step One or Step Two, as defined above.

20   The facts developed at trial demonstrate that the series of transactions at issue

21   began with the Martin Family Trusts' use of their cash holdings from the proceeds of the

22   CPC sale to purchase SPDRs on November 9, 2000.[7]  Dr. Grenadier offered several

23   reasons why the analysis of the Martin family's transaction should include the investment in

24   the SPDRs as well as the purchase and sale of options on the SPDRs and stock holdings

25   of the Martin family.  First, the purchase of SPDRs and the execution of the option

26   _____

27   [7]    Dr. Rubinstein testified that when he was hired by the Sideman firm in 2000 to
analyze the business purpose of the proposed options transactions, he was not aware of the

28   investment of cash in SPDRs and had assumed that there was an underlying equity portfolio
without any cash in it.

United States District Court

For the Northern District of California

1    contracts commenced at basically the same time and then terminated at basically the same

2    time.  Second, case documents show that these investments were intended to be entered

3    into simultaneously, such as the Ruble opinion letter which states that the purchase shall

4    be done concurrently.  Ex. 6.  Thus, Dr. Grenadier's economic substance analysis is the

5    analysis that the court finds more persuasive because it accounts for the movement from

6    Portfolio A to Portfolio B, whereas Dr. Rubinstein's analysis omits this important step of

7    moving from an all cash and stocks position to the position of holding stocks and SPDRs.

8                    **i.        No Reasonable Expectation of Profit**

9            The Martin Family Trusts' advisors described the transaction as a hedging strategy

10   which provided for the execution of a series of call and put options based on a notional

11   investment portfolio that mirrored the Trusts' actual aggregate investment portfolio.  The

12   putative purpose of this hedging strategy was for the Trusts to recover a portion of their

13   investment losses in the event the investments' value fell to certain specified levels in the

14   near term, and also to potentially profit if the investments' value rose.

15           Dr. Grenadier examined the potential profit from the entire transaction and

16   concluded that there was no reasonable expectation of earning a profit on the transaction

17   unless one assumed that the stock market would increase very sharply in the near term,

18   i.e., more than 14% in seven weeks, a highly unlikely possibility.  Dr. Grenadier considered

19   the combined payoff of the options portfolio and the S&P 500 portfolio, and concluded that

20   the entire transaction would lose money unless the market went up by 14% or more.

21           Dr. Rubinstein challenged Dr. Grenadier's conclusion that a 14% rise in the value of

22   the portfolio was required in order to earn an overall profit, on the ground that Dr. Grenadier

23   excluded the Liberty Media and other non-S&P equities held prior to November 2000.  If

24   these non-S&P stocks had been included in the analysis, Dr. Rubinstein calculated that

25   only a 4% rise in the value of the entire portfolio was required to achieve a profit overall,

26   even taking into consideration the cost of the options, and that this had a 41% chance of

27   happening, which he characterized as a significant chance of making a profit.  Tr.

28   1030:17-1031:18.  The court determines that the performance of the non-S&P stocks is not

**United States District Court**

For the Northern District of California

relevant to the analysis of the business purpose of the transaction at issue because the pre-existing stock holdings in Liberty Media, AT&T and TCI were not contributed to 2000-A and remained constant during the course of the transaction.  The court therefore finds Dr. Grenadier's opinion to be highly persuasive.

### ii.   Increased Exposure to Financial Risk

 Dr. Grenadier calculated the actual results during this time frame, based on the actual facts of this case, as follows:

a.    Stock prices fell between November 10 and December 29, 2000;

b.    Options terminated prior to expiration on December 21, 2000;

c.    S&P 500 investment liquidated on December 27, 2000;

d.    The Martin Family Trusts lost $10.8 million on the S&P investment;

e.    The Martin Family Trusts gained $3.9 million on the options;

f.    Overall, the Martin Family Trusts lost $6.9 million on the transaction.

As a result, Dr. Grenadier concluded that the transaction did not meet the Martin Family's stated objectives of reducing risk of the overall stock market and profiting from falling stock prices.

Having defined the transaction by the Martin Family Trusts as moving from a position of holding cash and four individual stocks, to the conversion of the cash into the S&P investment on November 9, the purchase and sale of options on November 10, and the ultimate termination of the options contracts on December 21 and sale of the S&P investment on December 27, Dr. Grenadier determined that this transaction actually increased risk from 22.9 percent to 24.40 percent.  Moreover, the options portfolio did not provide a form of insurance because it would not be reasonable to invest all the cash in the market, then purchase options against the market.  Dr. Grenadier compared the options purchase concurrent with the S&P investment to "buying fire insurance and a house that was on fire."  Dr. Grenadier demonstrated that no rational investor would have undertaken this transaction on the basis of risk-aversion because the transaction added risk, compared

United States District Court
For the Northern District of California

to the starting position of cash and stocks, and the transaction was expected to lose money.

### iii.    Transaction Was Expected to Lose Money

Dr. Grenadier showed that the transaction as a whole was expected to lose money if stock prices fell in the short term, as the Martin family and/or their advisors expected. Petitioners' maximum potential for economic gain on the offsetting options (before consideration of fees and expenses related to the entire transaction) was around $13.5 million, or about 4% of the non-economic tax losses they claimed.  However, the high-end of this profit potential for the options portfolio would occur only if the value of the underlying portfolio had decreased by around 15%.  Even in the unlikely event that the market dropped at the optimal rate of about 15%, the gain of $13.5 million on the options would be completely offset by a corresponding drop of over $30 million in the market value of the portfolio owned by petitioners.  If the market dropped at a rate of 4%, on the other hand, the options portfolio stood to lose about $8 million.  If the fees and expenses related to the transaction are factored in, the possibility of a gain becomes even more remote.  As the actual investment results demonstrate, even a modest gain in the options portfolio would be outweighed by the loss in the underlying portfolio: the options gained $3.9 million (after deducting fees), but the S&P 500 investment lost $10.8 million, for a net loss of $6.9 million.  Accordingly, this series of transactions was expected to lose money if stock prices fell.

Dr. Rubinstein testified that he does not dispute Dr. Grenadier's method or conclusion with respect to whether there was any business purpose in moving from an all cash and stock position to purchasing SPDRs and the offsetting options:

> And as I said in my report, I agree with Steven Grenadier that a careful analysis --which he did of A [cash and stock] to C [stock and options] suggests that to a reasonably -- if someone had done a good analysis, they would have seen there was no good business purpose in going from A to C in terms of risk aversion. And if I had done that analysis, I would have concluded that there was no business purpose in going from A to C.

Tr. 825-28 (quoting deposition testimony).  Assuming that the starting point of the

United States District Court

For the Northern District of California

1    transaction was the Martin Family Trusts' position of cash and stocks, the experts agree

2    that there was no business purpose to the transaction.  Dr. Rubinstein added that no

3    rational risk-averse investor would prefer portfolio C (the family's holdings of stock plus

4    options) to portfolio A (the family's initial holdings of cash and stock).

5        Petitioners further contend that at the time of the transactions, the market was

6    extremely volatile, and that no one could have predicted whether the market would have

7    gone up or down on any given day.  Petitioners point out that while the options were

8    obtained precisely for the purpose of insuring against a dramatic drop in the market, both

9    Professors Rubinstein and Grenadier testified that the Martin Family Trusts could have

10   yielded sizeable gains if the market had gone up.  Petitioners argue that the options would

11   only have been exercised if the aggregate value of the short term assets held in the

12   portfolio declined to between 81.2 and 90.5 percent, and that there was no way to

13   determine prior to the exercise date whether the aggregate value of the short term assets

14   would have declined to that range.  The record demonstrates, however, that petitioners and

15   their advisors expected the market to drop before the transaction was completed.  In

16   particular, Mr. Martin testified at deposition that JP Morgan expected the market to decline.

17       Further, the Ruble opinion letter states that the taxpayers entered into the options

18   transaction to offset market risks with respect to the underlying portfolio, reflecting "the view

19   that, in light of current market volatility, the aggregate value of trust assets most likely will

20   decline to between 81.2 and 90.5 percent."  Ex. 6 at US6475.  Dr. Rubinstein disagreed

21   with that statement because he could not have predicted how the market would act, but he

22   acknowledged an analysis conducted by JP Morgan in October 2000 comparing gain or

23   loss on the proposed options transaction to the gain or loss on the underlying portfolio.

24   See Ex. 319 at Priv Log 4691.  Dr. Rubinstein testified that the options portfolio would gain

25   when the market went down to 80% of its original level, up to the point where the market

26   reached 90%.  In the event of such a market downturn of 10 to 20 percent, only the options

27   portfolio would realize a gain whereas the underlying portfolio would lose significantly more.

28   Thus, the transaction would not result in a profit from falling stock prices, because the

United States District Court

For the Northern District of California

1    losses on the S&P investment wiped out any potential profit from the options.  Based on the

2    expectations of a market downturn at the time of engaging in the transaction, the

3    transaction was expected to lose money and did not provide petitioners with a reasonable

4    expectation of economic profit.

5                    **iv.    Option Portfolio Was Overpriced**

6           Dr. Grenadier concluded that the options were overpriced and that the Martin Family

7    Trusts overpaid JP Morgan by at least $5 million.  Specifically, Dr. Grenadier noted that the

8    Martin Family Trusts paid $0.9 million for the options, but opined that JP Morgan should

9    have paid the Martin family at least $4.5 million for the options transaction.  Dr. Rubinstein

10   challenged Dr. Grenadier's analysis on the ground that it was solely based on the Black-

11   Scholes method of pricing and failed to consider (1) jump risk associated with a sudden

12   change in the price or value of the option, (2) JP Morgan's fees, (3) the customized nature

13   of the options, and (4) a customary profit margin for JP Morgan, each of which would cause

14   the prices of options to be higher.  Dr. Grenadier acknowledged that jump risk would make

15   hedging more risky and would cause deviation from the Black-Scholes model, but noted

16   that to the extent that JP Morgan's potential exposure was increased by the jump risk, JP

17   Morgan overcharged the same amount, $5 million, for its various options proposals, even

18   for a proposal based on a $1 billion notional that was significantly larger in size than the

19   transaction that was approved.  Dr. Grenadier reasoned that if JP Morgan's fees were

20   adjusted to reflect the degree of exposure, the fees for the $1 billion proposal should have

21   been much larger than the $5 million amount that was charged for the proposals with

22   significantly less exposure.  This flat fee charged by JP Morgan did not reflect the economic

23   reality of the options transaction, suggesting that the fee was charged to create a

24   transaction, without a business purpose, in order to generate a tax benefit.

25          When reviewing the JP Morgan proposals in 2000, Dr. Rubinstein himself expressed

26   concern that the fees were too high, but testified that he was later satisfied that the fees

27   could be reasonable.  See Ex. 52 ("I was worried that $7M seemed a lot to pay.  They said

28   that the primary risk that JP Morgan faced in hedging themselves was the large Liberty

United States District Court

For the Northern District of California

1    Media stock component of the underlying portfolio, particularly around levels of 82 in the

2    portfolio.")  Dr. Rubinstein testified that he later accepted JP Morgan's explanation of the

3    fees, as taking on the risk for hedging this transaction, but did not verify JP Morgan's

4    statements about the reasonableness of the fees, noting that JP Morgan's hedging strategy

5    is their proprietary information.

6         The government has demonstrated that petitioners paid above-market, excessive

7    fees for the options, tending to suggest that the fees were not negotiated at arms-length but

8    were charged as a service fee, which tends to show that the transaction at issue lacks

9    economic substance.  The court finds that the transaction at issue did not have objective

10   economic substance based on the combination of factors discussed above: the absence of

11   a non-tax business purpose, lack of a reasonable expectation of profit, increased exposure

12   to financial risk by investing cash in the S&P 500 and buying/selling options, the expected

13   loss based on petitioners' downward market view, and the above-market fees charged for

14   the options transaction.

15        **3.    Section 165**

16        Title 26 U.S.C. Section 165 allows taxpayers to deduct losses incurred in any

17   transaction entered into for profit though not connected with a trade or business.  26 U.S.C.

18   § 165(a).  The accompanying regulation provides that "[o]nly a bona fide loss is deductible."

19   Treas. Reg. § 1.165-1(b).

20        Under Ninth Circuit authority, in order to deduct any loss resulting from the

21   transaction, petitioners must show that their primary motivation for entering into the

22   transaction was economic profit.  Landreth v. Comm'r, 859 F.2d 643, 645 (9th Cir. 1988)

23   ("'entered into for profit' under section 165(c)(2), [ ] has long been construed as imposing a

24   subjective standard requiring that the taxpayer's motive in entering the transaction be

25   'primarily for profit'") (quoting Helvering v. Nat'l Grocery Co., 304 U.S. 282, 289 n.5 (1938)).

26   As explained by the Tax Court in Fox v. Comm'r, 82 T.C. 1001, 1022 (1984):

27

28

United States District Court

For the Northern District of California

> By "primary", we mean "of first importance" or "principally." [Citations omitted.]  Profit motive refers to the desire for economic profit, independent of tax savings. [Citations omitted.]  Evaluating [a taxpayer's] motives is, of course, a factual inquiry.  The language of section 165(c)(2) speaks of the taxpayer's motive in "entering" a particular transaction and thus our main focus must be on the time petitioner initiated his transactions.  Nevertheless, all the circumstances surrounding petitioner's transactions, including the disposition of the [assets], are material to the question of petitioner's intent.

The Section 165(c)(2) issue is independent of the question of economic substance.  Keeler v. Comm'r, 243 F.3d 1212, 1220 (10th Cir. 2001).

Here, numerous factors evidence a lack of primary profit motive for the series of transactions in question.  First, as in Keeler, the losses were designed to offset petitioners' gain from the sale of the CPC stock.  Even if the transaction at issue was part of an overall profit-motivated investment strategy, the transactions themselves would have to be profit-motivated in order to be deductible under § 165(c).  See id.  With respect to the specific series of steps involved in the transaction at issue, put in the context of the entire investment program, the Martin Family Trusts started and ended with basically the same portfolio in a seven-week period during which time the Trusts used the cash from the sale of CPC to purchase SPDRs, engaged in offsetting options transactions, and contributed assets to, then dissolved, the 2000-A partnership.  As discussed above with respect to the economic substance doctrine, there was no reasonable expectation of profit and the series of S&P investments and options transactions netted a loss of $6.9 million.  Second, the tax savings from that series of transactions, over $321 million, was over 20 times the maximum economic profit ($13.5 million) that could have been made from the transactions.  Third, the sum that petitioners paid for the options ($896,142.64) represented only about .2% of the losses they sought from the transaction.  Fourth, petitioners shopped around for a tax shelter proposal for almost a year before settling on the transaction they ultimately implemented, and they completed the transaction in December before the end of the taxable year.

1     The evidence does not support petitioners' contention that the primary motives for

2 entering into the transaction were profit and other non-tax concerns and that tax saving was

3 not the primary motive for entering into the transaction.  Rather, the record demonstrates

4 that the $321 million loss from the set of transactions at issue was designed to offset the

5 large capital gain from the CPC sale.  Accordingly, any deduction for that loss would be

6 barred by the terms of § 165(a) and Treas. Reg.§ 1.165-1(b).

7     Because the court determines that the adjustment under the FPAA issued to 2000-A

8 was proper under Section 752, the economic substance doctrine, and Section 165, the

9 court declines to review petitioners' other challenges to the alternative bases on which the

10 IRS issued the FPAA: substance over form doctrine, step transaction doctrine, and anti-

11 abuse rules.

12 **C.    Out of Pocket Expenses**

13     Petitioners challenge the FPAAs issued to 2000-A and First Ship disallowing the

14 deduction for expenses attributable to petitioners' participation in the transaction at issue in

15 this case.  The court determines that the out-of-pocket expenses were properly disallowed.

16     Section 212 allows a deduction for all ordinary and necessary expenses paid or

17 incurred during the tax year (1) for the production or collection of income; (2) for the

18 management, conservation, or maintenance of property held for the production of income;

19 or (3) in connection with the determination, collection, or refund of any tax.  26 U.S.C.

20 § 212.  Further, Section 165 allows as a deduction for any loss in a transaction entered into

21 for profit, though not connected with a trade or business.

22     Generally, when a transaction is disregarded for lack of economic substance,

23 deductions for costs expended in furtherance of the transaction are prohibited.  Klamath

24 Strategic Investment Fund v. U.S., 568 F.3d 537, 549 (5th Cir. 2009).  See also Enrici v.

25 Comm'r, 813 F.2d 293, 296 (9th Cir. 1987).  Expenses are deductible under Section 212

26 only "if the facts and circumstances indicate that the taxpayer made them primarily in

27 furtherance of a bona fide profit objective independent of tax consequences."  Agro Science

28 Co. v. Comm'r, 934 F.2d 573, 576 (5th Cir. 1991) (citing 26 C.F.R. § 1.183-2(a)).

United States District Court
For the Northern District of California

1   Petitioners contend that the deduction by 2000-A on its year 2000 Form 1065 for

2   expenses of $4,308,787 and the deduction by First Ship on its year 2001 Form 1065 for

3   expenses of $1,353,736 representing fees related to the transactions are allowable under

4   26 U.S.C. §§ 165(c)(2) and 212 as the amounts in question were paid or incurred and

5   satisfy the requirements of these sections.  Because these fees reflect legal and

6   professional fees related to the transaction that the court has determined to lack economic

7   substance or primary profit motive, these expenses were properly disallowed.  "Section 212

8   was not designed to allow tax deductions based on mere preservation of net worth."

9   Zmuda v. Comm'r, 731 F.2d 1417, 1422 (9th Cir. 1984).

10  **D.    Penalties**

11  Section 6662 of the Internal Revenue Code imposes a variety of accuracy-related

12  penalties for tax underpayment.  As a general rule, when Section 6662 is applicable, the

13  taxpayer is penalized "an amount equal to 20 percent of the portion of the underpayment."

14  26 U.S.C. § 6662(a).  Examples of when the 20 percent penalty applies include taxpayer

15  negligence, § 6662(b)(1), and substantial valuation misstatements, § 6662(b)(3).  The 20

16  percent penalty is enhanced to 40 percent, however, in the case of gross valuation

17  misstatements.  § 6662(h)(1).  See Keller v. Comm'r, 556 F.3d 1056, 1059 (9th Cir. 2009).

18  There is no stacking of penalties, so the maximum penalty is either 20% or 40% of the

19  underpayment of tax, even if an underpayment is attributable to more than one type of

20  misconduct.  See Treas. Reg. § 1.6662-2(c).

21  During the audit of 2000-A, the IRS determined that four penalties apply to

22  petitioners' transaction: (1) a 40% penalty for a gross valuation misstatement (§ 6662(b)(3)

23  and (h)); (2) a 20% penalty for substantial valuation misstatement (§ 6662(b)(3)); (3) a 20%

24  penalty for substantial understatement of income tax (§ 6662(b)(2)); (4) a 20% penalty for

25  negligence or disregard of rules and regulations (§ 6662(b)(1)).  Petitioners contend that

26  imposition of penalties is inappropriate here.

27  The Ninth Circuit has adopted a restrictive view of the substantial and gross

28  valuation misstatement penalties under Sections 6662(b)(3) and (h) on the grounds that

United States District Court

For the Northern District of California

1   neither a substantial valuation nor gross valuation misstatement can occur when the

2   underlying transaction lacks economic substance because the tax underpayment that is

3   attributable to a valuation overstatement must be determined after making other proper

4   adjustments to tax liability.  Keller, 556 F.3d at 1060) (quoting Gainer v. Comm'r, 893 F.2d

5   225 (9th Cir.1990)).  Thus, under Gainer, when a deduction is disallowed in total, an

6   associated penalty for overvaluing an asset is precluded.

7          The parties do not dispute that the court has jurisdiction to consider the partnership's

8   defense against the imposition of penalties where the defense relates to the activity of the

9   manager or of a controlling partner rather than a partner-level defense that depends on

10  facts specific to a particular partner.  See American Boat, 583 F.3d at 480.  Because the

11  court has determined that the transaction at issue lacks economic substance, the penalties

12  are limited to 20 percent here under the substantial understatement or negligence penalty

13  provisions.  Keller, 556 F.3d at 1061 ("in this circuit we are constrained by Gainer").  The

14  court proceeds on the question whether application of the negligence penalty was

15  appropriate here.

16         **1.     Negligence**

17         Section 6662(a) and (b)(1) imposes an accuracy-related penalty of 20 percent on

18  any portion of an underpayment of tax attributable to negligence or disregard of rules or

19  regulations.  For purposes of Section 6662(b), the Code defines negligence as "any failure

20  to make a reasonable attempt to comply with the provisions of [the Code]," § 6662(c), and

21  requires the taxpayer to prove he acted with due care.  Hansen v. Comm'r., 471 F.3d 1021,

22  1028 (9th Cir. 2006) (citing Collins v. Comm'r, 857 F.2d 1383, 1386 (9th Cir.1988)).  Due

23  care is an objective standard by which the taxpayer must show that he acted as a

24  reasonable and prudent person would act under similar circumstances.  Treas. Reg.

25  § 1.6662-3(b)(1).  Negligence is "strongly indicated" when "[a] taxpayer fails to make a

26  reasonable attempt to ascertain the correctness of a deduction, credit or exclusion on a

27  return which would seem to a reasonable and prudent person to be 'too good to be true'

28  under the circumstances."  Hansen, 471 F.3d at 1029 (citing Treas. Reg. § 1.6662-3(b)(1),

United States District Court
For the Northern District of California

(b)(1)(ii).  The court considers both the underlying investment and the taxpayer's position

taken on the tax return in evaluating whether a taxpayer was negligent.  Id.

### a.    Reasonable Basis

A taxpayer is not liable for a negligence penalty where there is a reasonable basis

for the position taken.  Treas. Reg. § 1.6662–3(b)(1).  "Reasonable basis is a relatively high

standard of tax reporting, that is, significantly higher than not frivolous or not patently

improper. The reasonable basis standard is not satisfied by a return position that is merely

arguable or that is merely a colorable claim."  Treas. Reg. § 1.6662–3(b)(3).  Reasonable

basis requires reliance on legal authorities and not on opinions rendered by tax

professionals.  Id.; Treas. Reg. § 1.6662–4(d)(3)(iii).  The court may, however, examine the

authorities relied upon in a tax opinion to determine if a reasonable basis exists.  See

Treas. Reg. § 1.6662–4(d)(3)(iii).  "If a return position is reasonably based on one or more

of the authorities set forth in [the substantial authority standard for substantial

underpayment penalty] . . . the return position will generally satisfy the reasonable basis

standard even though it may not satisfy the substantial authority standard as defined in

§ 1.6662–4(d)(2)."  Treas. Reg. § 1.6662–3(b)(3).

The evidence developed at trial supports the assessment of the negligence penalty

against the 2000-A partnership.  Mr. Folger, as the trustee of the 14 Martin Family Trusts

and as president of LMGA Holdings, which was the managing partner of 2000-A, acted as

the decisionmaker on behalf of the 2000-A partnership after consulting with the members of

the Martin family.[8]  Petitioners contend that the negligence penalty does not apply because

there was a reasonable basis for their tax position and Mr. Folger made a reasonable

attempt to ascertain the correctness of the position.  Treas. Reg. § 1.6662-3(b)(1)(ii).  Mr.

Folger, a well-educated attorney with considerable business knowledge and experience,

should have known that the transaction was designed to generate an artificial capital loss to

_____

[8]    On January 22, 2001, Mr. Folger obtained an indemnification letter from the members of the Martin family concerning the purchase and sale of the securities market derivative contracts and related transactions.  Ex. 26.

offset the capital gains from the CPC sale.  As demonstrated by the evidence in the record,

PWC prepared spreadsheets for Mr. Folger and the Martin family showing that the losses

generated by the transaction could wipe out the entire capital gain from the sale of CPC.

Ex. 30 at Priv Log 3620.  However, the tax loss reported by 2000-A did not reflect the

economic reality of the actual transaction, which involved offsetting options costing a net

premium of $0.9 million, not a loss of $315.7 million as reported on the partnership return.

The fact that the actual cost of the options was only 0.29% of the reported increase in the

tax basis should have alerted Mr. Folger and the Martin family that the options transaction

was substantially overvalued and that the income taxes were therefore substantially

understated.  Mr. Folger and the Martin family, particularly Mr. Martin, a

highly-sophisticated and very successful businessman who had wide-ranging experience in

analyzing business and investment transactions, should have known that the transaction

was "too good to be true."  Acting with the consent and at the direction of the Martin family,

Mr. Folger failed to act as a reasonable and prudent person in filing the partnership return

reporting a total $321 million tax loss when the partnership did not suffer an economic loss

of that magnitude.

Petitioners argue that they acted reasonably by relying on the advice of experienced

tax professionals at PWC and the Sideman firm, both of which were compensated at their

normal hourly rates.  However, the mere act of seeking legal advice does not in and of itself

shield taxpayers from a negligence penalty.  See Treas. Reg. § 1.6664-4(b)(1).  The

discussions in the briefing memo and during the Martin family presentation by PWC and the

Sideman firm about the likelihood of an audit and litigation by the IRS, particularly in light of

the issuance of Notice 2000-44, should have alerted Mr. Folger and the Martin family

members that the "significant tax benefit in the form of a large capital loss" from the options

transaction was questionable.  These red flags were clear warnings that the proposed

transaction was likely improper, but Mr. Folger and the Martin family did not act as

reasonable, prudent taxpayers.  See Collins, 857 F.2d at 1386.  Here, the evidence tends

to show that Mr. Folger and the Martin family members not only stuck their heads in the

United States District Court

For the Northern District of California

1    sand in the face of these warnings about reporting the inflated capital loss, but took a

2    calculated risk of being challenged in court by the IRS after considering cost projections of

3    a tax controversy.  Ex. 30 at Priv Log 3622.  See Mortensen v. Comm'r, 440 F.3d 375, 385

4    (6th Cir. 2006).  Where the losses reported by the taxpayers did not reflect the economic

5    reality of the transaction and the resulting tax benefit was too good to be true, the

6    negligence penalty was appropriate here.

7                    **b.       Disregard of Rules or Regulations**

8           The penalty for "disregard" of rules or regulations includes any careless, reckless or

9    intentional disregard.  26 U.S.C. § 6662(c); Treas. Reg. § 1.6662-3(b).  The term "rules or

10   regulations" includes the provisions of the Internal Revenue Code, temporary or final

11   Treasury regulations issued under the Code, and revenue rulings or notices (other than

12   notices of proposed rulemaking) issued by the Internal Revenue Service and published in

13   the Internal Revenue Bulletin.  Treas. Reg. § 1.6662-3(b)(2).  A disregard of rules or

14   regulations is "careless" if the taxpayer does not exercise reasonable diligence to determine

15   the correctness of a return position that is contrary to the rule or regulation.  A disregard is

16   "reckless" if the taxpayer makes little or no effort to determine whether a rule or regulation

17   exists, under circumstances which demonstrate a substantial deviation from the standard of

18   conduct that a reasonable person would observe.  A disregard is "intentional" if the

19   taxpayer knows of the rule or regulation that is disregarded.  Nevertheless, a taxpayer who

20   takes a position contrary to a revenue ruling or notice has not disregarded the ruling or

21   notice if the contrary position "has a realistic possibility of being sustained on the merits."

22   Id.  In determining whether a realistic possibility of being sustained on its merits exists for

23   return positions, the regulations defining the realistic possibility standard refer to the same

24   list of authorities on which taxpayers may rely for substantial authority under the provisions

25   for substantial understatement penalty.  Treas. Reg. § 1.6694-2(b)(2) (citing Treas. Reg.

26   § 1.6662-4(d)(3)(iii)).  The "realistic possibility" standard is a lesser standard than

27   substantial authority.  See Joint Committee on Taxation, 106th Cong., Comparison of Joint

28

United States District Court

For the Northern District of California

1  Committee Staff and Treasury Recommendations Relating to Penalty and Interest

2  Provisions of the Internal Revenue Code (JCX-79-99) 13 (Nov. 5, 1999).

3       Petitioners contend that to the extent that Notice 2000-44 applied, the taxpayers'

4  position had a realistic possibility of being sustained on the merits because court opinions

5  such as Helmer, 34 T.C.M. 727 (holding that contingent obligations are not liabilities under

6  section 752) are entitled to greater deference than notices issued by the IRS.  Petitioners

7  argue that the taxpayers have not disregarded a rule or regulation under section 6662 and

8  that the penalty is therefore inapplicable.  Petitioners fail to acknowledge, however, the line

9  of authorities recognizing the long-standing economic substance doctrine which requires

10  disregarding, for tax purposes, transactions that comply with the literal terms of the tax

11  code but lack economic reality.  See Cemco, 515 F.3d at 752 (Treas. Reg. § 1.752–6

12  merely serves to "instantiate the pre-existing norm that transactions with no economic

13  substance don't reduce people's taxes") (citing Coltec, 454 F.3d 1340).

14       At a minimum, the record demonstrates that Mr. Folger and the Martin family

15  carelessly disregarded Notice-44, which was issued in August 2000 before the Martin

16  Family Trusts engaged in the transaction at issue, despite being warned by PWC and the

17  Sideman firm that "the IRS announced in Notice 2000-44 that transactions involving the

18  same basic mechanics as the instant one did not give rise to the intended capital loss."  Ex.

19  30 at Priv Log 3577.  Mr. Folger and the Martin family were advised that "Notice 2000-44

20  represents only the opinion of the IRS on this issue, and that opinion is not binding on the

21  courts."  Id.  Yet, Mr. Folger and the taxpayers were also advised of the high likelihood that

22  the IRS would "vigorously litigate rather than settle" the issue, giving rise to the inference

23  that Mr. Folger and the taxpayers were aware that it was not a realistic possibility that their

24  tax position would be sustained on the merits.  The "disregard" penalty was therefore

25  appropriately applied.

26       Petitioners also challenge the penalty assessed under the provision for substantial

27  understatement of income tax on the ground that there was "substantial authority"

28  supporting the understatement.  26 U.S.C. § 6662(d)(2)(B).  At trial, the government did

70

United States District Court

For the Northern District of California

1    not fully address the grounds for applying the substantial understatement penalty to

2    petitioners, and the court does not make any determination with respect to the substantial

3    understatement penalty here.  Having determined that petitioners failed to meet the

4    reasonable basis standard under the negligence penalty and the "realistic possibility"

5    standard under the penalty for disregard of rules or regulations, however, the court notes

6    that petitioners' challenge to the substantial understatement penalty would fail under the

7    more stringent standard for substantial authority.  See Treas. Reg. §§ 1.6662–3(b)(3),

8    1.6662-4(d)(2) ("[t]he substantial authority standard is less stringent than the more likely

9    than not standard (the standard that is met when there is a greater than 50–percent

10   likelihood of the position being upheld), but more stringent than the reasonable basis

11   standard").

12            **2.     Reasonable Cause and Good Faith Defense**

13            In challenging the negligence and substantial authority penalties, petitioners contend

14   that they demonstrated reasonable cause and good faith as an absolute defense to those

15   accuracy-related penalties.  Section 6664(c) provides that "[n]o penalty shall be imposed

16   under section 6662 . . . if it is shown [1] that there was a reasonable cause for [the

17   underpayment] and [2] that the taxpayer acted in good faith."  26 U.S.C.  § 6664(c)(1).  The

18   reasonable-cause-and-good-faith defense acknowledges that penalties are inappropriate

19   when a taxpayer underpays as a result of "an honest misunderstanding of fact or law that is

20   reasonable in light of all of the facts and circumstances."  Treas. Reg. § 1.6664-4(b)(1). The

21   taxpayer carries the burden of establishing the reasonable cause and good faith exception.

22   See 26 U.S.C. § 6662, 6664(c).  Generally, the most important factor is the extent of the

23   taxpayer's effort to assess the taxpayer's proper tax liability.  Treas. Reg. § 1.6664-4(b)(1).

24            Petitioners contend that they had reasonable cause and acted in good faith because

25   they reasonably relied on the advice of competent and independent professional advisors.

26   Reliance on professional advice constitutes reasonable cause and good faith if, under all

27   the circumstances, such reliance was reasonable and the taxpayer acted in good faith.

28   Treas. Reg. § 1.6664-4(b)(1).  However, mere reliance on the advice of a professional tax

United States District Court

For the Northern District of California

1   advisor "does not necessarily demonstrate reasonable cause and good faith."  Id.  A

2   taxpayer's claim of reliance upon professional advice as support for this defense is to be

3   evaluated under an objective standard.  "The reasonableness of any reliance turns on the

4   quality and objectivity of the advice."  Stobie Creek Investments LLC v. U.S., 608 F.3d

5   1366, 1381 (Fed. Cir. 2010).  Reasonable cause requires the taxpayer to show that the

6   advice was based on "all pertinent facts and circumstances and the law as it relates to

7   those facts and circumstances."  Treas. Reg. § 1.6664-4(c)(1)(i).

8           At trial, Mr. Folger and the Martin family members testified that they did not have the

9   expertise to fully understand how the transaction was structured and the tax ramifications

10  and that they relied on the advice of the Sideman firm and PWC, primarily on Mr. Sideman.

11  The evidence presented at trial tends to show that they relied on their tax attorney, Mr.

12  Sideman, to review all the advisory opinions and analyses and to make a recommendation

13  as to whether they should engage in the transaction.  The evidence also demonstrates that

14  Mr. Folger and the Martin family had negligible contact with either Dr. Rubinstein or Mr.

15  Ruble, on whom Mr. Sideman relied for an analysis of the business purpose and legality of

16  the transaction.  Mr. Folger testified that he did not understand the Ruble opinion letter  and

17  relied on Mr. Sideman "to say this was an authentic, valid transaction, and I satisfied myself

18  that he was answering that question."  Tr. 267:3-23.  While the record is clear that Mr.

19  Folger and the Martin family relied heavily on Mr. Sideman, the record is not clear as to the

20  extent that they relied directly on the advice of Dr. Rubinstein and Mr. Ruble, if at all.  It was

21  Mr. Sideman who appears to have relied on the advice of Dr. Rubinstein and Mr. Ruble in

22  advising Mr. Folger and the Martin family.

23          With regard to Dr. Rubinstein's economic advice, the record establishes that he was

24  given a very limited set of facts on which to conduct his analysis of whether the transaction

25  could have a business purpose.  As he testified at trial, Dr. Rubinstein limited his analysis

26  to whether the offsetting options portfolios could make a profit but did not take into account

27  the preexisting holdings of cash which were converted to SPDRs.  Dr. Rubinstein did not

28  know that petitioners started in a position of cash and was also instructed not to consider

United States District Court

For the Northern District of California

any tax consequences of the transaction.  Thus, any reliance on Dr. Rubinstein's advice would not be reasonable because his conclusions were not based on all pertinent facts and circumstances as required for reasonable cause.

With respect to the opinion letters issued by Mr. Ruble and the Brown & Wood firm, the evidence presented at trial demonstrates that the advice was similarly not based on "all pertinent facts and circumstances" and included unreasonable factual and legal assumptions.  The Brown & Wood opinion letters contained misstatements of fact and reached conclusions about the transaction that the Sideman firm and PWC, as well as the taxpayers, should have known could not be correct.  For instance, in the section of each opinion letter entitled "Investor Representations," Mr. Ruble states that the investor, being each of the Martin Family Trusts, dealt with First Ship and the other members at arms length, and that the investor reviewed the description of the transactions contained in the letter and verified that the description is accurate.  However, Mr. Folger testified that he had never communicated with or spoken to Mr. Ruble and that he did not remember reviewing the opinion letter or providing the investor representations, which would have been provided by the Sideman firm or PWC.  For his part, Mr. Martin testified that he never read the entire Ruble opinion letter and the record reflects that at one point he was willing to proceed with the earlier Arthur Andersen shelter transaction before receiving the Ruble opinion letter.  Ex. 101.

With respect to Ruble's statement that the transactions were motivated by non-tax reasons, Mr. Sideman, as well as the taxpayers, should have known that this statement was contrary to the purpose of the options transaction which was specifically to generate a large capital loss to offset the capital gains from the CPC sale.  Furthermore, they should have known that Ruble's factual assumption that the series of options transactions was a viable means of reducing market risks was unfounded because the transaction actually increased the Martin Family Trusts' risk of exposure to market fluctuations and offered no reasonable expectation of profit in the face of an expected market decline, as opined by Dr. Grenadier.

United States District Court

For the Northern District of California

1    There are other reasons why the Ruble opinion letter lacked "quality and objectivity,"

2  rendering reliance on his advice unreasonable.  See Klamath, 568 F.3d at 548 (citing

3  Swayze v. U.S., 785 F.2d 715, 719 (9th Cir. 1986)).  After being introduced by Arthur

4  Andersen, the Sideman firm hired Ruble in early 2000 to write an opinion letter for the

5  shelter transaction proposed by Arthur Andersen which counsel from the Sideman firm

6  described as one that "creates basis where there was none before."  Exs. 98, 100.  The

7  evidence shows that the Ruble opinion letter that was issued to the Martin Family Trusts

8  was based on a template opinion letter concerning foreign currency investments that had

9  been circulated earlier in the year with respect to the Arthur Andersen proposal.  In addition

10  to the boilerplate nature of the Ruble opinion letter provided to the Martin Family Trusts, the

11  opinion letter was rendered further unreliable after the IRS published Notice 2000-44, which

12  put Mr. Sideman and taxpayers on notice that transactions such as the one they

13  contemplated would be challenged as a sham transaction, particularly after PWC explained

14  that Notice 2000-44 covered "transactions involving the same basic mechanics as the

15  instant one."  Ex. 30.

16    For his part, Mr. Sideman understood that Mr. Folger and the Martin family relied on

17  him to "greenlight" or approve the transaction, but denied that he designed the transaction

18  with PWC and JP Morgan.  Tr. 149:10-20; 250:17-25.  Mr. Sideman communicated

19  primarily with Mr. Martin as the principal voice on behalf of the Martin family.  Tr. 134:16-25.

20  Mr. Sideman testified that he saw his role as that of overseeing the transaction "in a broad

21  way [and] hiring or engaging at my recommendation the most qualified people that I knew

22  who could provide the actual expertise about the transaction and about its financial

23  implications."  Tr. 152:19-25.  Mr. Sideman characterized himself as a tax controversy

24  lawyer, unfamiliar with economic judgments involving financial matters to advise the Martin

25  family directly on the issue whether the tax proposal by Arthur Andersen, and the

26  subsequent proposal by PWC, would have an economic reality or economic benefit.  Mr.

27  Sideman testified that he relied on the advice of PWC, Dr. Rubinstein and Mr. Ruble to

28  examine the business purpose of the proposed transaction.  Tr. 143:4-145:16.

United States District Court

For the Northern District of California

1    While the evidence at trial establishes that Mr. Folger and the Martin family relied on

2   Mr. Sideman's advice, the trial evidence lacks clarity as to exactly what advice Mr. Sideman

3   gave them, other than approving or "greenlighting" the transaction based on the advice he

4   received from the other professionals.  The weaknesses noted above in the Ruble and

5   Rubinstein opinions, as well as other aspects of the transaction, should have put at least

6   Mr. Sideman, if not the taxpayers, on notice that the transaction was a questionable tax

7   avoidance scheme lacking economic substance.  However, the question before the court is

8   not whether Mr. Sideman's reliance on professional advice was reasonable, but whether

9   Mr. Folger and the Martin family's reliance on Mr. Sideman's and the other professionals'

10   advice was reasonable.  As previously noted, it is not clear to what extent the taxpayers

11   themselves relied on any advice other than Mr. Sideman's.  Nor was it established that Mr.

12   Sideman ever specifically advised them that the transaction was bona fide or legal.  All the

13   evidence clearly establishes is that Mr. Sideman approved the transaction.

14    The government contends that Mr. Folger's and the Martin family's reliance on the

15   Sideman firm and PWC was unreasonable on the ground that those firms had an inherent

16   conflict of interest arising from their roles in promoting and implementing the transaction

17   and receiving fees.  The court is satisfied, however, that the Sideman firm and PWC did not

18   have a profit motive or other monetary interest in the outcome of the transaction because

19   those advisors were paid at an hourly rate to advise Mr. Folger and the Martin family,

20   regardless of whether they ultimately engaged in the transaction.  There was not, in the

21   court's view, a conflict of interest.

22    The government has not provided a clear argument or any authority for whether Mr.

23   Sideman's unreasonable reliance on the professionals he hired should be imputed to the

24   taxpayers.  This was a highly sophisticated transaction, one for which a taxpayer would

25   reasonably be expected to hire a tax lawyer.  The court is not prepared to find that having

26   retained a tax lawyer who "greenlights" a complicated transaction as having a business

27   purpose, a taxpayer necessarily acts unreasonably by relying on that advice.  See United

28   States v. Boyle, 469 U.S. 241, 250–51 (1985) (when an accountant or attorney advises a

taxpayer on a matter of tax law, it is reasonable for the taxpayer to rely on that advice, "even when such advice turned out to have been mistaken").  Even assuming, however, that the taxpayers acted reasonably in relying on their tax lawyer's advice to proceed with the transaction, to be entitled to the reasonable cause and good faith defense, the taxpayers must also prove that they acted in good faith.  Good faith is not synonymous with objective reasonableness.  Even if the concept of business purpose was too complicated for the taxpayers to assess and apprehend, the court finds that Mr. Folger and the Martin family have not demonstrated good faith under the circumstances and in light of the underlying purposes of entering into the transaction.

First, Mr. Folger and the Martin family should have known that the transaction resulting in a $315.7 million tax basis for a $0.9 million offsetting options transaction was "too good to be true."  Stobie Creek, 608 F.3d at 1383.  Furthermore, they knew that the purpose of the transaction was to boost the basis to generate a large capital loss to offset the capital gains from the CPC sale.  Finally, they proceeded with the transaction even after the issuance of Notice 2000-44, entitled "Tax Avoidance Using Artificially High Basis," which alerted them that the basis created by the options transaction would likely be disallowed.  Although they were advised by Mr. Sideman that the transaction had a legitimate business purpose, Mr. Folger and the Martin family entered into this transaction with the knowledge that it would generate an artificially high capital loss.  Given the level of education and business experience shared by Mr. Folger and the Martin family, they should have known that the absence of a tax liability on a sizeable capital gain did not reflect the economic reality of the transaction.  The underpayment of tax was not, therefore, the result of "an honest misunderstanding of fact or law."  Treas. Reg. § 1.6664-4(b)(1).  Because Mr. Folger, with the consent of the Martin family, did not act in good faith, the court finds that the accuracy-related penalty was appropriately applied here.

United States District Court
For the Northern District of California

76

United States District Court

For the Northern District of California

**CONCLUSION**

Based on the findings and conclusions set forth above, the court finds that the final partnership administrative adjustments setting forth adjustments to the 2000-A partnership tax return for the taxable year ending December 31, 2000, and the First Ship partnership tax return for the taxable year ending December 31, 2001, were proper.  The petitions in this consolidated action are hereby DENIED.

**IT IS SO ORDERED.**

Dated: October 6, 2011

_____
PHYLLIS J. HAMILTON
United States District Judge